IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Patricia Holmes,<br><br>Plaintiff,<br><br>v.<br><br>American Home Patient/Lincare,<br><br>Defendant. | :<br>:<br>:<br>:  Case 4:21-cv-01683-MWB<br>:<br>:<br>:<br>: |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, American Home Patient, Inc. ("AHOM") (incorrectly identified in the caption as American Home Patient/Lincare), submits the following Statement of Material Facts in support of its Motion for Summary Judgment.

1. Plaintiff, Patricia Holmes, worked as a customer service representative for AHOM from October 14, 2019, through July 14, 2020, in AHOM's State College location. (Holmes Tr. 15:18-20; 69:13-70:4)

2. On July 7, 2020, Plaintiff gave written notice by email that she was resigning from her employment and listed the reasons for her resignation in the email. (Holmes Tr. 15:21-17:5; 69:24-70:1; Holmes Dep. Exh. 4 at page 6)

3. Plaintiff's immediate supervisor was Timothy McCoy, the Center Manager. (Holmes Tr. 15:16-20) McCoy also managed the office in

Lewistown. (McCoy Tr. 6:5-9) McCoy's supervisor was Mark Cattron, Area Manager. (McCoy Tr. 12:24-13:18)

4. At all relevant times during Plaintiff's employment, AHOM had an employee handbook that included Anti-Discrimination/Anti-Harassment/Anti-Retaliation/ADA Policies. *See* Declaration of Lois Dodson (hereafter, "Dodson Decl.") at ¶ 12, Exh. 5 (policies effective 05/2019).

5. At all relevant times during Plaintiff's employment, AHOM's employee handbook also included a Policy Concerning Harassment that advises employees how to report concerns. (*Id.*)

6. Plaintiff received an electronic copy of the handbook, and she reviewed it. (Holmes Tr. 113:17-24)

7. AHOM employees receive training on the Anti-Discrimination/Anti-Harassment/Anti-Retaliation/ADA Policies and on the Policy Concerning Harassment. (Dunmire Tr.14:24-25:4; Eichelberger Tr. 4:7-10; McCoy Tr. 9:1-10:7)

8. All new employees receive training concerning the EEO and anti-harassment policies. The training covers sexual harassment and other forms of harassment and informs employees how to make an internal complaint. (Dodson Decl. at ¶ 14)

9. According to training records in Plaintiff's employee file, Plaintiff indicated that she reviewed the training video on AHOM's harassment policy. (Dodson Decl. at ¶ 15, Exh. 7)

10. AHOM offers benefit plans to employees. Benefit plan eligibility and benefit plan enrollment are explained in the handbook. (Dodson Decl at ¶13, Exh. 6)

11. An employee has 60 days from date of hire to enroll in a benefits plan or plans. Benefits are effective on the first day of the month after 60 days of employment. (Exh. 6 to Dodson Decl.)

12. Plaintiff did not sign up for benefits within her first 60 days of employment. (Holmes Tr. 114:11-126:127:1)

## INTERNAL COMPLAINT AND INVESTIGATION

13. Four months before she resigned, Plaintiff, who is Black, made an internal complaint of discrimination. On March 6, 2020 (a Friday), she called Cattron and reported that a White co-worker, Beverly Hibbert, had made a comment the day before that Plaintiff described as racist. (Holmes Tr. 184:2-185:16)

14. On the following Monday, March 9, 2020, Plaintiff contacted the Human Resources Department by phone that afternoon and was directed to Lois Dodson, Employee Relations Manager. (Dodson Decl. at ¶ 6)

15. Dodson handled the investigation into Plaintiff's internal complaint and interviewed her on March 9 about the events that had occurred on March 5, 2020. Dodson prepared notes of her interview with Plaintiff. (Dodson Decl. at 9, Exh. 2)

16. Dodson called Cattron after she spoke to Plaintiff and learned that Cattron already had reached out to Human Resources for assistance. (Dodson Decl. at ¶ 7)

17. Dodson subsequently interviewed other employees at the State College office, including Center Manager McCoy. (Exh. 2 to Dodson Decl.)

18. Plaintiff reported to Dodson that, on March 5, Hibbert had spelled out the N-word and then said the N-word aloud. After using the N-word, Hibbert later yelled "f--- you" to Plaintiff. (Exh. 2 to Dodson Decl.)

19. According to Plaintiff, Hibbert's outburst on March 5 arose during a discussion among McCoy, Hibbert and Plaintiff about politics that included references to then-President Trump and former President Obama. (Exh. 2 to Dodson Decl.) According to Dodson's notes, Plaintiff reported that the group discussion turned to derogatory terms, and there was discussion about what the "N" word meant. Someone made a statement that the word "Niger" "meant black people and characteristics of lower life." Plaintiff told Dodson that McCoy said the word did not mean that, that "Niger" meant black. (Exh. 2 to Dodson Decl.)

20. Plaintiff also reported to Dodson that Hibbert had remarked in the past that Hibbert's daughter was pregnant with a child whose father was Black and that Hibbert referred to the child as an "Oreo" baby. (Exh. 2 to Dodson Decl.)

21. Plaintiff reported that Hibbert ranted and used profanity with her and other employees in the office. (Exh. 2 to Dodson Decl.)

22. Plaintiff reported to Dodson that McCoy initiated conversations about politics, which Dodson described in her notes as "sidebar conversations." (Exh. 2 to Dodson Decl.)

23. Plaintiff told Dodson that McCoy had used the term "coonie" and had commented about how Jimmy the Greek had been fired as a sports commentator for saying that Blacks were bred to be better athletes. (Exh. 2 to Dodson Decl.)

24. Plaintiff also told Dodson about a remark that she said McCoy had made when Plaintiff was being "fit-tested" for respirator use, a requirement for AHOM employees. (Exh. 2 to Dodson Decl.)

25. Plaintiff reported to Dodson that McCoy had made a comment to the respiratory therapist, Haley Furrow, that he thought the situation was funny because a White person (*i.e.,* Furrow) was putting a white hood on a Black person (*i.e.*, Holmes) (Exh. 2 to Dodson Decl.)

26.  In a fit test, the AHOM respiratory therapist places a hood over the head of the employee wearing a face mask.  AHOM's respiratory therapist then sprays an aerosol under the hood to test the fit and effectiveness of the mask. (Haley (Furrow) Eichelberger Tr. 4:20-5:19)[1]

## DISCIPLINARY ACTION AFTER INVESTIGATION

27.  On March 9, 2020, AHOM issued a final written warning to Hibbert for using a racial slur and profanity toward Plaintiff on March 5, 2020. (Dodson Decl. at ¶ 8, Exh. 1)

28.  Dodson spoke to Furrow and employee Tammy Dunmire on March 13, 2020.  Dodson and Cattron spoke to Center Manager McCoy on March 16.  (Exh. 2 to Dodson Decl.)

29.  During the investigation, Dodson learned that Hibbert had placed tape over her mouth after she had received the final written warning.  On March 16, 2020, AHOM fired Hibbert.  (Dodson Decl. at ¶ 10, Exh. 3)

30.  On March 19, 2020, AHOM issued McCoy a written warning for violating the company's anti-harassment policy because he had failed to maintain the office in compliance with the policy. Dodson Decl. at ¶ 11, Exh. 4)

---

[1] Haley Furrow's last name has changed to Eichelberger because of marriage.

## PLAINTIFF'S DEPOSITION TESTIMONY
## <u>CONCERNING SEQUENCE OF EVENTS</u>

31. Plaintiff alleges in this case that she was subjected to racial slurs by Hibbert and McCoy. (Holmes Tr. 127:11-128:9, 168:14-19; Holmes Dep. Exh. 1)

32. Hibbert made the "Oreo" baby comment on October 15, 2019, which was Holmes' second day of employment. (Holmes Tr. 128:10-129:15) According to Holmes, other employees in the office heard the comment, including McCoy, who admonished Hibbert at the time. (Holmes Tr. 171:5-172:25)

33. The respiratory therapist at AHOM conducted Plaintiff's fit test on October 30, 2019. (Holmes Tr. 112:19-113:11; 171:14-172:3)

34. Plaintiff testified that McCoy had a conversation with her around Thanksgiving 2019 during which he said he had an uncle nicknamed "Coonie" because the uncle had dark skin.[2] Plaintiff testified that, during this same conversation, McCoy asked her whether she had ever heard the term "Black Jew." According to Plaintiff testimony, the comments that she alleges McCoy made at this time were the first he had made directly to her that referenced race. (Holmes Tr. 168:20-171:4)

---

[2] McCoy testified that he had a family picture album in his State College office for a period of time. One of the pictures in the album is of a relative with dark skin. McCoy testified that he told Plaintiff, in response to an inquiry, that the relative's nickname was Coonie. (McCoy Tr. 17:20-19:4)

35. Plaintiff testified that, on March 5, 2020, McCoy came out of his office during lunch hour and initiated a discussion about politics, which included discussion about then-President Trump and former President Obama. At some point, Plaintiff testified, McCoy asked her what she thought about the use of the N-word, and her response was that "no one should be using that word." (Holmes Tr. 173:1-176:7)

36. Plaintiff testified that McCoy then stated that some Black people use that word, to which she replied: "[N]o one should be using that word, it's an ugly work, it – you know, it's – it makes, you know, like people are beneath others." (Holmes Tr. 176:7-13)

37. According to Plaintiff, McCoy pulled out his cell phone to conduct a Google search of the term and showed the search results to her. Plaintiff testified that McCoy had searched the term "Niger," and she told him, "[T]hat's the country." (Holmes Tr. 176:14-177:10)

38. Hibbert then stood up from her desk and told Tim that he had spelled the word incorrectly, that the word with spelled with two "g's; Hibbert then looked at Plaintiff and said, "no offense, Patricia, but it's ------- [and yelled the N-word aloud]. (Holmes Tr. 177:12-25)

39. A co-worker urged Plaintiff to walk outside with her. When Plaintiff returned to the office, she ignored Hibbert, who then antagonized Plaintiff

about being upset about the comment Hibbert had made. Hibbert then yelled "f---you." Plaintiff started to leave, but McCoy directed her to stay and Hibbert decided to leave. Hibbert then returned, ranting, until McCoy told her to get out. (Holmes Tr. 178:7-179:19)

40. Plaintiff testified that, during the discussion on March 5, McCoy also had made the comment about Jimmy the Greek's firing and stated that he did not think Jimmy the Greek should have been reprimanded for the comment.[3] (Holmes Tr. 199:5-201:5)

41. Plaintiff testified that McCoy made no further statements to her referencing race after the March 5 incident. (Holmes Tr. 198:10-201:5)

**EVENTS AFTER INVESTIGATION OF COMPLAINT**

42. On March 23, 2020, Dodson sent an email to Plaintiff asking whether the situation at the State College office had calmed down. Plaintiff reported that "things are calm. No, there isn't anything additional to make you aware of. Thanks for inquiring." (Holmes Tr. 196:1-20; Holmes Dep. Exh. 4 at 11)

---

[3] https://en.wikipedia.org/wiki/Jimmy_Snyder_(sports_commentator)

43. Plaintiff alleges that between March 23, 2020 and July 7, 2020 (when she gave notice), McCoy denied her training and snatched papers out of her hands. (Holmes Tr. 196:22-197:18)

**ADDITIONAL ALLEGATIONS IN LAWSUIT**

44. Plaintiff alleges she was denied ability to sign up for benefits and never received notification that she could enroll. (Holmes Tr. 114:11-126:127:1) According to Plaintiff, she approached McCoy and asked for his assistance. (Holmes Tr. 116:13-19) On January 10, 2020, McCoy gave her contact information for the Benefits Department. (Holmes Tr. 117:2-25)

45. McCoy subsequently contacted Benefits on Plaintiff's behalf and learned that the enrollment period had expired and that Plaintiff could not sign up for benefits until her next open enrollment period. (Holmes Tr. 122:11-124:23)

46. Plaintiff alleges that she was denied overtime. Plaintiff testified that she worked overtime in November 2019 and that McCoy told her then that she could not work any more overtime. (Holmes Tr. 182:3-183:12) Plaintiff alleges that Hibbert and Tammy Dunmire received more overtime than she did. (Holmes Tr. 146:19-147:2)

47. There is no evidence of record that establishes how much overtime Plaintiff, Hibbert and Dunmire worked.

## OPERATIONAL MATTERS

48. Care Orchestrator is a software program made by Philips Respironics that tracks ventilator, CPAP and BiPaps data. (Eichelberger Tr. 30:20-22)

49. AHOM did not have or offer a specific training program for Care Orchestrator. Furrow assisted employees, including Plaintiff, on how to use the software as time permitted. (Eichelberger Tr. 31:11–32:16)

50. Parachute is an electronic platform for the ordering of durable medical equipment that was used by customer service representatives and the respiratory therapist. (Dunmire Tr. 24:14-7)

51. AHOM offered various on-line training programs for staff, including staff-wide training. (Dunmire Tr. 16:5-17:2) During training that included customer service representatives, the phone lines remained open, and the employee who was first able to answer the phone did so and missed portions of the training as a result. None of the CSR's – Hibbert, Dunmire and Plaintiff – were treated differently in this regard. (Dunmire Tr. 20:1-21:4)

52. AHOM employees are required to take an annual TB test. Plaintiff and Dunmire were charged for the test by the insurance carrier even though they should not have been. (Holmes Tr. 206:3-19; Dunmire Tr. 27:20-28:14)

## PLAINTIFF'S RESIGNATION

53. On July 7, 2020, Plaintiff sent a notice of resignation by email and addressed the email notice to Cattron and Dodson, with a "cc" to McCoy. (Holmes Tr. 15:21-17:5; Holmes Dep. Exh. 4 at page 6). In her notice, Plaintiff cited eleven reasons for her decision to resign:

- Hostility/ Bullying (paperwork snatched out of my hands twice this morning by center manager)

- Embarrassment during morning meetings spoke to condescendingly

- No insurance never received notice to sign up, I called benefits twice in January 2020 never received a call back, l can't afford my medicine, or needed doctor appointments

- In debt collections because of TB testing done for my employment 10/19/2019, I've been billed personally and paid but still sent to collections

- Being denied training for new programs such as Care Orchestrator, I was told I needed to answer phones

- Reprimanded for asking a question during Parachute Training 6/25/2020

- Orders that I'm working on is giving to Lewistown, (I stated that if I'm not afforded the opportunity to complete my work then I won't learn) and previously told, "if you don't like how the person(s) in Lewistown speak to you then do your own work"

- I've have told center manager since I started that work such as CPAPS, Overnight Pulse Ox are hoarded by other employees that has refused to let me help and train but I'm still held to the

  same accountability for that work not being done ... which leads to the embarrassment in morning meetings

- Previously told that the work I do is "menial"

- When Co-workers or myself would. try to address issues of the morale in the office we were told to, "I'm tired of your bitching; you need to be thick-skinned"

- Previous rude comments of racial/political nature .. I did speak with area manager and human resources regarding

  54. Plaintiff moved to Central Pennsylvania in 2017 from New Jersey and moved in with her then-boyfriend, Jeff Moore, who owned a house in Mill Hall, Pennsylvania.  (Holmes Tr. 44:22-46:19)

  55. In May 2020, Moore became involved with another woman while he and Plaintiff lived together.  (Moore Tr. 22:2-12; 30:15-20)

  56. On either July 3 or 4, 2020, Jeff Moore told Plaintiff that they were no longer going to be a couple and that she needed to move out of his house.  (Moore Tr. 14:15-18:5)

  57. Plaintiff told Haley Furrow that she was leaving her position at AHOM about two weeks before Plaintiff left (i.e., July 14, 2020).  At the time Plaintiff informed Furrow of her decision to resign, Plaintiff already had told Furrow that she suspected Moore was cheating on her.  (Eichelberger Tr. 52:8-53:19)

58. Plaintiff, now "homeless," moved back to New Jersey. (Holmes Tr. 48:16-49:12; Holmes Dep. Exh. 2, Response to Interrogatory 17)

        Respectfully submitted,

        CULHANE MEADOWS, PLLC

        */s/ Jo Bennett*
        Jo Bennett (Pa. ID No. 78333)
        40 W. Evergreen Ave. Suite 101
        Philadelphia, PA  19118
        Telephone: 215-880-0084
        Facsimile: 215-248-2381
        Email: jbennett@cm.law

        *Attorney for Defendant*

Dated:  February 18, 2023