**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

|                      |     |                          |
|----------------------|-----|--------------------------|
|                      | :   |                          |
| PATRICIA HOLMES,     | :   |                          |
|                      | :   |                          |
| Plaintiff,           | :   | Case No. 4:21-cv-01683-MWB |
|                      | :   |                          |
| v.                   | :   |                          |
|                      | :   |                          |
| AMERICAN HOME        | :   |                          |
| PATIENT/LINCARE,     | :   |                          |
|                      | :   |                          |
| Defendant.           | :   |                          |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Few words in the English language are so offensive and degrading to a person's

humanity, that they are socially unacceptable to speak or hear such that they are

routinely referenced solely by the first letter of the word.  The word "nigger" is

indisputably one of those words.

Many courts have ruled that "hearing the word 'nigger' at the workplace, as an

African American person is an inherently severe incident."  <u>Blandburg v.

Advanced Lighting and Electric, Inc.</u>, 2022 WL 17543024 *5 (D. NV, Sept. 28,

2022) (citations omitted).  "Perhaps no single act can more quickly alter the

conditions of employment and create an abusive working environment than the use

1

of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." Id., quoting Rodgers v. Western-Southern Life Ins. Co., 12 F. 3d 668, 675 (7th Cir. 1993).

Between October of 2018 and July of 2019, Patricia Holmes, was subjected to repeated racially derogatory slurs and epithets at work, including the "n-word." Holmes was the only black employee at the State College AHOM office.  Holmes' white supervisor, Tim McCoy, discussed and googled the n-word in her presence. McCoy's misspelling caused a co-worker to yell that the word is spelled N-I-G-G-E-R. (PSOF ¶¶ 25, 31, 71, 72, 80-84, and 106-107).  McCoy also showed Holmes a picture of a relative nick-named "Coonie."  (PSOF ¶¶ 72 and 73, see photo below, Plaintiff's Ex. 3).  McCoy told a co-worker to film Holmes' fit test, because he thought it was funny to see a white woman placing a white hood over a black woman's head. (PSOF ¶¶ 74, and 94-97, see photo below, Plaintiff's Ex. 11). McCoy said he agreed with Jimmy the Greek that black people were bred to be better athletes, that slave owners would match black slave men to the women so that they could produce a better slave. (PSOF ¶ 82).   McCoy also asked Holmes if she was aware of "black jews."  (PSOF ¶ 72).  A co-worker's bi-racial grandchild was referred to as an "Oreo Baby."  (PSOF ¶ 72).




"Coonie"                               Fit test with white hood

Holmes was treated differently and less favorably than her white co-workers.

For example, Holmes was unable to sign up for benefits, and she was also forced to

skip trainings to take phone calls, unlike white co-workers.  (PSOF ¶¶ 11, 44-47,

61-63, 77, and 78).  McCoy threatened that complaints to Human Resources would

have negative consequences.  (PSOF ¶¶ 76, 99, and 103).  Moreover, after Holmes

complained of the hostile work environment, she was treated with hostility,

animosity, and was reprimanded by McCoy.  (PSOF ¶¶ 41, 43, 65, 77, 79, 86-88,

91-92, 100, and 126).

Contrary to AHOM's contention, this case is not about McCoy lacking

"managerial skills."  ECF 23, p. 14.  Rather, this case is about blatant racial

discrimination, a hostile work environment soiled with racially degrading slurs and

epithets, and socially reprehensible conduct in the workplace.

AHOM failed to properly address Holmes' complaints.  AHOM had an anti-

discrimination, anti-harassment, and anti-retaliation policy, yet McCoy did not

3

understand or implement the policy.  Instead of taking responsibility for his

conduct, McCoy doubled down on his harassment and retaliation.  When Holmes

complained to AHOM about the discrimination and hostile work environment,

McCoy verbally reprimanded her and began to engage in physically aggressive and

insulting behavior which caused Holmes to feel that she could no longer tolerate

the toxic work environment.

## II. STATEMENT OF FACTS

Plaintiff incorporates by reference her Answer to Defendant's Statement of

Material Facts and Counter-Statement of Material Facts Precluding the Entry of

Summary Judgment ("PSOF").

## III.   ARGUMENT

### A. Legal Standard

"Granting summary judgment is an extraordinary remedy."  Oliver v.

Rhynart, 2019 WL 394358 *9 (E.D. Pa. Aug. 21, 2019).  The Oliver court

explained the role of the court when ruling on a summary judgment motion:

> In deciding a motion for summary judgment, the evidence of the
> nonmovant is to be believed, and all justifiable inferences are to
> be drawn in his favor.  The Court's task is not to resolve disputed
> issues of fact, but to determine whether there exist any factual
> issues to be tried.  Whenever a factual issue arises which cannot
> be resolved without a credibility determination, at this stage the
> Court must credit the nonmoving party's evidence over that
> presented by the moving party.

Id., (citations omitted).  The relevant legal standard used to address motions for

summary judgment has been explained as follows:

> Summary judgment may only be granted "if the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any, show that there is no genuine
> issue as to any material fact and that the moving party is entitled
> to a judgment as a matter of law." Fed. R. Civ. P. 56(c).
> Pursuant to Rule 56, the Court must enter summary
> judgment against the party "who fails to make a showing
> sufficient to establish the existence of an element essential to that
> party's case, and on which that party will bear the burden of
> proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106
> S. Ct. 2548, 91 L.Ed.2d 265 (1986).  A motion for summary
> judgment will not be defeated by the mere existence of some
> disputed facts, but will be defeated when there is a genuine issue
> of material fact. Anderson v. Liberty Lobby, 477 U.S. 242, 106
> S. Ct. 2505, 91 L. Ed. 2d 202 (1986).
>
> In evaluating the evidence, the Court must interpret facts in the
> light most favorable to the non-moving party, and draw all
> reasonable inferences in their favor. Watson v. Abington
> Twp., 478 F.3d 144, 147 (3d Cir. 2007).  Initially, the burden is
> on the moving party to demonstrate that the evidence in the
> record creates no genuine issue of material fact. Conoshenti v.
> Public Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004).
> The dispute is genuine if the evidence is such that a reasonable
> jury could return a verdict for the non-moving party. McGreevy
> v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005).  In determining
> whether the dispute is genuine, the court's function is not to
> weigh the evidence or to determine the truth of the matter, but
> only to determine whether the evidence of record is such that a
> reasonable jury could return a verdict for the non-moving
> party. Id. at 249, 106 S. Ct. 2505.

Estate of Creek v. Mittal Steel USA, Inc., 629 F. Supp. 2d 502, 504-5 (W.D. Pa.

2008).  Moreover, "the court must review the entire record, but in doing so must

take care to "disregard all evidence favorable to the moving party that the jury is not required to believe." Bonson v. Hanover Foods Corp., 451 F. Supp. 3d 345, 351 (M.D. Pa. 2020), quoting Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 150-51, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

**B. Racial discrimination**

"Section 1981 provides that 'all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts … as is enjoyed by white Citizens.'" Coleman v. Red Lion Controls, Inc., No. 1:20-cv-1163, 2022 WL 884270 *6 (M.D. Pa. March 24, 2022), quoting, 42 U.S.C. § 1981(a). Discrimination cases brought pursuant to 42 U.S.C. § 1981 are assessed using the same standard as Title VII of the Civil Rights Act of 1964. Castleberry v. STI Group, 863 F.3d 259, 263 (3d Cir. 2017); Newman v. Clouse Trucking, Inc., No. 1:16-cv-01993, 2018 WL 16351454 *3 (J. Brann) (M.D. Pa. April 5, 2018). "To establish a discrimination claim under § 1981, 'a plaintiff must show (1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981." Castleberry, 863 F. 3d at 266.

"If the plaintiff proves a prima facie case, the burden of production shifts to the employer to identify a 'legitimate nondiscriminatory reason' for its conduct." Coleman, 2022 WL 884270 at *6, quoting Fuentes v. Perskie, 32 F.3d 759, 763

(3d Cir. 1994).  Assuming the employer meets this relatively light burden, the

plaintiff must then show that the employer's stated reason is pretext.  <u>Coleman</u>,

2022 WL 884270 at *6.

Evidence of pretext sufficient to defeat summary judgment is evidence that

would allow the factfinder to "(1) disbelieve the employer's articulated legitimate

reasons; or (2) believe that an invidious discriminatory reason was 'more likely

than not a [motivating or] determinative cause' of the employer's action."  <u>Kochka</u>

<u>v. Allegheny Health Network</u>, 2023 WL 2216286 *6 (W.D. Pa. Feb. 24, 2023),

quoting, <u>Willis v. UPMC Children's Hosp. of Pittsburgh</u>, 808 F.3d 638, 644 (3d

Cir. 2015) (quoting <u>Fuentes</u>, 32 F.3d at 764).

> The plaintiff may call attention to "weaknesses, implausibilities,
> inconsistencies, incoherencies, or contradictions in the
> employer's proffered reasons."  See <u>Willis v. UPMC Children's</u>
> <u>Hosp. of Pittsburgh</u>, 808 F.3d 638, 644 (3d Cir. 2015) (quoting
> <u>Fuentes</u>, 32 F.3d at 764).  The plaintiff can also point to evidence
> that the employer previously discriminated against him;
> discriminated against others in the plaintiff's protected class, or
> treated others who were similarly situated, but not in plaintiff's
> protected class, more favorably than it treated the plaintiff.

<u>Coleman</u>, 2022 WL 884270 at *6.

Holmes is African American.  (PSOF ¶ 59).  The conduct of McCoy and

AHOM evince a discriminatory intent.  (PSOF ¶¶ 4, 7, 10, 18, 24-25, 31, 35, 40-

41, 44, 46, 51-53, 61-63, 65, 71-88, 91-92, 95-100, 103-108, 110-112, 115-118,

122-126, and 128-130).  AHOM discriminated against Holmes and treated her

differently and less favorably than her white co-workers.  (PSOF ¶¶ 44, 46, 51-53, 61-63, 65, 71-88, 91-92, 95-100, 103-108, 110-112, 115-118, 122-126, and 128-130).

Holmes has adduced evidence of pretext.  "Evidence used to establish a *prima facie* case of discrimination may also be relied upon to demonstrate pretext." Howard v. Blalock Elec. Service, 742 F. Supp. 2d 681, 701 (W.D. Pa. 2010). "Proof that an employer's explanation for an adverse employment action is unworthy of credence can be a powerful form of circumstantial evidence that is probative of intentional discrimination."  Id.  "Circumstantial evidence is not only sufficient to sustain a finding of liability for intentional discrimination, 'but may also be more certain, satisfying and persuasive than direct evidence.'"  Id.

To defeat a motion for summary judgment when the plaintiff must adduce evidence of pretext, "the plaintiff must point to some evidence … from which a fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Chase v. Frontier Communs. Corp., 361 F. Supp. 3d 423, 435 (M.D. Pa. 2019), quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

Under the first prong of the Fuentes test:

> [t]o discredit the employer's proffered reason, …the plaintiff
> cannot simply show that the employer's decision was wrong or

> mistaken since the factual dispute at issue is whether
> discriminatory animus motivated the employer, not whether the
> employer was wise, shrewd, prudent, or competent.  Rather, the
> non-moving plaintiff must demonstrate such weakness,
> implausibilities, inconsistencies, incoherencies, or contradictions
> in the employer's proffered legitimate reasons for its action that a
> reasonable fact-finder could rationally find them unworthy of
> credence, and hence infer that the employer did not act for the
> asserted non-discriminatory reasons.

Chase, 361 F. Supp. 3d at 440.

At the summary judgment stage, Plaintiff need not establish pretext by a preponderance of the evidence, but rather must simply point to sufficient evidence that raises a genuine issue of material fact.  Sheridan v. E.I DuPont de Nemours and Co., 100 F.3d 1061, 1067 (3d Cir. 1996) (en banc)).  "The plaintiff must submit evidence which…casts doubt upon the legitimate reasons proffered by the employer such that a fact-finder could reasonably conclude that the reasons were a fabrication."  Chase, 361 F. Supp. 3d at 440.  "Factors such as the defendant's credibility…could raise an inference of pretext which would make summary judgment for the employer inappropriate."  Faust v. Scranton Petro, No. 3: cv-06-0672, 2008 WL 906462, *8 (M.D. Pa. Mar.31, 2008), quoting Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638-39 (3d. Cir. 1993).

> In order to survive Defendant's motion for summary judgment
> on the retaliation claim, however, plaintiff need only
> demonstrate either that there is sufficient evidence to call into
> question the employer's proffered reasons for the adverse
> employment action, or, that there is sufficient evidence to
> allow a factfinder to conclude that retaliatory animus was more

> likely than not a motivating or determinative cause of the
> adverse employment decision.

Horton v. Amerway, Inc., No. 3:11-00112, 2013 WL 3802459, *10 (W.D. Pa. July

19, 2013).  "In evaluating claims of retaliation, 'timing and ongoing antagonism

have often been the basis for the causal link,' but plaintiffs may 'substantiate a

causal connection for purposes of a *prima facie* case through other types of

evidence.'"  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir.

2000).  "This evidence may include inconsistent reasons for termination, a pattern

of antagonism, temporal proximity between the events plus inconsistency in the

defendant's testimony, certain conduct toward others, and refusal to provide a

reference for the plaintiff."  Id. at 281.  "Essentially, there are no limits on what

[courts] have been willing to consider."  Id.

   "Under second prong of the Fuentes test, the plaintiff 'must identify

evidence in the summary judgment record that allows the fact-finder to infer that

discrimination was more likely than not a motivating or determinative cause' for

the discharge."  Tumpa v. 10C-PA-UC-RSM Enters., No. 2:17-cv-625, 2019 WL

202815, *10 (W. D. Pa. Jan. 15, 2019), quoting Keller v. Orix Credit Alliance,

Inc., 130 F.3d 1101, 1109 (3d Cir. 1997); Fuentes, 32 F.3d at 762.  "The plaintiff

can meet this burden by proving the employer either: (1) 'previously discriminated

against [him], (2) discriminated against other persons within [his] protected class

or another protected class, or (3) treated similarly situated individuals outside the

protected class more favorably than plaintiff." <u>Tumpa</u>, 2019 U.S. Dist. LEXIS 6898 at \*27, quoting <u>Simpson v. Kay Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 645 (3d Cir. 1998), citing <u>Fuentes</u>, 32 F.3d at 765.

Employers rarely admit the existence of invidious discrimination. Accordingly, treatment of other employees can be relevant and probative evidence in discrimination cases.  See <u>Johnson v. Fed. Express Corp.</u>, No. 1:12-cv-444, 2014 WL 805995, \*10, (M.D. Pa. February 28, 2014), citing <u>Becker v. ARCO Chem. Co.</u>, 207 F.3d 176, 194 n.8 (3d Cir. 2008).  Evidence of a defendant's prior discriminatory treatment of a plaintiff or other employees is relevant and admissible concerning whether the plaintiff's termination was motivated by invidious discrimination. <u>Abrams v. Lightolier Inc.</u>, 50 F. 3d 1204, 1214-15 (3d. Cir. 1995).

In addition to the facts establishing Plaintiff's prima facie case of invidious discrimination, Plaintiff has adduced ample evidence upon which a reasonable jury could find pretext.  (PSOF ¶¶ 61-63, 75-79, 84, 86-88, 91-92, 98-101, 103-106, 114-116, 123, 125-126, and 128-129).

**C. Hostile work environment**

To prevail on a hostile work environment claim under <u>§ 1981</u>, the plaintiff "must show that '1) the employee suffered intentional discrimination because of [her] race, 2) the discrimination was severe or pervasive, 3) the discrimination

detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability [meaning the employer is responsible].'"[1]  Coleman, 2022 WL 884270 at *4, quoting Mandel v. M &Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013).  The standard applied is whether the harassment was "severe or pervasive."  Castleberry, 863 F. 3d at 264.[2]  "[S]ome harassment may be severe enough to contaminate an environment even if not pervasive; other less objectionable, conduct will contaminate the workplace only if it is pervasive."  Id. (citations omitted).  "Whether the environment is hostile requires looking at the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with and employee's

---

[1] "An employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee."  Castleberry, 863 F. 3d at 268, n. 1 (quotation omitted).  (See PSOF paragraphs 13, 25, 31, 35, 40, 41, 43, 53, 56, 65, 71-77, 80-82, 86-88, 91-93, 95-97, 99-100, 193-104, 107-108, 110, and 118 for evidence adduced establishing McCoy's actions.).  "When the hostile work environment is created by a victim's non-supervisory co-workers, the employer is not automatically 'liable."  "But employer liability for non-supervisory coworker may exist 'if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action.'"  In other words, an employer may be liable for the harassment inflicted by non-supervisory coworkers 'if the employer was negligent in … responding to a report of such harassment."  Newman, 2018 WL 16351454 at *5 (citations omitted).  (See PSOF paragraphs 7, 31, 35, 41, 43, 53, 56, 65, 71-77, 80-84, 86-88, 99, 111-112, 122-127, and 129-130 for evidence adduced establishing vicarious liability).

[2] Defendant relies on the case of Greer v. Mondelez Global, Inc., 590 Fed. Appx, 170 (3d. Cir. 2014) as setting the standard of severe or pervasive conduct sufficient to establish a hostile work environment.  Greer, and the other cases cited by Defendant were all decided before the Third Circuit clarified the correct legal standard in Castleberry in 2017.

work performance.'"  Id., quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).

"Proffering sufficient evidence to meet each element of a hostile work environment claim generally precludes summary judgment in the defendant's favor and permits the plaintiff to proceed to trial.  Lockhart v. Energy Transfer Partners LP, 2022 WL 455183 *10 (W.D. Pa. Sept. 29, 2022), citing Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 280-81(3d Cir. 2001).  "The individual discriminatory incidents are not to be parsed out; rather, they are to be considered 'as a whole … to determine whether the acts that collectively form the continuing violation are severe or pervasive."  Newman, 2018 WL 16351454 at *4. (Summary judgment denied where plaintiff proffered evidence of use of the word "nigger" in the workplace, among other racially charged comments, such as jokes invoking African American stereotypes such as "eating watermelons" and "chicken.").

In Castleberry, this Honorable Court originally dismissed the Plaintiff's complaint pursuant to Rule 12(b)(6).  863 F.3d at 262-63.  The Third Circuit reversed and remanded the case to this Honorable Court.  Id. at 262.  The Castleberry court explained that:

> Under the correct "severe or pervasive" standard, the parties dispute whether the supervisor's **single use of the "n-word" is adequately "severe" and if one isolated incident is sufficient to state a claim** under that standard.  Although the resolution of

13

> that question is context-specific, it is clear that one such instance
> can suffice to state a claim.

Id. at 264 (emphasis added).  Under the Castleberry standard, "a single incident

can be found to be 'severe' if it is extreme enough to alter the victim's conditions

of employment."  Bonson, 451 F. Supp. 3d at 355 (citation omitted).

"Additionally, less objectionable conduct can be considered 'pervasive' even if not

severe, so long as it permeates the workplace in a way which alters the employee's

conditions of employment."  Id.

In Castleberry, the plaintiffs "alleged that their supervisor used a racially

charged slur in front of them and their non-African-American coworkers."  Id. at

265.  The Court rebuffed the defendants' attempts to minimize the impact of the

use of the "n-word."  Id.  "Perhaps no single act can more quickly alter conditions

of employment and create an abusive working environment than the use of an

unambiguously racial epithet such as the 'n-word" by a supervisor in the presence

of his subordinates … that impacts the work environment severely."  Id. (quotation

omitted).

In Kengerski v. Harper, 6 F. 4th 531, 539 (3d Cir. 2021), the Third Circuit

reversed and remanded the case to the trial court following entry of summary

judgment.  The employer addressed the employee's relative as a "monkey."  The

court noted that describing an African American as a "monkey is degrading and

humiliating in the extreme."  Id. at 540.  "The term 'porch monkey' was 'about as

odious' as the use of the "n-word."'  <u>Id</u>.  "When faced with a single use of a racial epithet by a supervisor, we rejected the District Court's conclusion that 'it was unreasonable for Plaintiffs to believe that a single incident of a discriminatory remark … could amount to unlawful activity.'"  <u>Id</u>.

In hostile work environment claims, "the harassment itself constitutes the 'adverse employment action.'"  <u>Robinson v. Consol Pennsylvania Coal Co. LLC</u>, 425 F. Supp. 3d 433, 445-46 (W.D. Pa. 2019).  Therefore, there is no need to assess the constructive discharge criteria with respect to this claim.

Holmes has indisputably adduced evidence establishing her hostile work environment claim.  Holmes clearly suffered intentional discrimination because of her race in the form of racial slurs and epithets.  (PSOF ¶¶ 24, 29, 31, 35, 40, 41, 43, 59, 69-77, 80-88, 92, 94-97, 103, 106-107, 110, 118, 121, 123, and 126).  The discrimination that was perpetrated against Holmes was nothing short of severe or pervasive.  (PSOF ¶¶ 10, 13, 24, 25, 29, 31, 35, 40, 41, 43, 46, 51-53, 59, 69-77, 80-88, 92, 94-97, 103, 106-107, 110, 118, 121, 123, and 126).  The discrimination she endured detrimentally affected Holmes.  (PSOF ¶¶ 19, 41, 43, 52-53, 56, 65, 67-68, 75-76, 80, 83-88, 92, 100, 118, and 126-127).  The discrimination Holmes endured would certainly detrimentally affect any reasonable person.  (PSOF ¶¶ 41, 43, 52-53, 56, 63, 65, 67, 72-77, 80, 84, 86-88, 92, 96-97, 99, 103, 107, 115-118, 123, and 126).  The hostile work environment was caused by the illegal conduct

and violation of AHOM policies by McCoy, the office manager. (PSOF ¶¶ 4, 13, 24, 31, 35, 40-41, 43, 53, 60, 65, 71-77, 80-82, 84, 86-88, 91-92, 96-97, 99, 103-104, 107, 108, 110, 115-118, 122, and 125-126). Additionally, AHOM failed to properly and adequately address the reported racial harassment perpetrated by Holmes' co-worker, Hibbert. (PSOF ¶¶ 7, 13, 31, 35, 41, 43, 53, 65, 71-72, 75-77, 81, 83-88, 91-92, 99, 103-105, 107-108, 112, 117-118, and 122-127).

### D. Retaliation

A retaliation claim under § 1981 is established by showing that "(1) [the employee] engaged in protected activity…; (2) the employer took an adverse employment action against [her]; and (3) there was a causal connection between [her] participation in the protected activity and the adverse employment action." Castleberry, 863 F.3d at 267. "The plaintiff 'must demonstrate that there had been an underlying section 1981 violation.'" Id. (quotation omitted). "In doing so, the plaintiff 'must have acted under a good faith, reasonable belief that a violation exited." Id., citing Daniels v. Sc. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015).

"Protected activity" … "extends beyond formal complaints … and can include 'informal protests of discriminatory employment practices, such as making complaints to management…." Bonson, 451 F. Supp. 3d at 357. "As the Supreme Court has recognized, 'when an employee communicates to his employer a belief that the employer has engaged in … a form of employment discrimination, that

communication virtually always constitutes the employee's opposition to the activity.'" Id., quoting Crawford v. Metro Gov't of Nashville and Davidson County, Tenn., 555 U.S. 271, 276, 129 S. Ct. 846, 172 L. Ed. 2d 650 (2009).

With respect to the issue of causation, "where temporal proximity between the protected activity and adverse action is 'unusually suggestive,' timing alone can be sufficient to establish a prima facie case of retaliation." Bonson, 451 F. Supp. 3d at 358, citing LeBoon v. Lancaster Jewish Community Center Ass'n, 503 F.3d 217, 231 (3d Cir. 2007). "In cases in which the temporal proximity is not unusually suggestive, 'we ask whether the proffered evidence, looked at as a whole, may suffice to raise the inference.'" Id. (citations omitted).

"In evaluating claims of retaliation, 'timing and ongoing antagonism have often been the basis for the causal link,' but plaintiffs may 'substantiate a causal connection for purposes of a *prima facie* case through other types of evidence.'" Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000). "This evidence may include inconsistent reasons for termination, a pattern of antagonism, temporal proximity between the events plus inconsistency in the defendant's testimony, certain conduct toward others, and refusal to provide a reference for the plaintiff." Id. at 281. "Essentially, there are no limits on what [courts] have been willing to consider." Id.

17

Holmes has adduced evidence supporting her retaliation claim.  There is no dispute that Holmes engaged in protected activity when she complained about the discrimination and hostile work environment at AHOM.  (PSOF ¶¶ 13, 18, 41, 43, 75-76, 84, 80, 84-88, 92, 116, 122, 126-127, and 130).  McCoy engaged in an adverse employment action against Holmes after she complained about the incidents at work.  (PSOF ¶¶ 75-77, 79, 86-88, 91-93, 99-100, and 126).  McCoy then repeatedly showed animosity toward Holmes resulting in her constructive discharge.  (PSOF ¶¶ 65, 75-77, 86-88, 91-93, 99-100, and 125-126).  Evidence of the timing and ongoing animosity exhibited by McCoy establishes a causal connection between Holmes' complaints, her subsequent reprimand, and her constructive discharge.  (PSOF ¶¶ 13, 41, 43, 53, 56, 65, 68, 75-77, 79, 86-88, 91-93, 99-100, 126; and Plaintiff's Ex. 12).

### E. A jury can reasonably decide that AHOM's response to the harassment and retaliation was negligent and inadequate.

AHOM's investigation following Holmes' complaints in March of 2019 was negligent for several reasons.  First, Dodson and Cattron learned that McCoy claimed he did not understand his responsibilities in accordance with AHOM's anti-discrimination, anti-harassment, and anti-retaliation policy, yet no retraining occurred.  (PSOF ¶¶ 108, 125 and 129).  AHOM did not immediately take any action towards McCoy.  No action was taken until the day that Hibbert was ultimately fired for placing tape on her mouth.  (Plaintiff's Ex. 12, pp.

AHOM0345-354).  AHOM did not discipline Hibbert for using racial epithets, she was disciplined for swearing.  (PSOF ¶ 123).  AHOM's warning to McCoy made no reference to McCoy's reprimand of Holmes.  (PSOF ¶¶ 86-88, 92; Plaintiff's Ex. 2 and 12, pp. AHOM0353-354). Despite learning from several sources that McCoy had made it known that he would not respond well to employee complaints about his office, AHOM took no action to ensure that McCoy understood that his attitude and intentions were incompatible with AHOM/Lincare policies.  (PSOF ¶¶ 92, 99, 124, 126, and Plaintiff's Ex. 12, pp. AHOM0353-354).  AHOM did not advise anyone that McCoy had received any consequence or that it would address McCoy's statements that reflect that he would retaliate against anyone who complained to Human Resources.  (PSOF ¶¶ 105).

After Hibbert was fired, McCoy's conduct did not change.  (PSOF ¶¶ 104). McCoy's questions to Holmes about whether she was out to get someone fired could easily cause an employee to refrain from reporting discrimination, harassment, and/or retaliation.  (PSOF ¶¶ 126).  When Holmes gave the reasons for her resignation, AHOM not only did nothing, it deviated from its standard practice of conducting exit interviews with departing employees.  (PSOF ¶ 113-114, and 128).   In fact, McCoy's hostility and animus escalated such that Holmes became afraid of what McCoy might do next.  The work environment was simply unbearable.  (PSOF ¶¶ 65, 75-77, 91-92, 100, and 103).

### F.  Constructive Discharge.

"To succeed on a constructive discharge claim, [the plaintiff] must show that [the employer] knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subjected to them would resign." Hancock v. Sleepy's LLC, 2009 WL 347465 *8 (E.D. Pa. Feb. 10, 2009), quoting Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996).  "In evaluating constructive discharge claims, the Third Circuit applies an objective test that asks, 'whether a reasonable jury could find that the employer permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign,' or retire." Sullivan v. Widener Univ., 20-cv-5614, 2022 WL 3030725 *5 (E.D. Pa. Aug. 1, 2022), quoting Duffy v. Paper Magic Grp., Inc., 265 F.3d 163, 166 (3d Cir. 2001) (citations omitted); Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir. 1992).

> In essence, to establish a constructive discharge claim, a plaintiff must prove all of the facts required to show a hostile work environment, and must make a further showing that the abusive working environment became so intolerable that his resignation qualified as a fitting response. Pa. State Police v. Suders, 542 U.S. 129, 133-34, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004).  An employer may defend against a constructive discharge claim by showing both: (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of racial harassment; and (2) that the plaintiff unreasonably failed to avail himself of that employer-provided preventative or remedial apparatus. Id. at 134.  "This affirmative defense will not be available to the employer however, if the plaintiff quits in

> reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation …."

Hancock, 2009 WL 347465 at * 8; Lockhart, 2022 WL 455183 at *22.[3]  "A constructive discharge qualifies as adverse employment action in the sense that it is the legal equivalent to actual termination."  Lockhart, 2022 WL 455183 at *22, 26 (citations omitted) (Summary judgment denied on the plaintiff's constructive discharge claim based on the "constellation of circumstances" where the defendant took no action to protect the plaintiff from his supervisor's harassment and did not inform plaintiff of any contemplated discipline against the supervisor or otherwise provide the plaintiff with any understanding that he would be protected from such treatment after invoking the defendant's anti-harassment policy.).

Holmes has adduced evidence establishing that she was constructively discharged.  Defendant's argument that Holmes left her employment because her significant other was unfaithful is disputed by the evidence and cannot be considered as a basis for summary judgment.  (PSOF ¶¶ 56-58, 65-68, 75-77, and 93).

Holmes resigned after repeatedly enduring discriminatory conduct and harassment at AHOM.  (PSOF ¶¶ 13, 43, 53, 65, and 93).  After Holmes

---

[3] Defendant has adduced no evidence that Plaintiff failed to avail herself of preventative or remedial mechanisms.  When Plaintiff properly complained to HR, she was reprimanded shortly thereafter by McCoy.  (PSOF ¶¶ 86-88, 92, and 126).

21

complained about the discrimination and harassment, McCoy disciplined her through a verbal reprimand.  (PSOF ¶¶ 41, 43, 86-88, and 92).  McCoy continued to belittle Holmes and engaged in aggressive and hostile behavior towards Holmes, which caused her to reasonably fear McCoy. (PSOF ¶¶ 41, 43, 53, 65, 68, 75-77, 79, 91-92, 99, 104, and 126).   Holmes also informed her co-workers shortly before she resigned that she could no longer tolerate McCoy's behavior.   (PSOF ¶¶ 56, 68, and 100).

## IV.   CONCLUSION

For the reasons set forth above, Defendants' motion should be denied.

Respectfully submitted,

Bordas and Bordas, PLLC

Dated March 21, 2023                     /s/ *Thomas B. Anderson, Esquire*
                                         Thomas B. Anderson, Esquire
                                         PA I.D. #79990
                                         One Gateway Center
                                         420 Fort Duquesne Blvd., Suite 1800
                                         Pittsburgh, PA  15222
                                         (412) 502-5000

                                         Attorneys for the Plaintiffs

- Counsel hereby certifies pursuant to Local Rule 7.8 (b)(2) that this brief contains 4961 words.