# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PATRICIA HOLMES,

                Plaintiff,

    v.

AMERICAN HOME
PATIENT/LINCARE, *et al.*,

                Defendants.

No. 4:21-CV-01683

(Chief Judge Brann)

## MEMORANDUM OPINION

### JULY 3, 2023

Patricia Holmes was formerly employed by American Home Patient, Inc. ("AHP") as a customer service representative at their State College, Pennsylvania location, until her eventual resignation from AHP. Her employment at AHP turned sour almost immediately after it began, as Holmes' supervisor and a coworker at AHP used racially derogatory slurs during Holmes' time there.

In the two most notable incidents, Holmes' supervisor not only used or referenced the slurs "coon" and "nigger"—two of the most offensive words contained in this language or any other—but directed those words toward the only African American employee subject to his supervision, and laughed while this occurred. These incidents, along with others, created a racially hostile work environment and, consequently, Holmes' claim of a hostile work environment may proceed to trial. However, there is insufficient evidence to support her claims of

constructive discharge or retaliation, and the Court will therefore grant summary judgment in AHP's favor as to those claims.

## I.   BACKGROUND

In 2021, Holmes filed a complaint against AHP,[1] alleging that it created a hostile working environment that was permeated with racial harassment and discrimination, in violation of 42 U.S.C. § 1981, had constructively discharged her from her job, and retaliated against her for reporting the hostile work environment.[2] Defendants filed answers to the complaint, and the matter proceeded through discovery.[3]

AHP has now filed a motion for summary judgment.[4] AHP first argues that it is entitled to summary judgment as to Holmes' constructive discharge claim because Holmes resigned her job for personal reasons, and no reasonable juror could conclude that her work environment was so intolerable that she was effectively forced to resign.[5] Second, AHP contends that summary judgment should be granted in its favor with regard to Holmes' hostile work environment claim, since AHP promptly and appropriately responded to Holmes' reports, and the offensive conduct was neither severe nor pervasive.[6] Finally, AHP asserts that judgment should be

---

[1]   Although the complaint identifies three different defendants, the parties agree that AHP is the only proper defendant in this case.
[2]   Doc. 1.
[3]   Docs. 8, 9.
[4]   Doc. 22.
[5]   Doc. 24 at 4-8.
[6]   *Id.* at 8-13.

entered in its favor with respect to Holmes' retaliation claim, as she suffered no adverse consequences, nor was there any causal link between such alleged consequences and Holmes' protected activity.[7]

Holmes responds that there is clear evidence of racial discrimination that created a hostile work environment, and AHP's response to reports of that environment was deficient.[8] Holmes further asserts that there is sufficient evidence of retaliation, as she engaged in protective activity by reporting the discrimination and was retaliated against by her supervisor.[9] Finally, Homes argues that she was constructively discharged because her supervisor's "aggressive and hostile behavior" toward her following her protected activity caused Holmes to fear that supervisor.[10]

AHP has filed a reply brief, rendering this matter is ripe for disposition.[11] For the following reasons, the motion for summary judgment will be granted in part and denied in part.

---

[7]   *Id.* at 13-15.
[8]   Doc. 27 at 6-16, 18-19.
[9]   *Id.* at 16-18.
[10]  *Id.* at 21; *see id.* at 20-22.
[11]  Doc. 28.

## II.   DISCUSSION

### A.   Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[12] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[13] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[14] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[15]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[16] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[17] The nonmoving party

---

[12]   Fed. R. Civ. P. 56(a).
[13]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).
[14]   *Clark*, 9 F.3d at 326.
[15]   *Id*.
[16]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[17]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[18] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[19]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[20] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[21] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[22] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[23]

## B.    Undisputed Facts

In 2019 and 2020, Holmes, an African American woman, was employed by AHP as a customer service representative in its State College, Pennsylvania location.[24] During that time, Holmes' immediate supervisor was Timothy McCoy,

---

[18]   *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

[19]   *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (internal quotation marks omitted).

[20]   *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

[21]   *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[22]   Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[23]   Fed. R. Civ. P. 56(c)(3).

[24]   Doc. 22-2 ¶ 1; Doc. 26 ¶ 59.

who was the State College location's manager.[25] During her time at AHP, Holmes was the only African American employed at the State College location, and was the only African American employee whom McCoy had supervised.[26]

The first incident of overt racial harassment occurred on October 15, 2019—just two days after Holmes began her employment with AHP.[27] During a conversation with a coworker, Beverly Hibbert, Hibbert "mentioned that her daughter was pregnant by a deadbeat Black man and  now they will be having a[n] . . . Oreo Baby . . ."[28] Hibbert apparently made reference to her granddaughter being an "Oreo baby" on several occasions, and once said so in an attempt to defend herself from accusations of racism after having said the "'N' word."[29]

The second incident occurred shortly thereafter, also in October 2019. At that time Haley Eichelberger, a respiratory therapist for AHP, administered a fit test with Holmes.[30] A fit test involves placing a white, airtight hood over an individual's head while that individual wears an N95 mask, then spraying a scented aerosol into the hood to determine if the individual is properly wearing the N95 mask.[31] After Eichelberger placed the hood on Holmes, McCoy stated that it was ironic seeing "a

---

[25]  Doc. 22-2 ¶ 3.
[26]  Doc. 26 ¶ 59.
[27]  Doc. 22-4 at 34.
[28]  *Id.*
[29]  Doc. 26-6 at 37-38.
[30]  Doc. 26-5 at 3-6.
[31]  *Id.* at 4-5.

black person with a white hood over their head."[32] Eichelberger informed McCoy that she believed his comment was "awful."[33] McCoy further asked others in the office to videotape the fit test because "it's funny to see a white woman putting a hood on a Black woman's head."[34]

The next incident occurred around Thanksgiving in 2019.[35] During a conversation with Holmes, McCoy was discussing personal things when, "out of the blue," he mentioned "his uncle being dark complexed" and, due to that complexion, being nicknamed "Coonie."[36] Holmes was shocked by this comment and walked away under the pretext that she needed to answer the phone.[37]

On March 5, 2020, Holmes had a conversation with Hibbert and McCoy.[38] McCoy initiated this conversation by telling Holmes that then President Donald Trump "was the most discriminated against President."[39] After a brief discussion regarding Donald Trump, McCoy inquired what Holmes thought about "[t]he use of the 'N' word."[40] After Holmes stated that it was "an ugly word" that should never be used, McCoy responded "well, the 'N' word does mean Black people."[41] Holmes disputed that assertion; McCoy then stated that he would "Google it" and, after

---

[32] *Id.* at 6.
[33] *Id.* at 15.
[34] Doc. 22-4 at 36.
[35] Doc. 22-4 at 44-45.
[36] *Id.* at 35.
[37] *Id.*
[38] Doc. 22-2 ¶ 19.
[39] Doc. 22-4 at 46.
[40] *Id.*
[41] *Id.*

having done so, showed his phone to Holmes and said "look, see, it does mean Black people," although McCoy had "spelled it N-I-G-E-R."[42]

Holmes informed McCoy that Niger is a country, at which time Hibbert "said, it's spelled with two G's, and she said—she turned and looked at [Holmes] and she said, no offense, Patricia, but it's Niggerrrr."[43] During this time, both Hibbert and McCoy were laughing.[44]

A coworker then yelled from her office to stop using such language, and Holmes and the coworker went outside briefly.[45] Upon returning to the office, Hibbert asked Holmes how long Hibbert would "have to put up with" Holmes being angry with her.[46] When Holmes responded that Hibbert did not get to dictate for how long Holmes would be upset, Hibbert began cursing.[47] McCoy eventually told Hibbert to stop but, after Holmes called Hibbert a racist, Hibbert screamed profanities at Holmes.[48] McCoy then told Hibbert to leave, but added that "Black people use the [n] word" and he did not "care about stuff like that" because some people call him "a Mick."[49]

---

[42] *Id.*

[43] *Id.*

[44] Doc. 26-6 at 64.

[45] Doc. 22-4 at 47.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.* Tammy Dunmire, one of Holmes' coworkers at AHP, stated that she had "never heard the word nigger used in the office other than when there was a black employee" present. Doc. 26-6 at 63.

The parties point to no evidence that Holmes lodged any formal complaints about racist conduct prior to the March 2020 event. However, the day after the March 2020 incident, Holmes lodged a complaint regarding the incident with Mark Cattron—McCoy's immediate supervisor—and Lois Dodson, who was employed in AHP's human resources department.[50] Dodson informed Holmes that use of the n-word was inappropriate, and that Dodson would investigate the incident.[51] Dodson began to investigate the incident and quickly learned "that this wasn't uncommon behavior for" Hibbert.[52]

As a result of the investigation, McCoy was issued a written warning—AHP's second lowest level of discipline—for failing to "create and foster an environment that is professional at all times" because he permitted Hibbert to behave in an unprofessional manner.[53] AHP made the decision to issue only a written warning to McCoy because he

> had had no prior discipline. He had been with the organization for . . . close to 20 years. He had—you know, we had taken into consideration malicious intent versus just poor judgment and we just didn't feel that there was malicious intent and felt that we could coach him and move him along and help him improve.[54]

---

[50]  Doc. 22-4 at 48; Doc. 26-9 at 7-9.
[51]  Doc. 26-9 at 8.
[52]  *Id.* at 11.
[53]  Doc. 22-3 at 19-20; *see* Doc. 26-9 at 12-13.
[54]  Doc. 26-9 at 16-17.

AHP further issued a final written warning[55] to Hibbert on March 9, 2020; the written warning stated that it was issued because Hibbert used "a racial slur in conversation, making others extremely uncomfortable."[56] After Hibbert was issued a final written warning, she placed tape over her mouth, stating that it was "the only way she didn't say anything to get in further trouble."[57] Holmes complained of this incident, and Hibbert was then fired from AHP because the use of tape over her mouth "perpetuat[ed] the entire situation" and did "not align with [AHP's] principles."[58]

During the incident with the tape, Holmes refused to sit near Hibbert at a meeting.[59] McCoy then verbally reprimanded Holmes for not sitting next to Hibbert, despite the fact that Holmes was not required to sit next to Hibbert.[60] After this conversation, Holmes asked whether she would be issued a written warning, to which McCoy became upset and responded "are you trying to cause a problem"[61] and "is [it] your intention to get [Hibbert] fired?"[62]

McCoy allegedly became verbally and physically aggressive toward Holmes in June and July of 2020 and, on July 7, 2020, McCoy twice "aggressively snatched"

---

[55] A final written warning is AHP's third level of discipline, with termination being the final level of discipline issued. Doc. 26-9 at 13, 15-16.
[56] Doc. 22-3 at 8-9.
[57] Doc. 26-9 at 18-19.
[58] Doc. 22-3 at 17.
[59] Doc. 22-4 at 48-49.
[60] *Id.* at 49.
[61] *Id.*
[62] Doc. 26-5 at 13.

papers from Holmes' hands.[63] On the same day, Holmes submitted her letter of

resignation to AHP. Holmes provided eleven reasons for her resignation:

1.  "Hostility/ Bullying (paperwork snatched out of my hands twice this morning by center manager)"

2.  "Embarrassment during morning meetings spoke to condescendingly"

3.  "No insurance never received notice to sign up, I called benefits twice in January 2020 never received a call back, I can't afford my medicine, or needed doctor appointments"

4.  "In debt collections because of TB testing done for my employment 10/19/2019, I've been billed personally and paid but still sent to collections"

5.  "Being denied training for new programs such as Care Orchestrator, I was told I needed to answer phones"

6.  "Reprimanded for asking a question during Parachute Training 6/25/2020"

7.  "Orders that I'm working on is giving to Lewistown, (I stated that if I'm not afforded the opportunity to complete my work then I won't learn) and previously told, 'if you don't like how the person(s) in Lewistown speak to you then do your own work'"

8.  "I've have told center manager since I started that work such as CPAPS, Overnight Pulse Ox are hoarded by other employees that has refused to let me help and train but I'm still held to the same accountability for that work not being done [] which leads to the embarrassment in morning meetings"

9.  "Previously told that the work I do is 'menial'"

10.  "When Co-workers or myself would try to address issues of the morale in the office we were told . . . 'I'm tired of your bitching; you need to be thick-skinned'"

---

[63]  Doc. 22-4 at 42.

11.   "Previous rude comments of racial/political nature [] I did speak with area manager and human resources regarding."[64]

Other employees reported that the environment at the State College location was difficult. Tammy Dunmire resigned from AHP due to McCoy's behavior and because he permitted the inappropriate behavior of others to continue.[65] McCoy would allegedly slam doors, throw pens, once "picked up a chair and threw it across the room," and "would just degrade" employees.[66] The environment led Dunmire to feel "so miserable[] that [she was] crying all the time."[67] Eichelberger testified that the time period during which Holmes alleges she was experiencing racial harassment was "honestly horrible" and explained that it "was just so awful at that time period to come to work."[68]

## C.   Analysis

### 1.   Racial Harassment Claims

The Court first addresses Holmes' claims of racial harassment. Holmes raises two distinct claims under 42 U.S.C. § 1981: a claim related to an allegedly hostile work environment, and a claim alleging constructive discharge.[69] The Court will analyze each claim in turn.

---

[64]   Doc. 22-4 at 80.
[65]   Doc. 22-7 at 18.
[66]   *Id.* at 4.
[67]   *Id.* at 18.
[68]   Doc. 26-5 at 16-17.
[69]   In response to AHP's motion for summary judgment, Holmes cites to the legal standard applied to claims of disparate treatment harassment and argues that she has met that standard. Doc. 27

### a.  Hostile Work Environment

AHP argues that Holmes' hostile work environment claim fails because (1) she cannot demonstrate that AHP is liable for Hibbert's conduct under the theory of *respondeat superior*, and (2) the conduct to which Holmes was exposed was neither severe nor pervasive.[70]

Holmes brings her claims pursuant to 42 U.S.C. § 1981 but, "[i]n employment discrimination cases, these claims are subject to the same analysis as discrimination claims under Title VII of the Civil Rights Act of 1964."[71] "Accordingly, a court reviews them under the burden-shifting framework outlined in *McDonnell Douglas Corp. v Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973)."[72]

> Under that framework, a plaintiff first must establish the requisite elements of his claim (called the *prima facie* elements); if so, the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action, and then the plaintiff bears the burden of establishing that the employer's stated reason for the adverse action was an excuse, or pretext, for why the action was actually taken.[73]

---

at 6-8. However, Holmes' complaint clearly alleges a hostile work environment, not disparate treatment. *See, e.g.*, Doc. 1 at 4 ("Plaintiff was subjected to intention harassment, *a hostile working environment*, and discrimination during her employment because of her race" (emphasis added)). And it is well established that "'[a] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" *Harmon v. Sussex Cnty.*, 810 F. App'x 139, 142 (3d Cir. 2020) (quoting *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)). The Court therefore will not consider whether Holmes has satisfied the requirements for a disparate treatment claim.

[70]  Doc. 24 at 8-13.

[71]  *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017).

[72]  *Id.*

[73]  *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802-04).

To establish a prima facie case of a hostile work environment, a plaintiff must demonstrate "1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability . . ."[74]

Judged under that standard, the Court concludes that Holmes' hostile work environment claim survives summary judgment. AHP does not contest that Holmes suffered intentional discrimination because of her race, that the discrimination detrimentally affected her, or that the discrimination would detrimentally affect a reasonable person in like circumstances.[75] Rather, it contests the existence of *respondeat superior* liability as to Hibbert, since Hibbert was only a coworker of Holmes, and AHP argues that it responded properly to Holmes' complaints.[76] It further contests that any conduct satisfies the pervasive or severe standard.[77]

### i.   Respondeat Superior

As to whether there exists a basis for *respondeat superior* liability with respect to Hibbert's conduct, the United States Court of Appeals for the Third Circuit has explained that "when the hostile work environment is created by non-supervisory

---

[74] *Id.*
[75] *See* Doc. 24. And even if AHP did contest these elements of a prima facie case, the Court would conclude that, for summary judgment purposes, those elements are easily satisfied.
[76] *Id.* at 9-10.
[77] *Id.* at 10-13.

coworkers, employers are not automatically liable in all instances."[78] "Rather, employer liability exists only if (1) the employer failed to provide a reasonable avenue for complaint or (2) the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action."[79]

"[A]n employer knew or should have known about workplace [racial] harassment if *management-level* employees had actual or constructive knowledge about the existence of a [racially] hostile environment."[80] The Third Circuit has "also recognized that management level employees have constructive notice of a hostile work environment when an employee provides management level personnel with enough information to raise a probability of [racial] harassment in the mind of a reasonable employer."[81]

Hibbert was directly involved in at least two incidents: the incident where Hibbert referred to her granddaughter as an "Oreo baby," and the second where she clearly and slowly enunciated the "n-word." A reasonable juror may infer that McCoy was aware of the first incident, as there is evidence that all employees at AHP's State College location were present when Hibbert stated that her granddaughter was an "Oreo baby," which would include McCoy.[82] And it is beyond

---

[78] *In re Trib. Media Co.*, 902 F.3d 384, 400 (3d Cir. 2018) (brackets, ellipsis, and internal quotation marks omitted).

[79] *Id.* (brackets, ellipsis, and internal quotation marks omitted).

[80] *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 105 (3d Cir. 2009) (internal quotation marks omitted).

[81] *Id.* (internal quotation marks omitted).

[82] Doc. 26-6 at 38.

peradventure that McCoy qualifies as a management-level employee, as he was the "Center Manager" for the State College location and "also managed the office in Lewistown."[83] Further, there is no evidence that McCoy or AHP took "prompt and appropriate remedial action"[84] after that incident. This incident may therefore be considered in determining whether Holmes was subjected to a hostile work environment.

The later incident involving a racial slur occurred in McCoy's presence—indeed, it was instigated by McCoy and his bizarre attempt to prove that the "n-word" is a word that refers to African Americans.[85] AHP management was therefore aware of this incident. Consequently, the only question is whether AHP took prompt and appropriate remedial action against Hibbert, which includes actions that are "reasonably calculated to end the harassment."[86] After Hibbert used racial slurs in Holmes' presence, Hibbert was issued a final written warning—one step below termination from AHP in the order of discipline.[87]

There is little doubt that this disciplinary action was taken promptly, occurring the following business day after the incident was reported to human resources. Moreover, the Court concludes that a reasonable juror could not determine that AHP's actions were not reasonably calculated to end the harassment. Hibbert's

---

[83]   Doc. 22-2 ¶ 3.
[84]   *In re Trib. Media Co.*, 902 F.3d at 400.
[85]   Doc. 22-4 at 46.
[86]   *Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007) (internal quotation marks omitted).
[87]   Doc. 22-3 at 8-9.

actions were highly offensive and inexcusable,[88] but AHP issued a final written warning, which placed Hibbert on notice that further such conduct could result in her termination. This warning unfortunately did not dissuade Hibbert from additional offensive conduct—she then placed tape over her mouth to protest her discipline—but it was reasonably calculated to end any harassment.[89] Hibbert's employment with AHP was then promptly terminated,[90] and there is no question that such action stopped the harassment and was therefore "adequate as a matter of law."[91] Because AHP responded appropriately to Hibbert's behavior in March 2020, her actions cannot be imputed to AHP and cannot form part of a hostile work environment.

## ii.    Severe or Pervasive

The Court turns then to the question of whether McCoy's actions—which AHP does not dispute forms the basis of *respondeat superior* liability[92]—combined

---

[88] These actions apparently were not an isolated incident for Hibbert, who had an unfortunate history of such behavior. Doc. 26-9 at 11. However, there is no evidence that AHP's human resources department was aware of this behavior prior to launching its investigation into the March 2020 incident.

[89] Doc. 26-9 at 18-19.

[90] Doc. 22-3 at 17

[91] *Andreoli*, 482 F.3d at 644 n.2.

[92] Even if AHP challenged whether McCoy's acts may be imputed to it, any such challenge would fail on the evidence presented here. The Supreme Court of the United States has held that plaintiffs may "hold an employer vicariously liable for some tortious conduct of a supervisor made possible by abuse of his supervisory authority." *Faragher v. City of Boca Raton*, 524 U.S. 775, 802 (1998). Automatic liability is attached in such circumstances, subject to "an affirmative defense to liability that the employer had exercised reasonable care to avoid harassment and to eliminate it when it might occur, and that the complaining employee had failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided." *Id.* at 805. No evidence to support such an affirmative defense has been presented by AHP.

with Hibbert's statement in October 2019, are sufficiently severe or pervasive. The Court concludes that they are.

McCoy's inappropriate conduct toward Holmes began almost immediately after she was hired by AHP in October 2019. During a fit test that month wherein an employee placed a white hood over Holmes' head, McCoy laughed and asked others to videotape the test because "it's funny to see a white woman putting a hood on a Black woman's head."[93] The following month, McCoy mentioned to Holmes that his uncle had a dark complexion and, therefore, he and his family nicknamed that uncle "Coonie"[94] which a reasonable juror could conclude—given the context of the statement—is a variation of the racial slur "coon."

These incidents, along with the incident involving Hibbert in October 2019, may be viewed as inappropriate and unfortunate statements made by McCoy without knowledge of the gravity and impact that his words may carry with his employees. However, the final incident was significantly more serious.

That incident, which occurred in March 2020, involved McCoy asking Holmes what she thought about "[t]he use of the 'N' word."[95] After Holmes stated that it was "an ugly word" that should never be used, McCoy responded "well, the 'N' word does mean Black people."[96] Holmes disputed that assertion; McCoy then,

---

[93] Doc. 22-4 at 36.
[94] *Id.* at 35.
[95] *Id.* at 46.
[96] *Id.*

incredulously, stated that he would "Google it," showed the results to Holmes, and stated "look, see, it does mean Black people," although McCoy had accidentally "spelled it N-I-G-E-R."[97] This misspelling led Hibbert to inform McCoy that slur he had intended to write was spelled with two g's before enunciating that word.[98] During this incident, McCoy was, shockingly, laughing.[99] Later McCoy stated that "Black people use the [n] word" and he did not "care about stuff like that" because some people call him "a Mick."[100]

While this presents a close question, the Court concludes that the March 2020 incident alone is sufficiently severe to satisfy Holmes' burden of proof.[101] The Third Circuit has explained that "it is clear that one such instance [of the use of the n-word in the workplace] can suffice to state a claim" for a hostile work environment, "[a]lthough the resolution of that question is context-specific."[102] Courts have noted that "no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as the "n-word" by a supervisor in the presence of his subordinates."[103] However, a plaintiff must still demonstrate that that the incident was "'extreme to

---

[97]  *Id.*
[98]  *Id.*
[99]  Doc. 26-6 at 64.
[100]  Doc. 22-4 at 47
[101]  Although this incident alone is sufficient to establish severe conduct, it is important to note that this was not one-off conduct. Rather, the March 2020 incident was the culmination of four racially charged episodes that occurred over the span of approximately five months.
[102]  *Castleberry*, 863 F.3d at 264.
[103]  *Id.* at 265 (quoting *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (brackets omitted)).

amount to a change in the terms and conditions of employment' for it to serve as the basis of a harassment claim."[104]

> The question of "whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[105]

Here, Holmes' direct supervisor, who was also the supervisor for the entire State College branch, made reference to a deeply offensive word and asked the only black employee what she thought of that word. He then stated that the word referred to black individuals, attempted to look the word up online, and showed the search results to his black employee. During this time, and while another of McCoy's subordinates enunciated the slur, McCoy laughed. That conduct is shocking. And that it was delivered by Holmes' supervisor makes the conduct all the more extreme since, as the Supreme Court has recognized "acts of supervisors have greater power to alter the environment than acts of coemployees generally."[106]

This conduct had a direct impact on Holmes and her working environment. Holmes had to immediately leave the office and "take a walk outside" because she was upset.[107] Anger and resentment between Holmes and Hibbert over the incident

---

[104] *Id.* at 264 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

[105] *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 215 (3d Cir. 2017) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)).

[106] *Faragher*, 524 U.S. at 805.

[107] Doc. 22-4 at 47.

led to a dispute shortly thereafter, which ended with Hibbert screaming curse words at Holmes.[108] Holmes then appears to have studiously avoided Hibbert and attempted to sit far away from Hibbert in a meeting.[109] Holmes obviously could not have avoided her supervisor, McCoy, and, for her efforts to avoid Hibbert, Holmes was verbally reprimanded by McCoy.[110] The incident was undoubtedly humiliating and interfered with Holmes' work, and therefore meets the severity required to demonstrate a hostile work environment.[111]

Moreover, although not legally dispositive, AHP's response to McCoy's actions could be viewed by a jury as markedly deficient. McCoy had a history of making, to put it generously, racially insensitive remarks to his only black employee and, at a minimum, condoned racist statements and behavior from Hibbert, who had a pattern of offensive behavior.[112] Despite McCoy's behavior over a period of

---

[108] *Id.*

[109] *Id.* at 48-49.

[110] *Id.*

[111] *Cf. Castleberry*, 863 F.3d at 262, 265 (concluding that incident was sufficiently severe to state a claim for a hostile work environment where "a supervisor told Castleberry and his coworkers that if they had 'nigger-rigged' the fence, they would be fired"); *Kengerski v. Harper*, 6 F.4th 531, 539-40 (3d Cir. 2021) (citing with approval out-of-circuit case holding "that even two uses of [the term 'monkey'], viewed as a single incident of harassment, could be found by a reasonable jury to be 'severe enough to engender a hostile work environment'" (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015)); *L. L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545, 549 (3d Cir. 2017) (holding that student's claim for a hostile school environment must survive summary judgment as "plaintiffs adduced sufficient evidence to establish a prima facie case of hostile environment as to KLJR, who was present when the 'n-word' was uttered").

[112] During the March 2020 incident where Hibbert enunciated "Niggerrrr," Doc. 22-4 at 46, McCoy was laughing. Doc. 26-6 at 64. And McCoy did not discipline Hibbert for using that slur; rather, he verbally reprimanded Hibbert only when she later began ranting, cursing, and yelling "fuck you" to Holmes. Doc. 22-4 at 47. This reaction could reasonably be viewed as encouraging Hibbert's conduct.

months, AHP issued only a written warning—one of the mildest forms of discipline that AHP could impose—and this was not in response to McCoy's racially insensitive behavior but, rather, was in response to McCoy having permitted Hibbert to behave in an unprofessional manner.[113]

A reasonable juror could also view as disingenuous AHP's reasons for issuing such mild discipline. AHP explained that it issued milder discipline because, *inter alia*, "we just didn't feel that there was malicious intent and felt that we could coach him and move him along and help him improve."[114] But McCoy was laughing as his employee was humiliated with the use of one of the most offensive racial slurs contained in the English language, and could even be viewed as having encouraged the use of that slur. A jury could conclude that no reasonable person would view this behavior as anything other than malicious, and that AHP simply chose to ignore the severity of McCoy's conduct.

In sum, Holmes has adequately demonstrated that the behavior to which she was subjected was severe or pervasive, and has therefore established a *prima facie* case of a hostile work environment. Because AHP does not argue that there was a legitimate, non-discriminatory reason for the conduct to which Holmes was subjected, her claim should be evaluated by a jury, and AHP's motion for summary judgment will be denied with respect to that claim.

---

[113]  Doc. 22-3 at 19-20; *see* Doc. 26-9 at 12-13.
[114]  Doc. 26-9 at 16-17.

### b.    Constructive Discharge

Next, AHP asserts that it is entitled to summary judgment on Holmes' constructive discharge claim.[115] Specifically, AHP contends that Holmes resigned for personal reasons[116] and, in any event, her workplace environment was not so intolerable that Holmes was in effect forced to resign.[117] Holmes responds that she resigned because McCoy engaged in hostile and aggressive behavior, causing her to fear McCoy which, according to Holmes, is sufficient to establish a claim for constructive discharge.[118]

"To establish a constructive discharge, [a plaintiff] must show that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."[119] Courts "employ an objective test and thus an employee's subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge."[120] Notably, "[t]o prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment."[121] This is so because "a hostile-work-environment claim is

---

[115] Doc. 24 at 4-8.

[116] *Id.* at 4-5. The facts upon which AHP relies for this contention are contested and, as such, the Court will not resolve Holmes' claim on that basis. *See* Doc. 27 at 21.

[117] *Id.* at 5-8.

[118] Doc. 27 at 20-22.

[119] *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013) (internal quotation marks omitted).

[120] *Id.*

[121] *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 316 n.4 (3d Cir. 2006) (internal quotation marks omitted).

a 'lesser included component' of the '*graver* claim of hostile-environment constructive discharge.'"[122]

> In determining whether an employee was forced to resign, [courts] consider a number of factors, including whether the employee was threatened with discharge, encouraged to resign, demoted, subject to reduced pay or benefits, involuntarily transferred to a less desirable position, subject to altered job responsibilities, or given unsatisfactory job evaluations.[123]

Here, no evidence has been submitted to the Court that would satisfy any of the factors proffered by the Third Circuit. Holmes was not forced to resign, encouraged to resign, demoted, transferred, subject to reduced pay or benefits, given altered job responsibilities, or given unsatisfactory job evaluations.

To be sure, Holmes alleges, and the evidence bears out, that she was subjected to a hostile work environment. But proving that Holmes was subjected to a hostile working environment simply is not sufficient to establish a constructive discharge claim.[124] Moreover, the environment to which Holmes was subjected was not so intolerable as to effectively force her or a reasonable person in her position to resign. The last incident of racial harassment occurred in March 2020, and Holmes did not resign until July 2020.[125] This interregnum of nearly four months demonstrates that

---

[122] *Green v. Brennan*, 578 U.S. 547, 559 (2016) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 149 (2004)).
[123] *Mandel*, 706 F.3d at 169-70.
[124] *Spencer*, 469 F.3d at 316 n.4.
[125] Doc. 22-4 at 46, 80.

any racial harassment alone was not sufficient to result in Holmes' constructive discharge.

The remaining evidence of Holmes' claim of constructive discharge is that, over a four-month period: (1) she was reprimanded for not sitting next to Hibbert in a meeting; (2) McCoy yelled at Holmes and another employee and told them that they were being too sensitive and needed to stop their "bitching"; (3) McCoy snatched papers from Holmes' hands on two occasions; and (4) McCoy told Holmes that her work was menial.[126] These incidents, although perhaps discomforting, demonstrative of poor leadership, and not conducive to a positive work environment, are simply insufficient to conclude that any reasonable person would feel compelled to resign from AHP, particularly given the absence of any of the factors that the Third Circuit has listed as being indicative of constructive discharge. And while Holmes has asserted her subjective fear of McCoy, her subjective fear, without an explanation of any underlying facts that may have given rise to that fear, cannot establish constructive discharge.[127] Accordingly, the Court will grant AHP's motion for summary judgment as to Holmes' claim of constructive discharge, and will grant judgment in AHP's favor.

---

[126] Doc. 27 at 21-22 (citing Doc. 26 ¶¶ 41, 43, 53, 65, 68, 75-77, 79, 86-88, 91-92, 99, 104, 126.
[127] *Mandel*, 706 F.3d at 169.

### 2.     Retaliation Claim

Finally, the Court turns to Holmes' claim of retaliation. AHP asserts that Holmes suffered no materially adverse consequences after filing complaints, and cannot connect any alleged materially adverse consequences to the filing of a complaint.[128] Holmes responds that the animosity demonstrated toward her by McCoy, combined with the timing of that animosity, sufficiently establishes retaliation.[129]

"Retaliation claims are cognizable under . . . § 1981" and are governed by the *McDonnell Douglas* burden shifting framework outlined previously in this Memorandum.[130]

> Under the first step of that framework, a plaintiff must establish a prima facie case by showing (1) that she engaged in protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.[131]

AHP does not dispute that Holmes engaged in protected activity when she reported the racial abuse that she had experienced to a human resources representative at AHP. The Court therefore only need analyze whether material

---

[128] Doc. 24 at 13-15.

[129] Doc. 27 at 16-18.

[130] *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022).

[131] *Id.* (brackets and internal quotation marks omitted). AHP argues solely that Holmes has not satisfied her burden of establishing a prima facie case of retaliation, and therefore has not availed itself of the opportunity to argue that any adverse action was taken for a legitimate, non-retaliatory reason. Doc. 24 at 13-15. The Court therefore will not analyze the second and third steps of the *McDonnell Douglas* framework. *See Canada*, 49 F.4th at 346 (detailing second and third steps of that framework).

adverse actions were taken against Holmes, and whether there was a causal connection between her protected activity and such actions.

To demonstrate that she experienced materially adverse actions, Holmes "'must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a'" complaint.[132] Courts must "examine the challenged conduct 'from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"[133] "'Petty slights, minor annoyances, and simple lack of good manners' generally will not suffice"[134] "However, 'context matters' such that 'an act that would be immaterial in some situations is material in others.'"[135]

Holmes alleges that she experienced several adverse actions: (1) McCoy twice snatched papers from Holmes' hands; (2) McCoy yelled at Holmes and another employee and told them that they were being too sensitive and needed to stop their "bitching"; (3) McCoy informed Holmes that she could file complaints against him, but he would not be fired or go to jail over any complaints; (4) McCoy told Holmes

---

[132] *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 195 (3d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

[133] *Id.* (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 71).

[134] *Id.* at 196 (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 71 (brackets omitted)).

[135] *Id.* (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 71 (brackets omitted)).

that her work is menial; (5) Holmes was reprimanded for not sitting next to Hibbert in a meeting; and (6) Holmes was denied certain training.[136]

Of these activities, the denial of training may "constitute retaliation where the training 'contributes significantly to the employee's professional advancement.'"[137] Although Holmes asserts that she was denied training,[138] the evidence establishes that, on July 6, 2020, AHP was attempting to schedule Holmes' training session.[139] However, Holmes resigned from AHP on July 7, 2020, before the training was scheduled.[140] Holmes therefore did not receive that training not as a result of retaliation, but as a result of Holmes' resignation. The remainder of the incidents to which Holmes' cites—being reprimanded once, yelled at once, having papers twice snatched from her hands, being told that complaints would not get her supervisor fired, and being told her work was menial, do not rise above the level of petty slights, minor annoyances, and simple lack of good manners that cannot sustain a claim of retaliation.[141]

---

[136] Doc. 27 at 18 (citing Doc. 26 ¶¶ 75-77, 79, 86-88, 91-93, 99-100, 125-126). The Court finds for the purposes of summary judgment that there is a causal link between these activities and Holmes' complaints to human resources, as these activities began immediately after Holmes made her report and continued until the day of Holmes' resignation. *See Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017) (noting that a plaintiff may establish causation by demonstrating "temporal proximity unusually suggestive of retaliatory motive" (internal quotation marks omitted)).

[137] *Boykins v. SEPTA*, 722 F. App'x 148, 160 (3d Cir. 2018) (quoting *Burlington N. & Santa Fe Ry. Co.,* 548 U.S. at 69).

[138] Doc. 26-1 at 17-23.

[139] Doc. 28 at 9.

[140] Doc. 22-4 at 80.

[141] *Daniels*, 776 F.3d at 195.

Because Holmes suffered no materially adverse consequences after reporting racial harassment to human resources, she has failed to demonstrate a prima facie case of retaliation. The Court will therefore grant summary judgment in AHP's favor for this count.

## III.   CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part AHP's motion for summary judgment.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge