# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICIA HOLMES, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:21-cv-01683-MWB |
| | § | (Hon. Matthew W. Brann) |
| AMERICAN HOME | § | |
| PATIENT/LINCARE, | § | |
| Defendant. | § | |

## RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR JUDGEMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL OR REMITTITUR, AND MOTION TO AMEND THE JUDGEMENT

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ....................................................................... i

**I.**    **INTRODUCTION** .......................................................................2

**II.**   **STATEMENT OF THE FACTS- SUMMARY OF RELEVANT**

       **TRIAL TESTIMONY AND EVIDENCE**………………………………… 2

**III.**  **STANDARD OF REVIEW**………………………………………….... 8

**IV.**  **QUESTIONS INVOLED**…………………………………………….... 8

**V.**    **ARGUMENT**...............................................................................8

      **A. This Court Should Not Grant a New Trial Liability** .....................8

          **1.**  **Hibbert's "Oreo Baby" Comments Were Properly Considered by the Jury and Found to Be Part of the Hostile Work Environment**………8

          **2.**  **The Jury's Verdict Concerning the Affirmative Defense Was Not Against the Great Weight of Evidence** ...............................17

      **B.** **The Jury's Compensatory Damages Award Was Not Excessive, Nor Was It the Product of Passion or Prejudice; Accordingly Neither A New Trial Nor Remittitur Is Necessary** .....................25

      **C.** **The Jury's Award of Punitive Damages in This Case Was Constitutionally Sound, And This Court Should Neither Grant Judgement as a Matter of Law Regarding Punitive Damages nor Reduce the Amount of Such Damages**………………….……… 34

      **VI.**  **DEGREE OF REPREHENSIBILTY GUIDEPOST.**………...…….. 37

**VII.** **REASONABLE RELATIONSHIP/RATIO GUIDEPOST**……………. 42

**VIII.** **COMPARABLE CIVIL PENALTY GUIDEPOST**....……………… 46

**IX.** **THE UNITED STATES SUPREME COURT COULD OVERRULE BMW v. GORE**………………………………………………...…… 47

**X.** **CONCLUSION** ...........................................................................48

## <u>TABLE OF AUTHORITIES</u>

## CASES

*Action Marine, Inc. v. Continental Carbon Inc.*,
481 F.3d 1302, 1321 (11th Cir. 2007)……………………………………… 45

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d,1074, 1081 (3d Cir. 1996) ............ 9

*Anderson v. American Airlines*, 352 Fed. Appx. 182 (9th Cir. 2009)…………..... 27

*Andrews v. City of Philadelphia*, 895 F.2d,
    1449, 1486 (3d Cir. 1990) ................................................................. 9

*Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354 (3d Cir. 2016)…………..…… 16

*Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C.Cir. 2013)………………… 24

*Bailets v. Pennsylvania Turnpike Commission*,
645 Pa. 520, 538-41, 181 A.3d 324, 335-37 (2018)……………………………… 27

*Bender v. Norfolk Southern*, 31 F. Supp.3d 659, 664-65 (M.D. Pa. 2014)…....… 19

*Blakey v. Continental Airlines, Inc.*, 992 F. Supp.731, 735-36 (D.N.J. 1998)…… 29

*Blount v. Stroud*, 395 Ill.App.3d 8, 27-28, 915 N.E.2d 925, 943-44 (2009)…….. 45

*Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015)…….... 24

*BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996)………………… 42, 47

*Briggs v. Temple Univ.*, 339 F. Supp.3d 466 (E.D. Pa. 2018)………………….. 29

*Brown v. Nutrition Mgmt. Servs. Co.*,
370 F.App'x 267, 269-70 (3d Cir. 2010)…………………………………………… 25

*Castleberry v. STI Group*, 863 F.3d 259, 265 (3d Cir. 2017) ………………….. 24

*Clausen v. Icicle Seafoods, Inc.*, 174
Wash.2d 70, 87, 272 P.3d 827, 836 (2012)…………………………………… 45

*Continental Trend Resources, Inc. v. OXY USA Inc.*,
101 F.3d 634, 642 (10th Cir. 1996)………………………………………… 45

*Cooper Indust., Inc., v. Letherman Tool Group, Inc.*,
532 U.S. 424, 434 (2001) ……………………………….……………… 48

*Deters v. Equifax Credit Information Services, Inc.*,
202 F.3d 1262, 1273 (10th Cir. 2000)…………………………………… 43

*Dickerson v. State of N.J. Dept. of Human Services*, 767 F. Supp. 605,
614-15 (D.N.J. 1991). ............................................................... 9

*Diaz v. Tesla, Inc.*, 598 F. Supp.2d 809, 835-36 (N.D.Cal. 2022)…………... 28, 38

*Dunn v. HOVIC*, 1 3.d 1371, 1383 (3d Cir. 1993)…………………………... 35

*EEOC v. W & O, Inc.*, 213 F.3d 600, 616 (11th Cir. 2000) (26:1 and 16:1)……. 44

*Frank C. Pollara Group, LLC v. Ocean View Investment Holding, LLC*,
784 F.3d 177, (3d Cir. 2015) …..…………………………….……… 15

*Flores v. City of Westminster*, 873 F.3d 739, 760 (9th Cir. 2017)…………........ 39

*Gagliardo v. Connaught Labs., Inc.*,
 311 F.3d 565, 572 (3d Cir. 2002)……………………………. 25, 26, 27, 31, 32

*Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 244
Fed.Appx. 424, 437 (3d Cir. 2007)……………………………..………… 45

*Giedgowd v. Cafaro Group, LLC*, No. 20-6184,
2021 WL 4963533 (E.D. Pa. Oct. 26, 2021)……………………..………… 29

*Gray v. Imperial Pacific International (CNMI), LLC*,
2023 WL 3714156, at *19…………………………………..…... 39, 42, 44

*Green v. Franklin Nat. Bank of Minneapolis*,
459 F.3d 903, 911 (8th Cir. 2006).......................................................... 24

*Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 771 (3d Cir. 1987)……………….. 26

*Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179, 188-89 (3d Cir. 1988)……..… 15

*Hurley v. Atlantic City Police Dept.*, 174 F.3d 95, 113-14 (3d Cir. 1999)…..…. 35

*Huston v. Procter and Gamble Paper products Corp.*,
568 F.3d 100, 104 (3d Cir. 2009)…………………………………………..… 11

*Hampton v. Dillard Dept. Stores, Inc.*, 247 F.3d 1091, 1111-17
(10th Cir. 2001) (20:1)………………………………………………...… 44

*Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993) ........................................... 10

*Hempstead v. State Div. of Human Rights*,
649 N.Y.S.2d 942 (N.Y. App. Div. 1996)…………………………………… 28

*Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179, 188-89 (3d Cir. 1988)……….. 15

*Huston v. Procter and Gamble Paper products Corp.*,
568 F.3d 100, 104 (3d Cir. 2009)…………………………………………….. 11

*In re USA Commercial Mortg. Co.*, 802 F.
Supp.2d 1147, 1188-89 (D.Nev. 2011)…………………………...………….. 45

*Inter Medical Supplies, Ltd. v. EBI Medical Systems, Inc.*,
181 F.3d 446, 463 (3d Cir. 1999)………………………………………… 14, 35

*Jester v. Hutt*, 937 F.3d 233, 242 (3d Cir. 2019)…………………...………. 44

*Jones v. Pennsylvania State Police*, No. 16-4205,
2018 WL 2214812 (E.D. Pa. May 11, 2018)…………………….…..………. 29

*Johnston v. School Dist. of Philadelphia*, No. 04-4948,
2006 WL 999966, *6 (E.D. Pa. Apr. 12, 2006)................26, 27, 29 31, 32, 33

*Kengerski v. Harper*, 6 F.4th 531, 539-40 (3d Cir. 2021).......................... 25

*Lightning Lube, Inc., v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)........... 20

*Matias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003).......... 44

*McKnight v. Circuit City Stores, Inc.*, Civil Action No. 3:95CV964, 1997 WL
328638, at **5-7 (E.D.Va. Mar. 12, 1997) (18:1 and 11:1).......................... 44

*Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 200 (3d Cir. 1995)........... 15

*Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023).......…..…........... 10

*O'Neill v. Sears, Roebuck and Co.*, 108 F. Supp.2d 433, 441 (E.D. Pa. 2000).... 26

*Osorio v. Source Enters., Inc.*, 05 Civ. 10029, 2007 WL 683985
(S.D.N.Y. Mar. 2, 2007)....................................................................... 28

*Quicken Loans, Inc. v. Brown*, 230 W.Va.
306, 330-33, 737 S.E.2d 640, 664-67 (2012)........................................... 45

*Quin v. Vertex, Inc.*, _ F.4th _, 2024 WL 1920379, at *6 (3d Cir. 2024)[1] ...... 10, 11

*Richardson v. Prisoner Transport Services of America*, Civil Action No. 3:15-CV-
01061, 2019 WL 1493313, at *3 (M.D.Pa. Apr. 4, 2019)........................... 15

*Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486,
1524 (M.D.Fla. 1991)......................................................................... 11

*Rodgers v. Western-Southern Life Ins. Co.*,
12 F.3d 668, 675 (7th Cir. 1993).......................................................... 11

*Romano v. U-Haul Int'l, Inc.*, 233 F.3d 655, 673 (1st Cir. 2000)….…....….. 38, 44

*Rosario-Mendez v. Hewlett-Packard Caribe BV*,
638 F. Supp.2d 205 (D.P.R. 2009)……………………………………………….. 28

*Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)…... 23

*Sallitt v. Stankus*, 720 F. Supp.2d 645 (M.D. Pa. 2010)…………………………. 29

*Sherman v. Kasotakis*, 314 F. Supp.2d 843, 872-73 (N.D.Iowa. 2004)….. 39, 46, 47

*Shrey v. Kontz*, 981 F. Supp.2d 333, 347-48 (M.D. Pa. 2013)…………………… 19

*Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ………….. 24

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003)………..... 35, 36

*Swinton v. Potomack Corp.*, 270 F.3d 794, 817-18 (9th Cir. 2001)…. 41, 44, 46, 47

*Talavera-Ibarrondo v. San Sebatian*, 887 F. Supp.2d 419 (D.P.R. 2012)……… 28

*Thomas v. Bronco Oilfield Services*,
503 F.Supp.3d 276, 303 (W.D. Pa. 2020))…………………………………………… 12

*Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121 (1st Cir. 2009)…………………… 28

*Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998)…………………………... 16

*White v. BFI Waste Services, LLC*, 375 F.3d 288, 297-98 (4th Cir. 2004)………. 24

*Wilburn v. Maritrans GP Inc.*, 139 F.3d 350 (3d Cir. 1998)…………………... 17

*Willow Inn, Inc. v. Public Service Mut. Ins. Co.*,
399 F.3d 224, 231 (3d Cir. 2005)……………………………………….. 34, 38, 45

*Zhang v. American Gem Seafoods, Inc*,
339 F.3d 1020, 1041 (9th Cir. 2003)……………………………....… 36, 38,39

## OTHER AUTHORITIES

Fed.R.Civ.P. 59(a)............................................................................................... 17

3d Cir. Model Jury Instruction 6.2.2  Section 1981…………………………….. 10

M.D.Pa. LR 7.08(a). ........................................................................................... 10

**RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED MOTION
FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW
TRIAL OR REMITTITUR, AND MOTION TO AMEND THE JUDGMENT**

NOW COMES the Plaintiff, Patricia Holmes, by and through her undersigned counsel, to file the following Response in Opposition to Defendant American Home Patient's ("AHP") Renewed Motion for Judgment as a Matter of Law, Motion for New Trial or Remittitur, and Motion to Amend the Judgment.

## INTRODUCTION

As acknowledged by AHP, many of the arguments raised in its consolidated post-trial motion have previously been ruled upon by this Court in either its Memorandum Opinion ruling on AHP's motion for summary judgment [ECF Doc. No. 29] or during trial.  For reasons to be addressed below, this Court was not only correct in its prior relevant rulings, but AHP's new arguments are also without merit.

## STATEMENT OF THE FACTS--SUMMARY
## OF RELEVANT TRIAL TESTIMONYAND EVIDENCE

The testimony offered during the three-day trial of this civil action was consistent with and enlarged upon that discussed in this Court's Memorandum Opinion ruling upon the Defendant's motion for summary judgment [Doc. No. 29].

By way of summarization, Patricia Holmes' immediate supervisor, Timothy McCoy, admitted that no black employee should ever have to hear the words "nigger," "coon" or "coonie," or hear her boss laughing as racial slurs are used. (Trial Transcript, Vol. I, p. 96:3-16).  He also admitted that the words "nigger" and

"coon" are two of the most offensive words in the English language, and that these words have historical hatred and dehumanization baked into them. (Trial Transcript, Vol. I, p. 102:11-18). McCoy admitted that he knew when he was laughing about Holmes's Fit Test that the KKK he was referring to wore white hoods, burned homes and crosses, and lynched black people. McCoy also admitted that he understood that a reasonable black person who heard her boss laughing at a comparison to the KKK would feel extremely offended, dehumanized, angry and hurt that her boss is a racist. (Trial Transcript, Vol. I, p. 102:23-103:18).

Haley Eichelberger, a respiratory therapist for AHP testified about McCoy's racist comments about Holmes's Fit Test and his comparison to the KKK. (Trial Transcript, Vol. II, p. 15:1-16:22). McCoy's racist comments were discussed thereafter by Holmes's co-workers. (Trial Transcript, Vol. II, p. 16:23-17:12, 30:7-17).

Holmes heard McCoy's racist comments about her Fit Test. (Trial Transcript, Vol. II, p. 117:25-118:3). McCoy laughed in Holmes's face after comparing her Fit Test to the KKK, which made her feel horrible and sick to her stomach. (Trial Transcript, Vol. II, p. 65:23-67:10). McCoy also burst out laughing along with Hibbert, after his misspelling of the word "nigger" was corrected. (Trial Transcript, Vol. II, p. 73:10-12, 141:15-17).

Holmes explained that McCoy called her a nigger to her face, as he was trying to convince her that the word referred to black people like her.  (Trial Transcript, Vol. II, p. 74:24-75:18).  McCoy then asked Holmes if she was trying to get someone fired and subsequently reprimanded Holmes for not sitting next to Beverly Hibbert in a meeting while Hibbert had put tape over her own mouth in protest to having received a written reprimand for recent foul and offensive racial slurs said to Holmes in a heated argument.  (Trial Transcript, Vol. II, p. 80:14-18, 84:1-8).

McCoy was the manager tasked with preventing racism and protecting his employees from a hostile work environment, yet he admittedly failed to protect Holmes.   (Trial Transcript, Vol. I, p. 104:9-105:9, 115:12-17). Mark Cattron, McCoy's immediate supervisor, admitted that McCoy's racist slurs were directly attributable to AHP.  (Trial Transcript, Vol. II, p. 40:16-23).  McCoy was not held accountable for using the term "coonie" or talking about Jimmy "the Greek," and the warning he received was solely based on the fact that he "allowed the situation to happen."  (Trial Transcript, Vol. I, p. 74:14-16, 97:22-25, 102:19-22).

Holmes reported to Cattron that McCoy had googled the "N" word, misspelled it Niger, and then he was corrected that the proper spelling was nigger. (Trial Transcript, Vol. II, p. 34:19-25).  McCoy blatantly lied during his trial testimony in an attempt to cover-up some of his own foul statements and made up an excuse that he was googling the term "Niger Mountain," rather than the word

"nigger." (Trial Transcript, Vol. I, p. 93:17-95:5, Vol. II, p. 36:25-37:10, 71:8-73:12, 197:20-22).

Lois Dodson, who was employed in the Defendant's Human Resources Department, Cattron, and McCoy all admitted that they knew during Patricia Holmes's employment that it was illegal to discriminate against an employee and to create a hostile work environment based on race. (Trial Transcript, Vol. I, p. 33:23-34:5; 91:9-15; Vol. II, p. 32:7-14). Yet, despite Dodson's admission that she was trained to interview all persons involved before making decisions about what occurred in the workplace, Dodson did not do so in this case. (Trial Transcript, Vol. I, p. 37:1-15). No one in management or Human Resources ever spoke with, or obtained a statement from Beverly Hibbert. (Trial Transcript, Vol. I, p. 34:21-35:3, Vol. II, p. 40:24-41:12).

Holmes was very upset and reported that she had vomited twice before calling Human Resources to report the use of the "N" word in the office. (Trial Transcript, Vol. I, p. 35:15-18). McCoy's conduct hurt Holmes so much that she is still feeling the impact four years later; she shakes, cries, and suffers from insomnia and nightmares about the trial and being forced to go back to work with McCoy. (Trial Transcript, Vol. II, p. 67:5-68:2, 69:3-8, 85:8-13, 96:19-98:12). Holmes was very upset and humiliated by McCoy's conduct and felt that she was being singled out

such that she could not take McCoy's behavior any longer.  (Trial Transcript, Vol. II, p. 20:11-16).

Holmes told Dodson that McCoy tried to convince her that the word "nigger" means black people.  McCoy then googled the term but misspelled it.  (Trial Transcript, Vol. I, p. 37:16-18; 41:19-42:10, Vol. II, p. 137:22-138:16; Plaintiff's Exh. 7).  Holmes also reported Hibbert's use of the term "Oreo grandbaby" to describe her mixed-race grandchild.  (Trial Transcript, Vol. I, p. 44:17-21; 147:2-9, Plaintiff's Exh. 7).  Hibbert talked about the "Oreo" grandchild all the time, in the office, in front of McCoy.  (Trial Transcript, Vol. I, p. 111:1-3; Vol. II, p. 63:24-645, 139:1-5, 147:2-9; Plaintiff's Exh. 7).  Dodson knew that McCoy talked about his Uncle Coonie, Jimmy "the Greek," and that when complaints are made to Cattron, he and McCoy simply laugh at the complaints.  (Trial Transcript, Vol. I, p. 45:6-13, Plaintiff's Exh. 7).

Dodson learned from Holmes and Eichelberger that McCoy had talked about how funny it was to see a white hood over Holmes's head during her Fit Test, and that he was laughing during the test and had asked Hibbert to take a picture of the test.  (Trial Transcript, Vol. I, p. 45:16-21; 49:1-6, 49:23-50:19,  Vol. II, 18:5-14 Plaintiff's Exh. 7-8).  Dodson recognized that McCoy's comment about the Fit Test referenced the KKK. (Trial Transcript, Vol. I, p. 70:12-16).

Dodson was also informed that McCoy had warned employees not to report events that occur in the office to Human Resources.  (Trial Transcript, Vol. I, p. 51:15-16, 52:14-15, Vol. II, p. 20:3-10, 140:15-141:2; Plaintiff's Exh. 8).  Instead, McCoy asked Holmes why she was complaining.  He asked if Holmes wanted to be happy or to get someone fired.  (Trial Transcript, Vol. I, p. 44:1-5, Plaintiff's Exh. 7).  McCoy showed no remorse concerning his racism.  (Trial Transcript, Vol. II, p. 79:3-5).

The written warning eventually given to McCoy made no reference to the words "nigger," "Coonie," the Fit Test, Jimmy "the Greek," the "Oreo" grandbaby, or threats about complaints to HR.  (Trial Transcript, Vol. I, p. 65:10-24, 72:9-14, 74:10-16, 106:3-13, Vol. II, p. 42:25-43:8, 50:25-51:2; Plaintiff's Exh. 11).  McCoy admitted that the warning letter he received did not concern his own conduct. Rather, it was related to Hibbert's conduct and him allowing it to occur.  (Trial Transcript, Vol. I, p. 105:24-106:2).

After Holmes complained to HR, McCoy's racial animus turned to aggressive and hostile behavior.  (Trial Transcript, Vol. II, p. 89:15-92:16, 94:14-95:16).  No one at AHP responded to Holmes's email detailing complaints and the reasons for her resignation.  (Trial Transcript, Vol. I, p. 82:11-84:4,109:1-5, Vol. II, p. 59:17-21).

Cattron wrote in his notes that "Patricia called HR.  Very serious situation we're in."  (Trial Transcript, Vol. II, p. 47:20-23).  AHP did not enforce its anti-discrimination and anti-harassment policies, instead, the policies were used essentially as a shield to protect management, including McCoy.  (Trial Transcript, Vol. II, p. 82:12-83:5).

Holmes testified that the day McCoy referred to her as a nigger was one of the most humiliating days of her life.  (Trial Transcript, Vol. II, p. 75:19-76:25).  Holmes also explained that accepting employment at AHP was one of the worst decisions of Holmes's life.  (Trial Transcript, Vol. II, p. 98:9-12).

The parties stipulated that AHP's total assets for the fiscal year ending March 31, 2022, are valued at $94,257,314.87.  AHP's net revenue for fiscal year 2022 was $52,376,884.39.  (Trial Transcript, Vol. II, p. 161:8-14).

Based upon the testimony and evidence admitted at trial, the jury reached a unanimous verdict answering all interrogatories in favor of Holmes.  (Trial Transcript, Vol. IV, p. 83:2-85:21).  The jury found by a preponderance of the evidence that the defendant intentionally discriminated against Holmes by creating a hostile work environment based on the conduct of both McCoy and Hibbert.  (Trial Transcript, Vol. IV, p. 83:19-84:7).  AHP did not exercise reasonable care to prevent racial harassment or promptly correct the harassing behavior, nor did it prove that Holmes had failed to take advantage of preventative or corrective opportunities.

7

(Trial Transcript, Vol. IV, p. 84:8-18).  AHP's actions were malicious or showed reckless indifference to Holmes's federally protected rights, and the company failed to make a good faith attempt to comply with the law prohibiting race discrimination. (Trial Transcript, Vol. IV, p. 85:1-9).  As a result, the jury awarded $500,000 to compensate Holmes for her injuries, and $20,000,000 as punitive damages to punish such behavior make an example of the defendant, and to deter such atrocious conduct in the future by AHP and others similarly situated.  (Trial Transcript, Vol. IV, p. 84:19-22, 85:10-13).

## STANDARDS OF REVIEW

Plaintiff will address the appropriate standards of review within each of the relevant argument sections below.

## QUESTIONS INVOLVED

While AHP has accurately stated the questions or issues it has raised in its post-trial motion and supporting brief, it has phrased such issues in its own favor. For reasons to be addressed below, each of the questions raised by AHP should be resolved against it and in favor of the Plaintiff.[1]

## ARGUMENT

### I.     This Court Should Not Grant a New Trial on Liability.

---

[1] Plaintiff will not attempt to "mirror" below each of the headings contained in AHP's brief, but suffice it to say that Plaintiff disagrees with each and will appropriately address each of AHP's arguments.

## A.    Hibbert's "Oreo Baby" Comments Were Properly Considered by the Jury and Found to Be Part of the Hostile Work Environment.

A hostile work environment claim is established when (1) the employee suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) there was a basis for *respondeat superior* liability. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996). *Accord, e.g.*, *Andrews v. City of Philadelphia*, 895 F.2d 1449, 1486 (3d Cir. 1990) (applying same standard to hostile or abusive work environment claim involving gender discrimination); *Dickerson v. State of N.J. Dept. of Human Services*, 767 F. Supp. 605, 614-15 (D.N.J. 1991).

Accordingly, when analyzing these factors, it is important to recognize that the evidence must be examined from the perspective of a plaintiff's race.   As explained, in pertinent part, in the Third Circuit's Model Jury Instructions:

> It is important to understand that, in determining whether a hostile work environment existed at the [employer's workplace] you must consider the evidence from the perspective of a reasonable [member of plaintiff's race] in the same position. That is, you must determine whether a reasonable [member of plaintiff's race] would have been offended or harmed by the conduct in question.  You must evaluate the total circumstances and determine whether the alleged harassing behavior could be objectively classified as the kind of behavior that would seriously affect the psychological or emotional well-being of a reasonable [member of plaintiff's race].  The reasonable [member of

plaintiff's race] is simply one of normal sensitivity and emotional make-up."

3d Cir. Model Jury Instruction 6.2.2  Section 1981 Definitions—Hostile or Abusive Work Environment Model (also noting in Comment that "[t]he standards for a hostile work environment claim are identical under Title VII and Section 1981.").

Courts have also required that the totality of the circumstances must be considered when applying the standard.

> To determine whether an environment is hostile, **a court must consider the totality of the circumstances**, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (emphasis added; citations omitted).  The Third Circuit has explained: "First, we do not look to the number of incidents in a vacuum.  Rather, we consider 'the frequency of the allegedly discriminatory conduct in the context of a given case." *Id*. at 571 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)).  When analyzing a hostile work environment claim, "[w]e concentrate not on individual incidents, but on the overall scenario*." Quin v. Vertex, Inc.*, _ F.4th _, 2024 WL 1920379, at *6 (3d Cir. 2024)[2] (quoting *Caver v. City of Trenton*, 420 F.3d 243, 262-63 (3d Cir. 2005)).  "In considering the severity of the discriminatory conduct, we look to whether the

---

[2] A copy of all unpublished cases cited herein are attached as exhibits, per M.D.Pa. LR 7.08(a).

conduct creates 'an attitude of prejudice that injects hostility and abuse into the working environment.'"  *Quin*, _ F.4th _ , 2024 WL 1920379 at *6 (quoting *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 182 (3d Cir. 2020)).

> As has been similarly explained:

> [T]he analysis cannot carve the work environment into a series of discrete incidents and measure the harm adhering in each episode. Rather, a holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes. "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents but on the overall scenario."

*Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1524 (M.D.Fla. 1991). *Accord Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (citation omitted) ("In examining the 'totality of circumstances' giving rise to Rodgers' action, the district court properly considered the cumulative weight of Mann's several 'isolated' racial comments."; also quoting *Robinson*).

The harassers in this case include Holmes's supervisor, Tim McCoy, and a former co-worker, Beverly Hibbert.  "The first four elements of [a hostile work environment claim] establish that a hostile work environment existed.  The fifth element, … establishes the basis on which to hold the employer liable." *Huston v. Procter and Gamble Paper products Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).  While an employer is vicariously and strictly liable for the actions of a supervisor,

> when the hostile work environment is created by a victim's non-supervisory co-workers, the employer is not automatically liable. Rather, employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action.

*Id*. at 104 (citations omitted*), Accord Thomas v. Bronco Oilfield Services*, 503 F.Supp.3d 276, 303 (W.D. Pa. 2020) (*quoting Andreoli v. Gates*, 482 F.3d 641, 648 (3d Cir. 2007) (quotation omitted)).   The Third Circuit Court of Appeals has explained "that an employer knew or should have known about workplace [racial] harassment if 'management-level employees had actual or constructive knowledge about the existence of a [racially] hostile environment.'"   *Id*. at 105 (citation omitted).

Accordingly, the jury was properly instructed to view Holmes's work environment as a whole.   ECF Doc 98, pp. 18-20.   The jury was tasked with determining whether Holmes proved liability on the part of AHP, including and excluding the conduct of Beverly Hibbert and her Oreo baby comment.   *Id*. at pp.20-21.   The jury clearly decided that AHP is strictly liable for the conduct of Tim McCoy, and that the company did not prove its affirmative defense.   (Trial Transcript, Vol. IV, p. 83:19-84:18).   The jury also considered whether AHP is vicariously liable for creating a hostile work environment when Hibbert's Oreo baby

comments were included in the aggregate making up the hostile environment. (Trial Transcript, Vol. IV, p. 84:1-18).

AHP has argued incorrectly that Hibbert's comments were not sufficient when viewed in isolation to create a hostile work environment. Instead of characterizing Hibbert's comments as the first in a sequence of racially hostile conduct, the defendant portrays Hibbert's conduct as a one-off benign comment at the beginning of Holmes's employment. However, the evidence at trial painted a different picture.

Hibbert did not just make the "Oreo baby" comment on one occasion in the presence of her manager; Hibbert made the comment in the office "all the time." (Trial Transcript, Vol. I, p. 111:1-3; Vol. II, p. 63:24-645, 139:1-5, 147:2-9; Plaintiff's Exh. 7). An action that occurs "all the time" certainly meets the definition of pervasive. When the comments are viewed as part of the entire work environment that Holmes endured, the jury found as a matter of fact that Hibbert's conduct and McCoy's conduct created a hostile work environment. (Trial Transcript, Vol. IV, p. 83:19-84:7). McCoy was present when Hibbert talked about her Oreo grandchild with Holmes, and McCoy took no action against Hibbert. (Trial Transcript, Vol II, p. 63:8-64:15). Likewise, when Dodson and Cattron learned of the Oreo baby comments, they too took no action. (Trial Transcript, Vol. I, p. 44:17-21, 111:1-3; Vol. II, p. 63:24-64:5, 139:1-5, 147:2-9; Plaintiff's Exh. 7). The fact that Hibbert

continued to repeat the racial comment "all the time" evinces the fact that no prompt or remedial action was taken to stop the racial harassment.

After receiving proper jury instructions, the jury found by a preponderance of the evidence that the defendant intentionally discriminated against Holmes by creating a hostile work environment based on the conduct of both McCoy and Hibbert. (Trial Transcript, Vol. IV, p. 83:19-84:7). AHP did not exercise reasonable care to prevent racial harassment or promptly correct the harassing behavior, nor did it prove that Holmes failed to take advantage of preventative or corrective opportunities. (Trial Transcript, Vol. IV, p. 84:8-18). AHP's actions were malicious or showed reckless indifference to Holmes's federally protected rights, and the company failed to make a good faith attempt to comply with the law prohibiting race discrimination. (Trial Transcript, Vol. IV, p. 85:1-9).

Moreover, as to the Defendant's contention that it is entitled to a new trial because the verdict form did not provide for an apportionment of damages between those damages caused by the behavior of Hibbert and those caused by the behavior of McCoy, Defendant has waived any such argument by failing to request such an apportionment in the verdict form or by failing to object to the verdict form as it was presented to the jury. *E.g.*, *Inter Medical Supplies, Ltd. v. EBI Medical Systems, Inc.*, 181 F.3d 446, 463 (3d Cir. 1999) (finding defendant waived any argument that award of punitive damages must be set aside on ground that the jury's verdict did

14

not distinguish or apportion compensatory damages between tort claim and breach of contract claim because the defendant did not object on such ground at the time the jury received the proposed verdict sheet or when the jury returned); *Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 200 (3d Cir. 1995) (en banc) ("Finally, where a defendant fails to object to the form and language of special verdict forms or to the jury charges, before closing arguments or at the close of charging before the jury retires to deliberations, and the form had been submitted to counsel, objections are waived."); *Frank C. Pollara Group, LLC v. Ocean View Investment Holding, LLC,* 784 F.3d 177, (3d Cir. 2015) ("Here, it is uncontested that the Appellants failed to object either to the wording on the verdict form—indeed, they joined in proposing it—or to the responses provided by the jury before the jury was discharged. Therefore, . . . we today join a number of our sister circuits and hold that, if a party fails to object to an inconsistency in a general verdict before the jury is excused, that party waives  any objection in that regard." (footnote omitted)); *Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179, 188-89 (3d Cir. 1988) (noting that district court has discretion over the use and form of special verdict interrogatories to the jury and that under Fed.R.Civ.P. 49(a) objections are deemed waived unless they are made known to the court before the jury retires); *Richardson v. Prisoner Transport Services of America*, Civil Action No. 3:15-CV-01061, 2019 WL 1493313, at *3 (M.D.Pa. Apr. 4, 2019) (Caputo, J.) ("Because PTS failed to object to any

15

inconsistency in the general verdicts before the jury was excused, it has waived '*any*

objection in that regard,'. . . and cannot now argue the jury could not have found

PTS liable on one legal theory but not another." (emphasis in original; internal

citation omitted)). *See also Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998) ("As

the district court correctly noted, it is clear that a party who fails to object to errors

at trial waives the right to complain about them following trial.").

Moreover, the two cases cited by the Defendant in support of this argument

appear to be distinguishable.  First, in *Avaya Inc., RP v. Telecom Labs, Inc.*, 838

F.3d 354 (3d Cir. 2016), it appears likely that a party had objected to the

apportionment issue.  *Avaya Inc.*, 838 F.3d at 365 & n. 2 ("The parties before us . .

. have created their own mountain of issues and have argued, appealed, and cross-

appealed nearly all of them."; " 'Make a record, go ahead, The circuit will love it.  It

will be the 5,927th error you have pointed out to them.' ").  And, even if a party had

not objected to the general verdict issue, the Court had already decided to vacate the

verdict and remand the case to the trial court on another issue and was explaining

how and why the trial court should handle the issue of different theories of liability

on the verdict form on remand in the section of the opinion cited to by the Defendant

herein.  *Ibid.*, at 365 & 409 ("Unfortunately, if there had been a hope of bringing

this matter to conclusion any time soon, that was dashed when, in the middle of trial,

the District Court erroneously granted judgment as a matter of law against one side,

tainting the entire trial and the ultimate verdict."; "Given that result, we pause briefly to note that our reversal of the PDS verdict would endanger the validity of the damages award, even if we were not otherwise vacating it because of the District Court's errors regarding the common law claims. . . .").

Second, in *Wilburn v. Maritrans GP Inc.*, 139 F.3d 350 (3d Cir. 1998), there is simply no discussion of whether either party requested that special verdict forms be given to the jury addressing each of the plaintiff's discrete theories of negligent conduct by the Defendant or otherwise objected to the trial court's decision to merely utilize a general verdict form. Rather, the trial court, itself, decided to grant a new trial because it determined post trial that expert testimony was required to support each of the theories of negligent conduct. On appeal, although the Circuit Court disagreed that expert testimony was needed to support each of the theories of negligent conduct, the Circuit Court concluded that it could not overturn the trial court's discretion to grant a new trial because special verdict forms had not been presented to the jury and it could not determine if the jury's verdict had been premised upon any of the theories that did not require expert testimony. *Wilburn*, 139 F.3d at 361.

**B.  The Jury's Verdict Concerning the Affirmative Defense Was Not Against the Great Weight of the Evidence.**

This Honorable Court has previously set forth the legal standard for ruling on a motion for new trial in the following terms:

Fed.R.Civ.P. 59(a) provides that "The court may, on motion, grant a new trial on all or some of the issues ... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." "Under this rule, a court, in the exercise of discretion, may grant a new trial if, *inter alia,* the jury's verdict was against the weight of the evidence, or if substantial errors occurred in the admission or exclusion of evidence or in the charge to the jury." *Kidd v. Commonwealth of Pennsylvania, Bureau of Liquor Control Enforcement,* 2001 U.S. Dist. LEXIS 15856, No. Civ.A. 97–CV–5577, 2001 WL 1159770, at *1 (E.D.Pa. Aug. 21, 2001) (*citing Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940)). "Nevertheless, new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record cries out to be overturned or shocks our conscience." *Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1353 (3d Cir.1991) (*citing EEOC v. Delaware Dep't of Health and Soc. Servs.,* 865 F.2d 1408, 1413 (3d Cir.1989)). *See also Klein v. Hollings,* 992 F.2d 1285, 1290 (3d Cir.1993).

"When the basis of the motion involves a matter within the trial court's sound discretion, such as my evidentiary ruling or point of charge to the jury, I have wide latitude in deciding the motion." *McKenna v. City of Philadelphia,* 2008 U.S. Dist. LEXIS 76766, *9, 2008 WL 4450223, *4 (E.D.Pa. Sept. 30, 2008) (Ditter, Jr. J.) (Internal citations omitted). "If the verdict is alleged to be against the weight of the evidence, however, my discretion to order a new trial is much narrower, and I shall not substitute my judgment of the facts and the credibility of the witnesses for that of the jury." *Id.* (Internal citations and quotations omitted).

Generally, a court will sustain a jury verdict "if, drawing all reasonable inferences in favor of the prevailing party, there is a reasonable basis to uphold the verdict; courts will examine the record for evidence that could reasonably have led to the jury's verdict." *Kidd,* 2001 U.S. Dist. LEXIS 15856, 2001 WL 1159770, at *1 (citing *Nissim v. McNeil Consumer Products Co.,* 957 F.Supp. 600, 602–04 (E.D.Pa.1997) (Reed, J.), aff'd, without opinion, 135 F.3d 765 (3d Cir.1997)). *See also Motter v. Everest & Jennings, Inc.,* 883 F.2d 1223, 1230 (3d Cir.1989). Indeed, "[a] trial judge must be extremely reluctant

to interfere with the time-honored power of the jury, in the exercise of its collective judgment, to assess the damages sustained by the plaintiff." *Wontor v. Neenan,* No. 92–1588, slip op. at 7 (M.D.Pa. June 28, 1996) (Vanaskie, J.). (Internal quotation and citations omitted).

Moreover, the court does not have the prerogative to substitute its own judgment as to the amount of damages for that of the jury. Thus, regardless of whether the trial judge agrees or disagrees with the jury's verdict, the verdict must be upheld so long as it is supported by a 'minimum quantity of evidence from which a jury might reasonably decide to afford relief.' *Id.* at 7–8 (*quoting New Market Inv. Corp. v. Fireman's Fund Ins. Co.,* 774 F.Supp. 909, 917 (E.D.Pa.1991).

*Shrey v. Kontz*, 981 F. Supp.2d 333, 347-48 (M.D. Pa. 2013). Moreover, "where the evidence is in conflict, … and subject to two or more interpretations, the trial judge should be reluctant to grant a new trial." *Bender v. Norfolk Southern*, 31 F. Supp.3d 659, 664-65 (M.D. Pa. 2014) (citing *Klein v. Hollings*, 992 F.2d 1285, 1295 (3d Cir. 1993)).

The Third Circuit has repeatedly stated that motions for a new trial arguing that the verdict is against the weight of the evidence are proper only "when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Whelan,* 226 Fed.Appx. at 145 (quoting *Grapier v. City of Phila.,* 328 F.3d 120, 128 (3d Cir.2003)). This "stringent standard" is established "to ensure that a district court does not substitute its judgment on the facts and the credibility of the witnesses for that of the jury." *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1076 (3d Cir.1996). Such an action would effect "a denigration of the jury system and [,] to the extent that new trials are granted[,] the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts." *Id.*

*Bender*, 31 F. Supp.3d at 665.

"In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence ... The question is ... whether there is evidence upon which the jury could properly find a verdict for that party." *Id*. at 347, *quoting*, *Lightning Lube, Inc., v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).

First, the jury was properly instructed on the law concerning the defendant's affirmative defense. ECF Doc 98, pp. 23-24. Next, Defendant's argument that "no evidence was presented at trial that AHOM failed to implement these policies, failed to enforce these policies, or failed to" properly investigate and take proper remedial measures, is simply false.

As set forth above, the evidence at trial established that McCoy was the manager tasked with preventing racism and protecting his employees from a hostile work environment, yet he admittedly not only failed to protect Holmes, but harassed and discriminated against her himself. (Trial Transcript, Vol. I, p. 104:9-105:9, 115:12-17). Cattron admitted that McCoy's racist slurs were directly attributable to AHP. (Trial Transcript, Vol. II, p. 40:16-23). McCoy was not held accountable for using the term "coonie" or talking about Jimmy "the Greek," and the warning he received was solely based on the fact that he "allowed the situation to happen." (Trial Transcript, Vol. I, p. 74:14-16, 97:22-25. 102:19-22).

Holmes reported to Cattron that McCoy had googled the "N" word, misspelled it Niger, and then he was corrected that the proper spelling was nigger.

(Trial Transcript, Vol. II, p. 34:19-25).   McCoy blatantly lied during his trial testimony and made up an excuse that he was googling the term "Niger Mountain," rather than the word "nigger" in an effort to cover-up some of his own wrong-doing. (Trial Transcript, Vol. I, p. 93:17-95:5, Vol. II, p. 36:25-37:10, 71:8-73:12, 197:20-22).

Lois Dodson, Mark Cattron, and Tim McCoy all admitted that they knew during Patricia Holmes's employment that it was illegal to discriminate against an employee and to create a hostile work environment based on race. (Trial Transcript, Vol. I, p. 33:23-34:5; 91:9-15; Vol. II, p. 32:7-14).   Yet, despite Dodson's admission that she was trained to interview all persons involved before making decisions about what occurred in the workplace, Dodson did not do so in this case.  (Trial Transcript, Vol. I, p. 37:1-15).   No one in management or Human Resources ever spoke with, or obtained a statement from Beverly Hibbert. (Trial Transcript, Vol. I, p. 34:21-35:3, Vol. II, p. 40:24-41:12).

Holmes told Dodson that McCoy tried to convince her that the word "nigger" means black people.   McCoy then googled the term but misspelled it.   (Trial Transcript, Vol. I, p. 37:16-18; 41:19-42:10, Vol. II, p. 137:22-138:16; Plaintiff's Exh. 7).   Holmes also reported Hibbert's use of the term "Oreo grandbaby" to describe her mixed-race grandchild.   (Trial Transcript, Vol. I, p. 44:17-21; Vol. II 147:2-9, Plaintiff's Exh. 7).   Hibbert talked about the Oreo grandchild all the time,

in the office, in front of McCoy.  (Trial Transcript, Vol. I, p. 111:1-3; Vol. II, p. 63:24-64:5, 139:1-5, 147:2-9; Plaintiff's Exh. 7).  Dodson knew that McCoy talked about his Uncle Coonie, Jimmy "the Greek," and that when complaints are made to Cattron, he and McCoy simply laugh at the complaints.  (Trial Transcript, Vol. I, p. 45:6-13, Plaintiff's Exh. 7).

Dodson learned from Holmes and Eichelberger that McCoy had talked about how funny it was to see a white hood over Holmes's head during her Fit Test, he was laughing and asked Hibbert to take a picture of the test.  (Trial Transcript, Vol. I, p. 45:16-21; 49:1-6, 49:23-50:19,  Vol. II, 18:5-14 Plaintiff's Exh. 7-8).  Dodson recognized that McCoy's comment about the Fit Test referenced the KKK. (Trial Transcript, Vol. I, p. 70:12-16).

Dodson was also informed that McCoy had warned employees not to report events that occur in the office to Human Resources.  (Trial Transcript, Vol. I, p. 51:15-16, 52:14-15, Vol. II, p. 20:3-10, 140:15-141:2; Plaintiff's Exh. 8).   The written warning given to McCoy made no reference to the word "nigger," "Coonie," the Fit Test, Jimmy "the Greek," "Oreo," or threats about complaints to HR.  (Trial Transcript, Vol. I, p. 65:10-24, 72:9-14, 74:10-16, 106:3-13, Vol. II, p. 42:25-43:8, 50:25-51:2; Plaintiff's Exh. 11).  McCoy admitted that the warning letter he received did not concern his conduct, rather, it was related to Hibbert's conduct.  (Trial Transcript, Vol. I, p. 105:24-106:2).

After Holmes complained to HR, McCoy's racial animus turned to aggressive and hostile behavior.  (Trial Transcript, Vol. II, p. 89:15-92:16, 94:14-95:16).  No one at AHP responded to Holmes's email detailing complaints and the reasons for her resignation.  (Trial Transcript, Vol. I, p. 82:11-84:4,109:1-5, Vol. II, p. 59:17-21).

Cattron wrote in his notes that "Patricia called HR.  Very serious situation we're in."  (Trial Transcript, Vol. II, p. 47:20-23).  AHP did not enforce its anti-discrimination and anti-harassment policies, instead, the policies were used as a shield to protect management, including McCoy.  (Trial Transcript, Vol. II, p. 82:12-83:5).

As acknowledged by this Court in its Memorandum Opinion ruling on the Defendant's motion for summary judgment, "Holmes' supervisor not only used or referenced the slurs 'coon' and 'nigger'—two of the most offensive words contained in this language or any other—but directed those words toward the only African American employee subject to his supervision, and laughed while this occurred." Memorandum Opinion [Doc. No. 29], at p. 1.  Indeed, as also noted by this Court,[3] courts have explained that "[p]erhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment,' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence

---

[3] Memorandum Opinion [Doc. No. 29], at pp. 19-20 & n. 103.

of his subordinates." *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (internal citations omitted) (also noting "a supervisor's use of the term impacts the work environment far more severely than use by co-equals"). *Accord Castleberry v. STI Group*, 863 F.3d 259, 265 (3d Cir. 2017) (same; citing *Rodgers*); *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C.Cir. 2013) (same; citing *Rodgers*); *Ayissi-Etoh v. Fannie Mae*, 712 F.3d at 580 (Kavanaugh, J., concurring) ("No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African–Americans."); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ("Far more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to African–Americans."; "Stickell's constant use of the word 'monkey' to describe African Americans was similarly odious. To suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme."); *White v. BFI Waste Services, LLC*, 375 F.3d 288, 297-98 (4th Cir. 2004) (same; quoting *Spriggs*); *Green v. Franklin Nat. Bank of Minneapolis*, 459 F.3d 903, 911 (8th Cir. 2006) (same; citing *White, Spriggs*, and other cases); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015) (en banc) ("We also grasp that the use of Clubb's chosen slur—"porch monkey"—is about as odious as the use of the word 'nigger.' "; "Consequently, a reasonable jury could find that Clubb's

two uses of the 'porch monkey' epithet—whether viewed as a single incident or as a pair of discrete instances of harassment—were severe enough to engender a hostile work environment."); *Kengerski v. Harper*, 6 F.4th 531, 539-40 (3d Cir. 2021) (same; quoting *Boyer-Liberto*); *Dickerson v. State of N.J. Dept. of Human Services*, 767 F. Supp. at 616 ("The mere mention of the KKK invokes a long and violent history sufficient to detrimentally affect *any* reasonable person of the same race as the plaintiff." (emphasis in original)).

The evidence presented at trial clearly provided a reasonable basis to uphold the verdict. The jury clearly did not believe that AHP met its burden of proving its affirmative defenses. When all reasonable inferences are drawn in favor of Holmes, the record evidence provides ample bases that could reasonably have led to the jury's verdict. Based on the evidence presented at trial, the jury verdict should stand because no miscarriage of justice resulted from the verdict. *Brown v. Nutrition Mgmt. Servs. Co.*, 370 F.App'x 267, 269-70 (3d Cir. 2010) (citation omitted). Therefore, This Honorable Court should sustain the jury's verdict and should deny AHP's motion for a new trial.

## II. THE JURY'S COMPENSATORY DAMAGES AWARD WAS NOT EXCESSIVE, NOR WAS IT THE PRODUCT OF PASSION OR PREJUDICE; ACCORDINGLY NEITHER A NEW TRIAL NOR REMITTITUR IS NECESSARY

"A court may grant a new trial 'where a miscarriage of justice would result if the verdict were to stand.'" *Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 572

(3d Cir. 2002) (*citing Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282, 289 (3d Cir. 1993)).   In the context of a jury's damages award, a new trial is only appropriate where a jury's verdict is unsupported by the evidence or "so disproportionate to the injury that it 'shocks the conscience of the court.'"   *Id.* Alternatively, a court may reduce a damage award by remittitur, but "only if the verdict is so grossly excessive as to shock the judicial conscience." *Id.* at 574 (*citing Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 771 (3d Cir. 1987)).

The jury's verdict here was firmly supported by the evidence and well within the range of damage awards in similar cases, so that neither a new trial nor remittitur is appropriate.   Initially, medical evidence is not required to prove emotional damages in a discrimination case as long as "damages are 'direct, obvious, and foreseeable results of an injury…'"   *O'Neill v. Sears, Roebuck and Co.*, 108 F. Supp.2d 433, 441 (E.D. Pa. 2000) (*quoting Montgomery v. Bazaz-Sehgal*, 742 A.2d 1125, 1132 (Pa. Super. Ct. 1999)).   "A jury has 'very broad discretion in measuring damages,'" and a reviewing court only "review[s] the evidence to determine whether there is a 'rational relationship between the specific injury sustained and the amount awarded.'"   *Johnston v. School Dist. of Philadelphia*, No. 04-4948, 2006 WL 999966, *6 (E.D. Pa. Apr. 12, 2006) (*quoting Gumbs*, 823 F.3d at 773).

Moreover, the Court of Appeals for the Third Circuit has refused to disturb a verdict substantially higher than the jury's in this matter.  *See Gagliardo*, 311 F.3d

565 (denying new trial and remittitur following jury verdict of $1.55 million in emotional pain and suffering damages in disability discrimination matter). *See also Johnston*, 2006 WL 999966 (refusing to grant new trial or remittitur following verdicts of $500,000 each for emotional damages to four separate plaintiffs in race discrimination and retaliation cases). The plaintiff in *Gagliardo* suffered from multiple sclerosis, and was denied the accommodation of removing from her responsibilities a certain type of work that was difficult to perform with her condition, and that adversely affected her other work. *Gagliardo*, 311 F.3d at 567-68. She was subjected to discipline for her waning performance, and eventually dismissed. *Id.*

In addition to other elements of damages, the jury returned a verdict of $1.55 million in damages for emotional pain and suffering. *Id.* at 573-74. The evidence "demonstrated the effects of the mental trauma, transforming Gagliardo from a happy and confident person to one who was withdrawn and indecisive." *Id.* at 574. The *Gagliardo* court affirmed the trial court's denial of a new trial or remittitur, finding the $1.55 million verdict for emotional pain and suffering "not so excessive as to be unsupportable or offend the conscience of the court." *Id.* As such, the jury's verdict here was very much in line with others upheld in this Circuit.[4]  Indeed, other

---

[4] Courts in the Third Circuit are not alone in reaching this conclusion. *See Anderson v. American Airlines*, 352 Fed. Appx. 182 (9th Cir. 2009) (upholding $1 million jury verdict for emotional distress damages in disability discrimination claim).

courts also have reached similar results. *E.g., Bailets v. Pennsylvania Turnpike Commission*, 645 Pa. 520, 538-41, 181 A.3d 324, 335-37 (2018) (affirming award of $1.6 Million in whistleblower action for non-economic damages, including embarrassment and mental anguish and suffering; concluding that such award was not excessive, did not shock the conscience, and was not based on partiality, prejudice, or passion); *Diaz v. Tesla, Inc.*, 598 F. Supp.2d 809, 835-36 (N.D.Cal. 2022) (reducing an award of emotional distress damages from $6,900,000 to $1,500,000 in race discrimination case); *Gray v. Imperial Pacific International (CNMI), LLC*, Case Nos, 1:19-cv-00008 and 1:19-cv-00020, 2023 WL 3714156, at *19 (D.C.Northern Mariana Islands, May 30, 2023) (Manglona, C.J.) (awarding emotional distress damages in the amount of $1,000,000 in race discrimination case); *Osorio v. Source Enters., Inc.*, 05 Civ. 10029, 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007) (upholding $4 million in compensatory damages for emotional distress and reputational damage in retaliation claim); *Hempstead v. State Div. of Human Rights*, 649 N.Y.S.2d 942 (N.Y. App. Div. 1996) (upholding compensatory damages as high as $500,000 for psychological damages in discrimination cases); *Rosario-Mendez v. Hewlett-Packard Caribe BV*, 638 F. Supp.2d 205 (D.P.R. 2009) ($1.5 million verdict for compensatory damages in discrimination case involving sexual harassment); *tboin v. Liberty Mut. Ins. Co.*, 553 F.3d 121 (1st Cir. 2009) ($500,000 in damages for emotional distress not excessive in disability discrimination claim);

*Talavera-Ibarrondo v. San Sebatian*, 887 F. Supp.2d 419 (D.P.R. 2012) (awards of $899,000 each for emotional harm to two plaintiffs in sexual harassment case not excessive).

On the contrary, in the case on which the Defendant relies most heavily, the plaintiff's emotional trauma had improved to the point that her own expert testified that she "seemed fine," and the plaintiff only offered a "vague statement that her emotional distress continued 'to some extent.'" *Blakey v. Continental Airlines, Inc.*, 992 F. Supp.731, 735-36 (D.N.J. 1998). Furthermore, of the six cases cited by the Defendant to demonstrate an appropriate range of damages (which do not include the *Gagliardo* or *Johnston* cases cited above), four upheld damages verdicts less than the jury's assessment of Ms. Holmes' damages.[5] The courts in those cases never had an opportunity to consider whether or not a higher amount was excessive, limiting those cases' support to the Defendant's position.

Importantly, the Defendant grossly understates Ms. Holmes' emotional pain and suffering, as well as the evidence in support of it. The Defendant mischaracterizes Ms. Holmes' testimony regarding her emotional suffering as being "minimal," "very limited," and only felt "for a short period." It also remarkably posits that the fact that she endured difficulties in a romantic relationship and prior

---

[5] Those cases are *Giedgowd v. Cafaro Group, LLC*, No. 20-6184, 2021 WL 4963533 (E.D. Pa. Oct. 26, 2021); *Jones v. Pennsylvania State Police*, No. 16-4205, 2018 WL 2214812 (E.D. Pa. May 11, 2018); *Briggs v. Temple Univ.*, 339 F. Supp.3d 466 (E.D. Pa. 2018); and *Sallit v. Stankus*, 720 F. Supp.2d 645 (M.D. Pa. 2010).

employment challenges somehow lessens the impact of its own discrimination. The Defendant goes so far as to suggest that because Ms. Holmes did not immediately report the virulent discrimination to which she was subjected, she could not have been seriously harmed. Ms. Holmes' actual testimony paints a far different and more compelling picture of her suffering, as the jury plainly found.

Comments about Ms. Holmes' race at the Defendant's workplace began on her second day of employment, when a coworker, Beverly Hibbert, volunteered in the presence of a manager that her own daughter was romantically involved with a "deadbeat black man" and was soon to have an "Oreo baby." Trial Transcript Vol. IV, p. 63:8-p. 64:5. Worse, when Ms. Holmes later had to don a hood as part of a fit test for respiratory protection, the same manager who had heard the "Oreo baby" comment, Tim McCoy, made a crass joke referencing the Ku Klux Klan and its well-known hooded ritual clothing. *Id.*, p. 64:16-66:24.

Ms. Holmes described the effect of the Defendant's hostile workplace in painful detail. Mr. McCoy's comments made her "sick to [her] stomach," and "[f]our years later, it still hurts [her]." *Id.*, p. 66:25-67:15. As a result of the Defendant's discrimination Ms. Holmes experienced and continues to experience shaking, crying, insomnia, and nightmares when she does sleep. *Id.*, p. 67:16-25.

The two instances of overt discrimination described above were not isolated. Mr. McCoy continued to use racist language in Ms. Holmes' presence, at one point

calling one of his own darker-complected relatives "coonie," a reference to the racial slur "coon." *Id.*, p. 68:6-69:6.   Ms. Holmes described this experience as "dehumanizing." *Id.*   Furthermore, on another occasion Mr. McCoy bluntly began discussing use of the "n-word" with Ms. Holmes, with Ms. Hibbert joining in and overpronouncing the word for effect. *Id.*, p. 71:15-73:9.  In Ms. Holmes' own words, "And she said it's nig-gerrr.  That gerrr still rings in my ears to this day." *Id.*  The entire experience was "[o]ne of the most humiliating days in [her] life." *Id.*, p. 75:22-76:1.

AHP's persistent and severe discrimination caused Ms. Holmes to experience self-doubt, and for a time made her cautious and untrusting of Caucasians.  *Id.*, p. 76:2-77:8.  Before she reported the offending behavior to the Defendant's human resources department, Ms. Holmes vomited at least twice.  Trial Transcript Vol. I, p. 35:10-18.  Contrary to the AHP's callous suggestion, Ms. Holmes' emotional suffering was not limited in either severity or duration; rather it was profound.  Trial Transcript Vol. II, p. 98:9-12.

Ms. Holmes' emotional damages bear important similarities to those suffered by the plaintiffs in the *Gagliardo* and *Johnston* cases, where verdicts as large as or larger than the jury's here were upheld.   The plaintiffs in those cases offered narrative testimony regarding the impact of workplace discrimination.   *See Gagliardo*, 311 F.3d at 573-74 (plaintiff met standard of proof for emotional

damages with "evidence from her co-workers and family demonstrating the effects her problems with [the defendant] had on her life," and connecting her pain and suffering to her employment problems); *Johnston*, 2006 WL 999966 at 8-14 (damages included nausea, anxiety, feelings of decreased self-worth, and sleeplessness).

The types of damages Ms. Holmes suffered are likewise similar to those discussed in *Gagliardo* and *Johnston*. In addition to physical effects such as nausea and insomnia, Ms. Holmes shared with the *Gagliardo* and *Johnston* plaintiffs profound negative effects on her self-esteem, as well as emotional upset that continues to this day. Trial Transcript Vol. II, p. 67:16-25; 68:6-69:6.

Another important similarity shared among Ms. Holmes and the plaintiffs in these cases was serious damage to the ability to interact with others and form relationships. The *Gagliardo* court noted "the effects of the mental trauma, transforming Gagliardo from a happy and confident person to one who was withdrawn and indecisive." *Gagliardo*, 311 F.3d at 574. Similarly, Ms. Holmes described how the Defendant's discrimination sowed the seeds of mistrust in her, affecting her ability to interact with Caucasians for some time. Trial Transcript Vol. II, p. 76:2-77:8. The same type of harm that rendered $1.55 million in compensatory damages not excessive in *Gagliardo* leads to the conclusion that the jury's $500,000

verdict here is likewise not excessive; nor was it the result of passion or prejudice on the part of the jury.

Notably, the jury here had the opportunity to observe Ms. Holmes as she testified, weigh her credibility, and evaluate the effect of the discrimination she described under oath.  The District Court in *Johnston* commented on the importance of the jury's perception, observing that one plaintiff "appeared visibly shaken throughout his testimony," and that "the jury had the opportunity to view his demeanor and assess his level of suffering."  *Johnston*, 2006 WL 999966 at *10.  The *Johnston* court refused the invitation to second-guess the jury's determination, and Ms. Holmes respectfully submits that this Court should do the same.

The law is clear that in order for the jury's verdict to stand, there need only be "a rational relationship between the specific injury sustained and the amount awarded." *Johnston*, 2006 WL 999966 at *6.  A $500,000 verdict for emotional pain and suffering may not be commonplace, but neither is casual use of the "n-word" and invoking the terror of the Ku Klux Klan in the workplace.  Ms. Holmes respectfully submits that the jury's verdict in her case was not excessive because it in no way "shocked the conscience," but rather was consistent with the governing law, bore a thoroughly rational relationship with the harm she suffered, and was entirely appropriate under the circumstances.  The Court should therefore deny the

Defendant's motion for new trial or remittitur based on the jury's compensatory damages verdict.[6]

## III. The Jury's Award of Punitive Damages in This Case Was Constitutionally Sound, And This Court Should Neither Grant Judgment as a Matter of Law Regarding Punitive Damages nor Reduce the Amount of Such Damages.

The United States Court of Appeals for the Third Circuit has held:

> If a jury's punitive damages award is free of irrationality, passion, and prejudice, and falls within the "broad discretion in authorizing and limiting permissible punitive damages awards" . . . a trial judge should not substitute his or her view of the appropriate amount of punitive damages for the jury's determination. Similarly, the touchstone of appellate review of punitive damages awards is reasonableness, not exactitude.  If a court determines that a jury's punitive damages award is constitutionally excessive, . . . the court should decrease the award to an amount the evidence will bear, which amount must necessarily be as high—and may well be higher—than the level the court would have deemed appropriate if working on a clean slate. . . .

*Willow Inn, Inc. v. Public Service Mut. Ins. Co.*, 399 F.3d 224, 231 (3d Cir. 2005) (internal citations omitted).

While the Third Circuit has recognized that a new trial is the proper remedy if it can be shown that a jury verdict resulted from passion or prejudice, the Court has rejected a proposition that there is some level of a punitive damages award that

---

[6] AHP's request for a new trial because the jury's verdict resulted from passion or prejudice is completely devoid of merit.  As stated herein numerous times, the jury's verdict was based on ample evidence introduced at trial.  Additionally, AHP did not object in any way to Plaintiff's closing argument which was properly based upon record evidence.  Accordingly, even if there were any validity to AHP's arguments in such regard, those arguments have been waived.  *See* Response in Opposition to Defendant's Motion to Require Filing of Demonstrative Slides Used by Plaintiff in Opening and Closing Argument [ECF Doc. No. 128], a pp. 2-9.

would, in itself, evidence prejudice and passion and has found that an award of $25,000,000, although large, did not necessarily indicate that the jury's verdict was influenced by passion or prejudice in light of the evidence presented. *Dunn v. HOVIC*, 1 3.d 1371, 1383 (3d Cir. 1993). *Accord Inter Medical Supplies, Ltd. v. EBI Medical Systems, Inc.*, 181 F.3d 446, 464 (3d Cir. 1999); *Hurley v. Atlantic City Police Dept.*, 174 F.3d 95, 113-14 (3d Cir. 1999).

In *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003), the United States Supreme Court explained:

> We recognized in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), that in our judicial system compensatory and punitive damages, although usually awarded at the same time by the same decisionmaker, serve different purposes. *Id.,* at 432, 121 S.Ct. 1678. Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *Ibid.* (citing Restatement (Second) of Torts § 903, pp. 453–454 (1979)). By contrast, *punitive damages serve a broader function; they are aimed at deterrence and retribution. Cooper Industries, supra,* at 432, 121 S.Ct. 1678; *see also* [*BMW of North America, Inc. v.] Gore,* [517 U.S. 559,] 568, 116 S.Ct. 1589 [1996] ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition"); *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 19, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) ("[P]unitive damages are imposed for purposes of retribution and deterrence").
>
> * * *
>
> Although these [punitive damages] awards serve the same purposes as criminal penalties, defendants subjected to punitive damages in civil cases have not been accorded the protections applicable in a criminal proceeding. This increases our concerns over

the imprecise manner in which punitive damages systems are administered. We have admonished that "[p]unitive damages pose an acute danger of arbitrary deprivation of property. Jury instructions typically leave the jury with wide discretion in choosing amounts, and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences." *Honda Motor, supra,* at 432, 114 S.Ct. 2331; see also *Haslip, supra,* at 59, 111 S.Ct. 1032 (O'CONNOR, J., dissenting) ("[T]he Due Process Clause does not permit a State to classify arbitrariness as a virtue. Indeed, the point of due process—of the law in general—is to allow citizens to order their behavior. A State can have no legitimate interest in deliberately making the law so arbitrary that citizens will be unable to avoid punishment based solely upon bias or whim"). . . .

> In light of these concerns, in *Gore, supra, we instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. Id.,* at 575, 116 S.Ct. 1589. We reiterated the importance of these three guideposts in *Cooper Industries* and mandated appellate courts to conduct *de novo* review of a trial court's application of them to the jury's award. 532 U.S. 424, 121 S.Ct. 1678. Exacting appellate review ensures that an award of punitive damages is based upon an " 'application of law, rather than a decisionmaker's caprice.' " *Id.,* at 436, 121 S.Ct. 1678 (quoting *Gore, supra,* at 587, 116 S.Ct. 1589 (BREYER, J., concurring)).

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. at 416-18 (emphases added).

Following these and other holdings of the United States Supreme Court, courts have acknowledged:

> In a federal employment discrimination suit such as this one, punitive damages are available against an employer who " 'discriminate[s] in

the face of a perceived risk that its actions will violate federal law.' ...
[A]lthough egregious conduct could be evidence of intent to break the
law, such conduct [is] not required to establish punitive damages
liability. *Thus, in general, intentional discrimination is enough to
establish punitive damages liability."* Passantino *[v. Johnson &
Johnson Consumer Prods., Inc.],* 212 F.3d [493,] at 515 [(9th Cir.
2000)] (quoting *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 536, 119
S.Ct. 2118, 144 L.Ed.2d 494 (1999)) (first alteration in original).
*Review of the sufficiency of the evidence to support punitive damages
would thus be nearly identical to substantial evidence review for
liability for discrimination.*

*Zhang v. American Gem Seafoods, Inc*, 339 F.3d 1020, 1041 (9th Cir. 2003)

(emphases added).

Accordingly, all of the testimony and evidence discussed above in relation to

the liability of AHP for the behavior of McCoy and Hibbert, as well as its own failure

to act in this case to protect the civil rights of Holmes, must be also considered in

assessing the award of punitive damages.   In an effort to avoid unnecessary

repetition, plaintiff will not restate all such evidence in this section but instead adopts

and incorporates it here as if fully set forth below.

### Degree of Reprehensibility Guidepost

Turning to the first factor that focuses on the reprehensibility of the relevant

conduct, the Third Circuit Court of Appeals has explained:

"Perhaps the most important indicium of the reasonableness of a
punitive damages award is the degree of reprehensibility of the
defendant's conduct." *Gore,* 517 U.S. at 575, 116 S.Ct. 1589. Just as
criminal sanctions are calibrated to comport with the gravity of the
offender's conduct, so should the amount of the punitive damages
imposed on a defendant "reflect [ ] the accepted view that some wrongs

are more blameworthy than others." *Id.*

        Given the procedural posture of this case, we find especially salient the Supreme Court's observation that with respect to the reprehensibility inquiry, "the district courts have a somewhat superior vantage over courts of appeal, and even then the advantage exists primarily with respect to issues turning on witness credibility and demeanor." *Cooper Indus.[, Inc. v. Leatherman Tool Group, Inc.],* 532 U.S. [424,] at 424, 121 S.Ct. 1678[, 149 L.Ed.2d 674 (2001)]. . . .

*Willow Inn*, 399 F.3d at 230-31.

        In this context, the United States Supreme Court has also acknowledged:

We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell*, 538 U.S. at 419 (citing *Gore*, 517 U.S. 576-77).

        Importantly, AHP fails to acknowledge in its motion that intentional racial discrimination is among the upper echelon of reprehensible conduct for purposes of awarding punitive damages. In discussing the reprehensible nature of racial discrimination and harassment, courts have explained that in contrast to "purely economic harm" which is less likely to warrant substantial punitive damages awards, "intentional discrimination is a different kind of harm, a serious affront to personal liberty." *Zhang v. American Gem Seafoods, Inc*, 339 F.3d at 1043 (2003) (citing *Romano v. U-Haul Int'l, Inc.*, 233 F.3d 655, 673 (1st Cir. 2000), *cert. denied*, 534 U.S. 815 (2001)).

The *Zhang* Court further explained:

> There can be no question of the importance of our society's interest in combating discrimination; *this nation fought the bloodiest war in its history in part to advance the goal of racial equality, adding several amendments to the Constitution to cement the battlefield victory. See* U.S. Const. amends. XIII, XIV, XV. *Freedom from discrimination on the basis of race or ethnicity is a fundamental human right* recognized in international instruments to which the United States is a party, *see, e.g.,* International Convention on the Elimination of All Forms of Racial Discrimination, *adopted by the U.N. General Assembly* Dec. 21, 1965, 660 U.N.T.S. 195660 U.N.T.S. 195 (*entered into force for the United States* Nov. 20, 1994), *and the intentional deprivation of that freedom is highly reprehensible conduct.*
>
> *Racial discrimination often results in large punitive damage awards.* . . .

*Id.* (emphases added; footnote omitted). *Accord Diaz v. Tesla, Inc.*, 598 F. Supp.2d at 842 ("Tesla's conduct falls high on the spectrum. '[I]ntentional discrimination on the basis of race or ethnicity is especially reprehensible and a different kind of harm, a serious affront to personal liberty.' *Flores v. City of Westminster*, 873 F.3d 739, 760 (9th Cir. 2017) (internal quotation marks and citation omitted)."); *Sherman v. Kasotakis*, 314 F. Supp.2d 843, 872-73 (N.D.Iowa. 2004) (quoting *Zhang* and other cases; noting in part "the degradation of an individual in this fashion based solely on their race in today's society certainly falls, in this court's view, in the upper echelon of reprehensible conduct"); *Gray v. Imperial Pacific International (CNMI), LLC*, 2023 WL 3714156, at *19 (quoting *Zhang*).

When rejecting an employer's contention that the use of racial slurs, by co-

employees who were not supervisors, constituted merely tasteless and offensive joking that did not justify a large punitive damages award--similar to the argument made by Defendant herein albeit involving not only the behavior of a co-employee but also the conduct of an actual supervisor for which the employer is clearly liable--the Ninth Circuit explained:

> We first must assess the degree of reprehensibility of Potomac's conduct. In so doing, we are mindful of the fact that the conduct for which Potomac was found liable was not Fosdick's "nigger" jokes per se, but rather the action—or, rather, inaction—of the company's proxies in response to them. But, of course, *the reaction to the jokes cannot be divorced from the jokes themselves; one can only judge the reaction of the company with reference to that to which it reacted (or failed to react)*.

> *Potomac asserts on appeal that, though "tasteless, objectively offensive joking" occurred in its workplace, it was, at the end of the day, nothing more than "joking," and did not justify such a large punitive damages award. We reject this benign characterization of the evidence presented at trial*. Swinton made clear on the witness stand that he did not consider the language to which he was subject a joke. The only African–American employee of about 140 at the U.S. Mat plant, he was subject to daily abuse *featuring the word "nigger," "perhaps the most offensive and inflammatory racial slur in English, ... a word expressive of racial hatred and bigotry." Merriam–Webster's Collegiate Dictionary* 784 (10th ed.1993). Potomac presented its "joke" theory of the case to the jury. Had they believed it, they would have found for Potomac, as mandated by the jury instructions that required Swinton to prove that "the plaintiff regarded the conduct as undesirable and offensive." As signaled by the jury's verdict on liability and damages, they believed that what went on at U.S. Mat was "undesirable and offensive,"—not a "joke"—and we do not hesitate before agreeing.

> Nor do we agree with Potomac's contention that a large punitive damages award is unjustified because "this [is not] a case where the plaintiff complained and his complaints went unaddressed." As

explained above, *Potomac made Stewart its proxy by placing him in the position as recipient of Swinton's harassment complaints. For the purposes of liability and damages, what Stewart knew, Potomac knew, and what Stewart failed to do, Potomac failed to do as well. Despite witnessing the constant barrage of racial harassment directed at Swinton, Stewart (and thus Potomac) did absolutely nothing to stop it.* Despite testimony that offensive racial language was ubiquitous at U.S. Mat, there is nothing to indicate that anyone in the company did anything to combat this problem until officially informed by a state agency that Swinton was charging racial harassment.

Without minimizing the effect of the ugly word and the racially-charged jokes that permeate this case, we do note, however, that the Supreme Court in *BMW* outlined what one court has termed a "hierarchy of reprehensibility," with acts and threats of violence at the top, "followed by acts taken in reckless disregard for others' health and safety, affirmative acts of trickery and deceit, and finally, acts of omission and mere negligence." *Florez v. Delbovo,* 939 F.Supp. 1341, 1348–49 (N.D.Ill.1996) (citing *BMW,* 517 U.S. at 575–76, 116 S.Ct. 1589). Without deciding where exactly on the "hierarchy of reprehensibility" the conduct in this case falls, it is undisputed that it did not involve either actual violence or the threat thereof. While we certainly have nothing good to say about Potomac's conduct, we recognize that it does not amount to the worst kind of tortious conduct a defendant can commit.

*In sum, we have no trouble concluding that the highly offensive language directed at Swinton, coupled by the abject failure of Potomac to combat the harassment, constitutes highly reprehensible conduct justifying a significant punitive damages award.*

*Swinton v. Potomack Corp.*, 270 F.3d 794, 817-18 (9th Cir. 2001) (emphases added)

(affirming ratio of 28:1 of punitive to compensatory damages).

Additionally, courts have acknowledged in the context of assessing the

reasonableness of the amounts of punitive damages awards that conduct that causes

emotional distress damages is, indeed, reprehensible conduct because psychological

harm is a form of physical harm and falls within the continuum of harm affecting the health and safety of others.

> First, "physical harm ... encompasses psychological harm[.]" *Yowan Yang v. ActioNet, Inc.*, No. CV1400792ABPJWX, 2017 WL 2117028, at *15 (C.D. Cal. Jan. 23, 2017) (citation omitted). . . . Second, "emotional injuries are on a continuum of harm affecting at least the 'health and safety of others[.]' " *Miller v. Equifax Info. Servs., LLC*, No. 3:11-CV-01231-BR, 2014 WL 2123560, at *4, 2014 U.S. Dist. LEXIS 69450 at *11 (D. Or. May 20, 2014). . . .

*Gray*, 2023 WL 3714156, at *19.

### Reasonable Relationship/Ratio Guidepost

Turning to the second factor which focuses upon the disparity between the actual or potential harm suffered by the Plaintiff to the award of punitive damages, the United States Supreme Court explained in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996):

> *[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. TXO [Production Corp. v. Alliance Resources Corp.]*, 509 U.S. [443,] at 458, 113 S.Ct. [2711], at 2720 [(1993)]. Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. It is appropriate, therefore, to reiterate our rejection of a categorical approach. Once again, "we return to what we said ... in *Haslip: 'We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness ... properly enter[s] into the*

constitutional calculus.' " *Id.,* at 458, 113 S.Ct., at 2720 (quoting *[Pacific Mut. Life Ins. Co. v.] Haslip,* 499 U.S. [1], at 18, 111 S.Ct. [1032], at 1043 [1991]). In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis. *When the ratio is a breathtaking 500 to 1, however, the award must surely "raise a suspicious judicial eyebrow." TXO,* 509 U.S., at 481, 113 S.Ct., at 2732 (O'CONNOR, J., dissenting).

*Gore*, 517 U.S. at 582-83 (emphases added; footnote omitted). *Accord, e.g., Swinton v. Potomack Corp.*, 270 F.3d at 818; *Deters v. Equifax Credit Information Services, Inc.*, 202 F.3d 1262, 1273 (10th Cir. 2000) (noting in a case involving a claim of sexual harassment, that "where the injury is primarily personal, a greater ratio may be appropriate").

After concluding both that the compensatory damages involved a lower amount of economic damages as well as a personal noneconomic injury that was difficult to quantify and that the defendant's wealth was significant enough to justify a substantial punitive damages award, the *Swinton* Court acknowledged that both the actual harm caused and the potential harm that could have been caused are appropriately at issue in such analysis.

Finally, under *BMW* we are permitted to address the reasonable relationship between the punitive damages and "the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." *Id.* at 581, 116 S.Ct. 1589 (quoting *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 21, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). *But for Swinton's decision that he couldn't take it any longer and thus had to quit, nothing in the record suggests that U.S. Mat would have done anything to address a workplace replete with racial and ethnic slurs, not only about blacks, but also directed at other minorities and ethnic groups. The fact that the harm from unchecked racial*

> *harassment occurring day after day cannot be calculated with any precision does not deflate its magnitude.*
>
> In view of the factors articulated by the Court, we cannot say that the ratio [of 28:1] is constitutionally excessive or jars our "constitutional sensibilities." *Haslip,* 499 U.S. at 18, 111 S.Ct. 1032. . . .

*Swinton*, 270 F.3d at 819 (emphases added).

Consistent with the above discussion, "[c]ourts have awarded punitive damages with high ratios in employment discrimination cases." *Gray*, 2023 WL 3714156, at *19. While courts applying *State Farm's* second guidepost, have stated "few awards exceeding a single-digit ratio between punitive damages and compensatory damage, to a significant degree, will satisfy due process," there is no bright-line test. *Jester v. Hutt*, 937 F.3d 233, 242 (3d Cir. 2019). Various courts have awarded ratios higher than the single digits. *See, e.g., Swinton*, 270 F.3d at 819 (28:1); *Deters*, 202 F.3d at 1272-73 (59:1); *EEOC v. W & O, Inc.*, 213 F.3d 600, 616 (11th Cir. 2000) (26:1 and 16:1); *Romano*, 233 F.3d at 673 (19:1); *Hampton v. Dillard Dept. Stores, Inc.*, 247 F.3d 1091, 1111-17 (10th Cir. 2001) (20:1); *McKnight v. Circuit City Stores, Inc.*, Civil Action No. 3:95CV964, 1997 WL 328638, at **5-7 (E.D.Va. Mar. 12, 1997) (18:1 and 11:1); *Matias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003) (37.2:1; in case not involving discrimination).

Moreover, in assessing the ratio in this case, attorney fees and costs awarded by the Court are considered part of the compensatory damages for purposes of comparing the ratio of punitive damages to compensatory damages. *E.g., Willow Inn, Inc. v. Public Service Mut. Ins. Co.*, 399 F.3d 224, 235-37 (3d Cir. 2005); *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*, 244 Fed.Appx. 424, 437 (3d Cir. 2007); *Action Marine, Inc. v. Continental Carbon Inc.*, 481 F.3d 1302, 1321 (11th Cir. 2007); *Continental Trend Resources, Inc. v. OXY USA Inc.*, 101 F.3d 634, 642 (10th Cir. 1996); *In re USA Commercial Mortg. Co.*, 802 F. Supp.2d 1147, 1188-89 (D.Nev. 2011); *Quicken Loans, Inc. v. Brown*, 230 W.Va. 306, 330-33, 737 S.E.2d 640, 664-67 (2012); *Clausen v. Icicle Seafoods, Inc.*, 174 Wash.2d 70, 87, 272 P.3d 827, 836 (2012) (en banc); *Blount v. Stroud*, 395 Ill.App.3d 8, 27-28, 915 N.E.2d 925, 943-44 (2009).

Accordingly, until this Court rules upon Plaintiff's Petition for Attorney Fees and Costs, it cannot be known what the exact ratio currently is here between punitive damages and compensatory damages. Indeed, this issue is further hampered by the fact that the Plaintiff will also be entitled to an award for attorney fees and costs based upon her counsels' work in filing or responding to post-trial motions and any appeals. Nonetheless, it is a fair statement that AHP's statement that the ratio at issue is 40:1 is not actually correct. However, even without yet knowing the exact ratio at issue herein, Plaintiff submits for all of the reasons discussed herein that the

difference between the actual and potential harm at issue in this case when compared to the amount of punitive damages is not so great as to render the award unconstitutionally excessive.

### Comparable Civil Penalty Guidepost

Turning to the third factor of the analysis, Plaintiff notes that "in this case, there are no comparable civil penalties—which is precisely the reason that the federal government implemented statutes that would protect an individual's civil rights. For this very reason, some courts have found the third guidepost of limited utility in assessing the reasonableness of a punitive damages award for a civil rights violation." *Sherman v. Kasotakis*, 314 F. Supp.2d at 875-76 (citing *Williams v. Kaufman County*, 352 F.3d 994, 1016 n. 77 (5th Cir. 2003) (concluding that the third guidepost is not easily applicable to a case involving a § 1983 violation)). Indeed, "Congress has not seen fit to impose any recovery caps in cases under § 1981 (or § 1983), although it has had ample opportunity to do so since the 1991 amendments to Title VII." *Swinton*, 270 F.3d at 820. *Accord, e.g., Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir.), *rehearing and rehearing en banc denied*, 77 Fed.App'x 510 (11th Cir. 2003), *cert. dismissed*, 540 U.S. 1158 (2004) ("Although a comparison to the Title VII cap may be instructive, to some degree, when analyzing the third *Gore* guidepost, we will not apply the Title VII cap by analogy to employment discrimination cases under § 1983."); *Hampton v. Dillard Dept. Stores, Inc.*, 247

F.3d at 1117 ("Section 1981 does not have a statutory cap that limits punitive damages as does Title VII.").

Nonetheless, AHP, as have other defendants before it, argues for purposes of addressing this third guidepost that this Honorable Court should impose the same punitive damage cap in this § 1981 case as the cap imposed in cases under Title VII. Of course, this argument ignores the fact that Congress' decision to not apply punitive damages caps to claims brought under § 1981, despite having done so to claims brought under Title VII, strongly demonstrates that Congress envisioned that larger awards are appropriate under § 1981. Over the years, courts which have analyzed this argument, or ones similar to it, have, by and large, declined to reduce punitive damages awards solely on the basis of caps applicable to Title VII cases in light of Congress' plain intent to not require them in cases brought pursuant to other civil rights statutes. *See*, *e.g.*, *Swinton*, 270 F.3d at 820; *Bogle*, 332 F.3d at 1362; *Hampton*, 247 F.3d at 1117; *Shermans*, 314 F. Supp.2d at 875-76. For those reasons expressed herein, Plaintiff respectfully requests that this Honorable Court similarly reject AHP's arguments in such regard.

### The United States Supreme Court Could Overrule *BMW v. Gore*

Lastly, for purposes of preserving the issue for any appeals, Plaintiff acknowledges that Justice Thomas and the late Justice Scalia have consistently argued in dissenting and/or concurring opinions to the majority opinions in cases

addressing the constitutionality of punitive damages awards that the United States Constitution, including the Bill of Rights, does not constrain the size of punitive damages and that if given the opportunity they would vote to overrule *BMW v. Gore*, *supra*, and its progeny. *See*, *e.g.*, *Cooper Indust., Inc., v. Letherman Tool Group, Inc.,* 532 U.S. 424, 434 (2001) (Thomas, J., concurring) (Scalia, J., concurring). Accordingly, in light of the recent changes to the Justices sitting on the Supreme Court as well as the potential for additional changes, Plaintiff reserves the right to preserve this argument for any appeals in the event that any new majority of the Justices might wish to revisit such issue.

## CONCLUSION

For all of the foregoing reasons, the Plaintiff respectfully requests that Your Honorable Court deny the Defendant AHP's Renewed Motion for Judgment as a Matter of Law, Motion for New Trial or Remittitur, and Motion to Amend the Judgment.

Dated: May 20, 2024                     Respectfully submitted,

                                        /s *Thomas B. Anderson, Esquire*
                                        Thomas B. Anderson, Esquire
                                        PA I.D. #79990
                                        Bordas and Bordas, PLLC.
                                        420 Fort Duquesne Blvd., Suite 1800
                                        One Gateway Center
                                        Pittsburgh, PA  15222
                                        (412) 502-5000
                                        Email:  tanderson@bordaslaw.com

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.8(b)(2)</u>

Plaintiff certifies that this brief does not violate the page-limit restriction because although it does not exceed 15,000 words.  This brief contains <u>12,485</u> words.

Dated: May 20, 2024                    Respectfully submitted,

<u>/s *Thomas B. Anderson, Esquire*    </u>
Thomas B. Anderson, Esquire
PA I.D. #79990
Bordas and Bordas, PLLC.
420 Fort Duquesne Blvd., Suite 1800
One Gateway Center
Pittsburgh, PA  15222
(412) 502-5000
Email:  tanderson@bordaslaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of Plaintiff's Brief in Support of Petition for Attorney Fees and Costs has been served on this 20th day of May, 2024, via email on the following:

Mishell B. Kneeland
Culhane Meadows, PLLC
National Litigation Support Center
13101 Preston Rd. Suite 110-1510
Dallas, TX 75240
(mkneeland@cm.law)

Jo Bennett
Culhane Meadows, PLLC
1650 Market Street Suite 3600
Philadelphia, PA 19103
(jbennett@cm.law)

/s *Thomas B. Anderson, Esquire*
Thomas B. Anderson, Esquire
PA I.D. #79990
Bordas and Bordas, PLLC.
420 Fort Duquesne Blvd., Suite 1800
One Gateway Center
Pittsburgh, PA  15222
(412) 502-5000
Email:  tanderson@bordaslaw.com