## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PATRICIA HOLMES,

      Plaintiff,

      v.

AMERICAN HOMEPATIENT, INC.,

      Defendant.

No. 4:21-CV-01683

(Chief Judge Brann)

## MEMORANDUM OPINION

### SEPTEMBER 6, 2024

Litigation is fraught with risk and uncertainty. Knowing these risks, American HomePatient, Inc. nonetheless chose to proceed to trial in this case. After the jury awarded Plaintiff a $20.5 million verdict, American HomePatient, Inc. swiftly sought to contain the fallout from that decision. Since then, the Court has received numerous motions challenging aspects of this trial. As Robert Louis Stevenson observed: "[e]verybody, soon or late, sits down to a banquet of consequences." That time is now for American HomePatient, Inc.

## I.    BACKGROUND

On September 30, 2021, Plaintiff, Patricia Holmes, filed a two-count complaint against Defendant, American HomePatient, Inc. ("AHOM").[1] After granting summary judgment in favor of AHOM on Plaintiff's retaliation claim,[2] the

---

[1]    Doc. 1 (Compl.).
[2]    Doc. 30 (Granting in Part and Denying in Part Defendant's Motion for Summary Judgment).

Court held a three-day jury trial on Plaintiff's Section 1981 hostile work environment claim. At the conclusion of this trial, the jury delivered a unanimous verdict awarding Holmes $500,000 in compensatory damages and $20 million in punitive damages.[3] Currently pending before the Court are a series of post-trial motions filed by the parties. Each motion and its appropriate standard of review are discussed separately below.

## II.   FACTUAL BACKGROUND

Patricia Holmes worked as a Customer Service Representative at AHOM's State College, Pennsylvania location from October 2019 through July 2020.[4] Timothy McCoy managed the State College office and four of its employees: Patricia Holmes, Tammy Dunmire, Beverly Hibbert, and Haley Eichelberger.[5] Dunmire and Hibbert also worked as Customer Service Representatives while Eichelberger served as the site's respiratory therapist.[6]

### A.   Discrimination Alleged by Holmes

Holmes alleged that she faced a racially hostile work environment created by Hibbert and McCoy.

---

[3]   Doc. 99 (Jury Verdict).
[4]   Doc. 103 (Apr. 8, 2024 Trial Transcript) ¶¶ 109:6-14; Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 81:6-14.
[5]   Doc. 103 (Apr. 8, 2024 Trial Transcript) ¶¶ 95:25-96:2.
[6]   Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 14:8-9, 14:22-15:16.

### 1.    Hibbert's Conduct

On Holmes' second day with AHOM, Hibbert told her that she was "about to be a grandmother … and that her daughter was involved with a deadbeat black man that already had five other children."[7] She then called her future grandchild an "Oreo baby."[8] McCoy was present when Hibbert made that comment; Holmes testified that he only said "Jeez, Bev"[9] but had stated at her deposition that he also reprimanded Hibbert.[10] Holmes thought Hibbert "lacked decorum" and that "she was a person that was rough around the edges" for making that comment.[11] When asked if Hibbert talked about the "Oreo baby," Dunmire said she did so "[a]ll the time" in front of McCoy.[12]

In March 2020, Hibbert interjected in a conversation between McCoy and Holmes to loudly spell out and say the N-word.[13] After receiving a final written warning from AHOM for that behavior, Hibbert wore a piece of tape over her mouth to avoid "say[ing] the wrong thing."[14] Due to this continuation of her inappropriate behavior, AHOM terminated her employment.[15] The Court

---

[7]   *Id.* ¶¶ 63:25-64:2.
[8]   *Id.* ¶ 64:3.
[9]   *Id.* ¶ 64:13.
[10]   *Id.* ¶ 119:21.
[11]   *Id.* ¶¶ 64:8-9.
[12]   *Id.* ¶¶ 139:1-5.
[13]   *Id.* ¶¶ 73:2-7.
[14]   *Id.* ¶¶ 138:24-25.
[15]   Ex. D-5 (Hibbert Termination Notice).

previously concluded that AHOM could not be held liable for Hibbert's March 2020 conduct.[16] The jury was appropriately instructed on that issue.[17]

### 2. McCoy's Conduct

### a. The Fit Test Incident

McCoy's first racial comment occurred after Holmes' N95 mask fit test on October 30, 2019.[18] Eichelberger placed a white hood over Holmes' head to perform this test.[19] With the test complete, McCoy approached Eichelberger to say "[i]t's ironic to see a white woman putting a hood on a black woman's head."[20] Holmes overheard McCoy make this comment; as she entered Eichelberger's office, McCoy turned so that he was "laughing in [Holmes'] face."[21]

Afterwards, Holmes "felt horrible" and naturally connected McCoy's comment to the Ku Klux Klan.[22] It made her "sick to [her] stomach," as she thought McCoy "placed very little value on [her] life as a person."[23] She also testified that this still "hurts" her four years later as she is "still shaking, still crying" and suffers from nightmares.[24]

---

16 Doc. 29 (Summary Judgment Mem. Op.) at 17.
17 Doc. 98 (Jury Instructions) at 21.
18 Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 119:34-120:4.
19 Ex. P-4 (Fit Test Image); Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 15:1-16.
20 Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 66:16-19.
21 *Id.* ¶¶ 66:22-24.
22 *Id.* ¶¶ 67:1-4.
23 *Id.* ¶¶ 67:6-13.
24 *Id.* ¶¶ 67:17-20.

### b.    Uncle "Coonie" Comment

In November 2019, Holmes asked McCoy a question after a morning meeting.[25] After McCoy addressed her concern, he went on a tangent about his uncle with a "dark" complexion.[26]  He indicated that his family referred to this uncle as "Coonie."[27] Holmes described this slur as "dehumanizing."[28]

### c.    The Events of March 2020

### i.    Holmes' Version of March 5, 2020

On March 5, 2020, McCoy initiated a conversation with Holmes about the 2020 presidential election.[29] After discussing then-President Donald Trump, McCoy inquired about Holmes' thoughts on the N-word.[30] Holmes was "taken aback" and told him that she believed it was "an ugly word."[31] McCoy explained that he thought that the "N-word means black people" and attempted to search the word on Google to prove this point.[32] He accidentally showed Holmes search results for the country of Niger instead.[33] At that time, Hibbert interjected and told McCoy that he was spelling the word wrong.[34] Hibbert pronounced "it to him as if

---

[25]  *Id.* ¶¶ 68:10-17.
[26]  *Id.* ¶¶ 68:15-17.
[27]  *Id.* ¶¶ 68:17-18.
[28]  *Id.* ¶¶ 69:1-6.
[29]  *Id.* ¶¶ 70:8-16.
[30]  *Id.* ¶¶ 71:15-16.
[31]  *Id.* ¶¶ 71:15-18.
[32]  *Id.* ¶¶ 71:21-25.
[33]  *Id.* ¶¶ 72:8-12.
[34]  *Id.* ¶¶ 73:2-7.

he was a fourth grade student …."[35] McCoy and Hibbert then "bust[ed] out laughing."[36] When asked about this conversation, Holmes stated she felt McCoy was calling her the N-word because he believed it "means black people."[37] She described it as "[o]ne of the most humiliating days of [her] life."[38]

After this conversation, Dunmire took Holmes outside because she was "not okay."[39] Upon their return, Hibbert immediately confronted Holmes.[40] Hibbert eventually began to "yell[] and scream[]" and McCoy told them to "just knock it off."[41] Holmes decided to remove herself from the situation as McCoy failed to control Hibbert's behavior.[42] As she left, Holmes asked McCoy "to give this racist back her [lunch] money."[43] In response, Hibbert yelled "[f]uck you" at Holmes.[44] This prompted McCoy to make Hibbert leave for the day as well.[45] Holmes reported this entire incident to AHOM Area Manager Mark Cattron the following day, and Hibbert received a final written warning as a result.[46]

---

[35] *Id.* ¶¶ 73:5-7.
[36] *Id.* ¶¶ 73:10-12.
[37] *Id.* ¶¶ 75:2-11.
[38] *Id.* ¶¶ 75:24-25.
[39] *Id.* ¶¶ 74:1-8.
[40] *Id.* ¶¶ 74:9-15.
[41] *Id.* ¶¶ 74:18-22.
[42] *Id.* ¶¶ 78:11-17.
[43] *Id.* ¶¶ 78:21-23.
[44] *Id.* ¶¶ 78:24.
[45] *Id.* ¶¶ 79: 1-2.
[46] *Id.* ¶¶ 81:20-82:7.

This conversation caused Holmes to change "the way [she] felt about [her]self."[47] She wondered why anyone would view her as "less than" and why someone would "devalue" her like that.[48] It also caused her to change how she "interacted with white people"[49] before she eventually "came to [her] senses."[50]

### ii.    McCoy's Version of March 5, 2020

McCoy denied starting a conversation about the N-word.[51] He instead claimed to have searched what he "thought was Niger Mountain on [his] phone"[52] due to a "debate about renaming a mountain in Western Pennsylvania."[53]

### iii.    Subsequent Events in March 2020

After reporting the March 5, 2020 incident to Cattron, Holmes overheard a conversation in which Hibbert claimed that both Holmes and McCoy would also be disciplined.[54] This prompted Holmes to ask McCoy if she was going to be written up as well.[55] In response, McCoy asked Holmes "what are your intentions here … are you looking to get somebody fired, or do you want to be happy here?"[56]

---

[47]  *Id.* ¶¶ 76:2-4.
[48]  *Id.* ¶¶ 76:9-14.
[49]  *Id.* ¶¶ 76:19-20.
[50]  *Id.* ¶ 77:1.
[51]  Doc. 103 (Apr. 8, 2024 Trial Transcript) ¶ 93:16.
[52]  *Id.* ¶¶ 93:19-20.
[53]  *Id.* ¶¶ 94:1-3.
[54]  *Id.* ¶¶ 79:17-22.
[55]  *Id.* ¶¶ 80:8-13.
[56]  *Id.* ¶¶ 80:14-16.

Despite receiving a final written warning, Hibbert escalated her behavior by attending a morning meeting with a piece of tape over her mouth.[57] Because Holmes refused to sit next to Hibbert at the meeting,[58] McCoy asked her if she was "trying to start trouble in here."[59] This perceived reprimand led Holmes to contact the Human Resources Department directly.[60]

### B. AHOM's Policies and Investigation

#### 1. AHOM's Anti-Discrimination Policies

AHOM's anti-discrimination and anti-harassment policy entitled "[a]ll employees … [to] the right to work in an environment that is free from all forms of unlawful discrimination and conduct that can be considered harassing, coercive or disruptive, including harassment based on … race …."[61] "Location managers are responsible for ensuring … compliance with these policies …."[62]

AHOM's reporting procedure directed employees to report discrimination to any of the following individuals: the Region/Division Manager, Head of Human Resources, Head of Employee Relations/Human Resources Services, Employee Relations Manager, or the Human Resources Business Partner.[63]

---

[57]   *Id.* ¶¶ 83:8-84:8.
[58]   *Id.*
[59]   *Id.*
[60]   *Id.* ¶¶ 84:19-85:4.
[61]   Ex. P-2 (Lincare Employee Handbook) at 33.
[62]   *Id.*
[63]   *Id.* at 37.

But it is the responsibility of the Human Resources Department to investigate claims of discrimination.[64] To do so, the investigators consider "the totality of the circumstances, the nature of the alleged discriminatory or harassing conduct and the context in which it is claimed to have occurred …."[65]

Lois Dodson, a member of Lincare's Employee Relations team, stated that the goal of an investigation is "[t]o either substantiate the situation or the allegation … or to determine it unsubstantiated."[66] They will make a recommendation when a situation has "been witnessed by at least one other person [and] the information" collected "is succinct" and "consistent."[67] Under these circumstances, they will often have "reason to believe that this is the picture of what's happened …."[68] If there is not sufficient information to make a recommendation, they then "investigate further" to see if the allegation can be substantiated.[69] For unsubstantiated allegations, they inform the complainant of what they have found and tell them to reach out if "anything further … comes up."[70]

If an allegation is substantiated, the Employee Relations team member and the employee's manager consider the employee's history, the presence of any prior complaints or corrective actions, the length of their employment history, and how

---

[64]   *Id.* at 38.
[65]   *Id.*
[66]   Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 164:16-17.
[67]   *Id.* ¶¶ 164:8-12.
[68]   *Id.*
[69]   *Id.* ¶¶ 164:13-14.
[70]   *Id.* ¶¶ 164:20-23.

corrective actions have been used "in the past for a similar situation" to select an appropriate corrective action.[71]

### 2.    Holmes Calls Mark Cattron

As noted above, Holmes called Cattron about the March 5, 2020 incident.[72] Holmes described Cattron as "empathetic" and felt "he had some sincerity in the things he said to" her.[73] This call led Cattron to issue a final written warning to Hibbert for her use of the N-word and other, inappropriate language on March 5, 2020 after consulting with Human Resources.[74] Dodson, the Human Resources employee Holmes later contacted, was not involved in this decision.[75] At trial, Cattron acknowledged that he knew it was illegal to create a racially hostile work environment in March 2020.[76]

### 3.    Dodson Investigates

Following the incident with the tape, Holmes directly contacted Dodson.[77] Holmes told Dodson about Hibbert's "Oreo baby" comment, McCoy's comments about "Coonie" and Jimmy the Greek, the fit test incident, the events of March 5, 2020, and the tape incident.[78] Before calling Dodson, Holmes vomited twice.[79]

---

[71]   *Id.* ¶¶ 165:7-12.
[72]   *Id.* ¶¶ 81:20-82:1.
[73]   *Id.* ¶¶ 82:3-10.
[74]   *Id.* ¶¶ 190:21-191:2.
[75]   Doc. 103 (Apr. 8, 2024 Trial Transcript) ¶¶ 36:13-25, 39:1-7.
[76]   Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 32:7-14.
[77]   *Id.* ¶¶ 84:22-85:4.
[78]   Ex. P-7 (Dodson Holmes Interview Notes) at 2.
[79]   *Id.*

Dodson interviewed Eichelberger and Dunmire; she also spoke with McCoy and Cattron.[80] Eichelberger confirmed Holmes' description of the fit test incident and felt he should not "have the 'odd-ball' conversations he" engaged in.[81] Dunmire indicated that McCoy had stated that "things would be very different if HR got involved in situations."[82] Finally, Dodson, Cattron, and McCoy "talked through the scenarios described by [Holmes] and the witnesses."[83] McCoy did not remember "the example involving the hood."[84] Dodson specifically noted that both Holmes and Eichelberger "described" the fit test incident but McCoy maintained that he did not "recall anything about that."[85] McCoy also admitted to discussing Jimmy the Greek and having a conversation about genealogy where he mentioned "Coonie," someone he believed to be "part black."[86] When testifying, Dodson described McCoy as "remorseful" during this conversation.[87] Dodson also acknowledged that she knew it was illegal to create a racially hostile work environment in March 2020.[88]

---

[80]   Ex. P-8 (Employee Interview Notes).
[81]   *Id.* at 1.
[82]   *Id.* at 2.
[83]   *Id.*
[84]   *Id.*
[85]   *Id.* at 3.
[86]   *Id.*
[87]   Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 173:9-12.
[88]   Doc. 103 (Apr. 8, 2024 Trial Transcript) ¶¶ 34:2-5.

Because Dodson "understood what happened and had enough information to make a decision[,]" she chose not to interview Hibbert.[89] This understanding was based on the fact that "Patricia said [Hibbert] said [the N-word]" and McCoy "confirmed it."[90]

### 4.    The Corrective Actions

After consulting with a Human Relations employee, Cattron decided to issue a Final Written Warning to Hibbert on March 9, 2020 due to her actions on March 5, 2020.[91] This Final Written Warning stated that: "[d]uring a political conversation with other staff members in, multiple witnesses confirmed you used a racial slur in conversation, making others extremely uncomfortable."[92] The Final Written Warning identified this behavior as a violation of two "Lincare Major Infractions":

> #4 – Immoral, disorderly, indecent or harassing conduct, including the use of abusive or profane language.

> #16 [–] Failing to exhibit self-control to customers and/or fellow employees.[93]

Following the tape incident, Dodson and Cattron concluded that Hibbert needed to be terminated.[94] Her March 16, 2020 Employment Termination Notice

---

[89]   *Id.* ¶¶ 37:10-15.
[90]   *Id.* ¶¶ 38: 24-39:1.
[91]   Ex. D-3 (Hibbert Final Written Warning).
[92]   *Id.*
[93]   *Id.*
[94]   Ex. P-8 (Employee Interview Notes) at 3.

stated that she "put tape on [her] mouth, perpetuating the entire situation" and again identified her behavior as a violation of Lincare Major Infractions #4 and #16.[95]

Due to his involvement in the events of March 2020, McCoy received a Written Warning on March 19, 2020.[96] This Written Warning stated in relevant part:

> You admitted to initiating a discussion that led to serious rational tension when an employee stated and spelled a racial slur with another employee that is a minority. That conversation then led to this employee using profanity towards the other employee and left that employee feeling very uncomfortable. During further investigation, it was revealed that this employee was well known for having highly inappropriate outbursts to her coworkers. In one of these outbursts, she taunted another employee to hit her. It was confirmed by multiple employees [that] she would yell and cause a scene, leaving her coworkers very uncomfortable. They reported the environment very hostile in those moments.

> As the Center Manager, you are to set the example for your staff as well as hold them accountable if their behaviors violate our policies. You are to create and foster an[] environment that is professional at all times. As the leader of this center, it is your responsibility to ensure all aspects of the business are successful. In that same respect, clarity around expectations, and follow through are essential to every role within the center.

> This type of behavior cannot be tolerated. It is also a violation of the following Lincare Major Infractions:

> > #4 – Immoral, disorderly, indecent or harassing conduct, including the use of abusive or profane language.

---

[95] Ex. D-5 (Hibbert Termination Notice).
[96] Ex. P-11 (McCoy Written Warning).

> #9 – Failure to discharge job duties in a satisfactory, professional and/or efficient manner
>
> Your behavior also violates Lincare's Anti-Harassment policy … This policy states, in part:
>
> All employees have the right to work in an environment that is free from all forms of unlawful discrimination and conduct that can be considered harassing, coercive or disruptive ….
>
> Lincare does not and will not tolerate discrimination against, or harassment of or by, Lincare's employees, consultants, applicants, customers or vendors.[97]

The Written Warning does not explicitly reference McCoy's use of the term "Coonie," the fit test incident, or the comment about Jimmy the Greek.[98] Dodson acknowledged that she knew "coon" was a slur and that the fit test comment referenced the Ku Klux Klan.[99] But she clarified she did not know who made the fit test comment, despite indicating that it was inappropriate.[100] She proceeded to testify that "[t]he warning does discuss violating [the] harassment policy and that was included in the warning and the discussion that [Dodson and Cattron] had with him."[101] Cattron further testified that there would have been a "conversation" with McCoy that accompanied the Written Warning.[102] Cattron emphasized that he did

---

[97]   Ex. P-11 (McCoy Written Warning).
[98]   Doc. 103 (Apr. 8, 2024 Trial Transcript) ¶¶ 65:14-17, 66:3-4.
[99]   *Id.* ¶¶ 65:14-17, 66:3-4, 70:12-16.
[100]   *Id.* ¶¶ 70:19-24, 71:1-11.
[101]   *Id.* ¶¶ 66:5-12.
[102]   Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 52:21-25.

not "want to paint the picture that this wasn't taken seriously because there aren't specific references made" in the Written Warning.[103]

### 5.      McCoy's Perspective on the Written Warning

McCoy testified that he understood that he received the Written Warning because he allowed "allowed the situation to happen."[104] It is unclear what exactly McCoy meant by this, but the content of the Written Warning suggests that the "situation" refers to the events of March 2020.[105] He also could not recall if he was disciplined for talking about "Coonie" in the office[106] and again denied making the comment about Holmes' fit test.[107] Finally, he acknowledged that the Written Warning did not reference his comment about Jimmy the Greek.[108]

### 6.      Holmes' Perspective on the Written Warning

Holmes testified that AHOM used its "policy as a shield" for management.[109] From her perspective, "the only one remaining" at the State College Center was McCoy.[110]

### 7.      Dodson Checks in on Holmes

On March 23, 2020, Dodson emailed Holmes to "see how things are going."[111] Holmes responded by stating "[y]es, things are calm. No, there isn't

---

[103]   *Id.* ¶¶ 53:1-3.
[104]   Doc. 103 (Apr. 8, 2024 Trial Transcript) ¶¶ 98:24-99:4, 105:24-106:2.
[105]   Ex. P-11 (McCoy Written Warning).
[106]   Doc. 103 (Apr. 8, 2024 Trial Transcript) ¶¶ 98:24-99:4.
[107]   *Id.* ¶¶ 99:15-23.
[108]   *Id.* ¶¶ 102:19-22.
[109]   Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 82:15-16.
[110]   *Id.* ¶¶ 82:18-21.

anything additional to make you aware of."[112] Dodson testified that this is the last communication she had with Holmes.[113]

### C.     McCoy's Post-Reprimand Behavior

After McCoy received the Written Warning, the "racial banter" stopped.[114] But Holmes described other incidents involving McCoy, including when he became verbally "aggressive[]."[115]McCoy told her that she needed "to be thick-skinned" and that he was "sick of [her] bitching" after confronting her about why she asked questions during a training session.[116] At trial, Holmes claimed McCoy only directed that comment at her but had previously indicated at her deposition that Dunmire had been involved in that conversation as well.[117] Holmes also testified on cross-examination to an incident where McCoy "made the announcement … that Patricia is no longer employed here" when he meant Hibbert.[118] Holmes claimed to have informed Dodson about this incident because McCoy failed to add her name to the employee list after he removed Hibbert's name.[119] Eventually, this verbal aggression turned into physical aggression when

---

[111]  Ex. P-14 (Holmes and Dodson Email 3/23/2020).
[112]  *Id.*
[113]  Doc. 103 (Apr. 8, 2024 Trial Transcript) ¶¶ 81:9-11.
[114]  Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 88:14-17.
[115]  *Id.* ¶¶ 89:18-25.
[116]  *Id.* ¶¶ 90:14-15.
[117]  *Id.* ¶¶ 124:7-13, 125:4-17.
[118]  *Id.* ¶¶ 134:5-10.
[119]  *Id.* ¶¶ 134:13-23.

McCoy twice snatched papers out of Holmes' hand in July 2020.[120] She felt unsafe being in the building alone with him and felt that "he was obviously blaming [her] for everything … from March."[121]

### D.   Holmes Resigns and Leaves Pennsylvania

Holmes resigned on July 7, 2020.[122] Due to earlier rulings from the Court, only some of the reasons she listed were identified for the jury to consider. These reasons included: "hostility/bullying (paperwork snatched out of my hands twice this morning by center manage)"; "[w]hen co-workers or myself would try to address issues of the morale in the office we were told to, 'I'm tired of your bitching, you need to be thick-skinned'"; and "[p]revious rude comments of racial/political nature … I did speak to area manager and human resources regarding."[123] Dodson could not remember if she performed any follow-up after receiving this email from Holmes.[124] Holmes later testified, on cross-examination, that her relationship with Jeff Moore ended around this time and that she moved out of his house one week after she resigned from AHOM.[125]

---

[120]  *Id.* ¶¶ 90:22-92:3.
[121]  *Id.* ¶¶ 92:11-16.
[122]  *Id.* ¶¶ 56:11-20.
[123]  Ex. P-15 (Notice of Resignation 7/7/2020).
[124]  Doc. 103 (Apr. 8, 2024 Trial Transcript) ¶¶ 83:23-84:9.
[125]  Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 109:23-25.

### E.   Holmes' Other Sources of Emotional Pain

Holmes also testified to other sources of emotional pain and suffering that overlapped with her employment at AHOM and the four years thereafter. These included the race discrimination lawsuit she brought against Seko Logistics;[126] the end of her relationship with Moore;[127] her unemployment during the COVID-19 pandemic;[128] the fact several of her family members became ill with COVID-19;[129] and the death of the father of one of her grandchildren.[130] She also indicated that she had "stress-related gallbladder issues" that required surgery in 2023.[131]

### F.   The Jury's Verdict

The jury found AHOM liable for the creation of a hostile work environment based on both Hibbert's and McCoy's behavior and concluded that AHOM did not satisfy its affirmative defense.[132] As a result, the jury awarded Holmes $500,000 in compensatory damages and $20 million in punitive damages.[133]

## III.   ANALYSIS

Each motion is separately discussed below alongside its appropriate standard.

---

[126] *Id.* ¶¶ 101:22-105:19.
[127] *Id.* ¶¶ 109:8-25, 110:18-111:1.
[128] *Id.* ¶¶ 112:19-113:17.
[129] *Id.* ¶¶ 112:1-7.
[130] *Id.* ¶¶ 112:8-11.
[131] *Id.* ¶¶ 116:12-14.
[132] Doc. 99 (Jury Verdict: Redacted) at 2, 4.
[133] *Id.* at 5, 9.

## A. Renewed Motion for Judgment as a Matter of Law: Hibbert's Conduct

"A grant of judgment as a matter of law is appropriate 'where a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'"[134] The Third Circuit has directed that "[s]uch a motion should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."[135] When performing this analysis, the Court is not permitted "to make credibility determinations or weigh the evidence."[136] Under Federal Rule of Civil Procedure 50(b), a "movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under" Federal Rule of Civil Procedure 59.

AHOM has renewed its motion for judgment as a matter of law, in part, on the basis that Beverly Hibbert's conduct was insufficient to form the basis of a hostile work environment claim. After a thorough review of the record, I conclude that it is appropriate to deny this part of Defendant's Rule 50(b) motion.

---

[134] *Levy v. Schmidt*, 573 F. App'x 98, 101 (3d Cir. 2014) (quoting FED. R. CIV. P. 50(a)(1)).
[135] *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).
[136] *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

### 1.      Hostile Work Environment Claim

Holmes' hostile work environment claim required her to demonstrate that she: (1) suffered intentional discrimination because of her protected status; (2) "the discrimination was severe or pervasive;" (3) it "detrimentally affected" her; (4) it "would detrimentally affect a reasonable person in like circumstances;" and (5) the existence of respondeat superior liability.[137] AHOM challenges Plaintiff's ability to raise a sufficient issue concerning the second, third, fourth, and fifth elements of this claim.

### 2.      Second Element: Severe or Pervasive Conduct

"'[S]everity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive.'"[138] "For discrimination to constitute severe or pervasive behavior, it must [also] 'alter the conditions of [the victim's] employment and create an abusive working environment.'"[139] "When assessing hostility or abusiveness, courts must look 'at all the circumstances,' such as the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or

---

[137] *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).

[138] *Id.* (quoting *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006)).

[139] *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed 2d 49 (1986)).

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"[140]

Defendant emphasizes that Hibbert's conduct outside of March 2020 is limited to her reference to her "Oreo baby" comment on Holmes' second day of employment.[141] First, this argument fails to consider Holmes' testimony that Hibbert also said her daughter had been impregnated by a "deadbeat black man that had already had five other children."[142] This is a clear invocation of an abhorred racial stereotype. Second, Dunmire also testified that this "Oreo baby" comment was not a unique occurrence; she claimed Hibbert made this comment "[a]ll the time" in front of McCoy.[143] Given the size of the State College Center,[144] the layout of the office,[145] and another instance where a conversation was overhead,[146] the jury reasonably could have inferred that Holmes repeatedly overheard Hibbert make this comment. While this type of comment is only a "mere offensive utterance," when viewed in Plaintiff's favor, it exhibits an environment

---

[140] *Szyper v. Am. Med. Response Mid-Atlantic, Inc.*, 2023 U.S. App. LEXIS 6855, at *4 (3d Cir. Mar. 22, 2023) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 141 L.Ed. 2d 662 (1998)).

[141] Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 63:24-64:3.

[142] *Id.*

[143] *Id.* ¶¶ 139:1-5.

[144] The size of the State College Center limited the ability of all employees to attend trainings at once. *Id.* ¶¶ 184:7-16. Presumably, the Center was rather small.

[145] Hibbert's desk was in front of Holmes' desk in an open office layout. *Id.* ¶¶ 64:24-65:3.

[146] Dunmire overheard McCoy's and Hibbert's discussion of the N-word from her office. *Id.* ¶¶ 73:19-22.

that tolerated racially hostile language. The fact Hibbert loved her grandchild does not change this conclusion.[147]

Further, the structure of the verdict form does not mean Hibbert's and McCoy's actions were evaluated by the jury in a vacuum. Instead, the jury was properly instructed to consider the totality of the circumstances. Here, that includes McCoy's purported reaction to Hibbert's comments. Holmes testified that he did little to reprimand Hibbert. Dunmire's testimony suggests that this behavior was frequent. Under these circumstances, the jury could conclude that Hibbert acted with McCoy's implicit approval. Although McCoy claimed to have reprimanded Hibbert,[148] contrary testimony was presented on this point. So long as the other elements of this claim are satisfied, this is the exact kind of testimonial conflict that is inappropriate to resolve on a Rule 50 motion.[149]

### 3. Third and Fourth Elements: Whether the Conduct Detrimentally Impacted Holmes and Would Have Impacted a Reasonable Person

Defendant also challenges Plaintiff's ability to demonstrate that Hibbert's conduct altered the conditions of her work environment and would have

---

[147] *Id.* ¶¶ 147:5-9.

[148] Doc. 103 (Apr. 8, 2024 Trial Transcript) ¶¶ 111:1-10.

[149] *See e.g.*, *Giedgowd v. Cafaro Grp., LLC*, Civ. Action No. 20-6184, 2021 U.S. Dist. LEXIS 205889, 2021 WL 4963533 (E.D. Pa. Oct. 26, 2021) (denying a Rule 50(b) motion, in part, due to the presence of conflicting testimony); *Express Mobile, Inc. v. Godaddy.com, LLC*, 680 F. Supp. 3d 517 (D. Del. 2023) (noting that conflicting testimony allows a jury to make credibility determinations); and *Simpson v. Betteroads Asphalt Corp.*, 598 F. App'x 68, 71 (3d Cir. 2015) (noting that "[i]t was the role of the jury to determine the credibility of the witnesses presenting conflicting testimony …").

detrimentally impacted a reasonable person. To support this proposition, AHOM emphasizes that Holmes only described Hibbert as "lack[ing] decorum" and being "rough around the edges."[150] Upon a review of the record, I conclude that AHOM's argument mischaracterizes the testimony. Holmes testified that she believed Hibbert "lack[ed] decorum" and was "rough around the edges" after hearing her make these comments on her second day of employment.[151] This was the very first time she heard Hibbert use racial language. Although Holmes does not testify explicitly to how these comments made her feel, the jury was free to infer that these comments were greatly upsetting to her. To do so, all the jury had to consider was Holmes' testimony concerning the lasting effects the discrimination she faced at AHOM has had on her life. Similarly, I conclude that a reasonable person in Holmes' position would have been impacted by these kinds of frequent racial comments.

### 4.     Fifth Element: Respondeat Superior Liability

As explained to the jury, since Hibbert was a non-supervisor employee, Plaintiff was also required to "prove by a preponderance of the evidence that management level employees knew, or should have known, of the abusive conduct

---

[150]  Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 64:8-10.
[151]  *Id.*

and failed to take prompt and effective remedial action."[152] "To succeed on such a theory," Holmes must show that AHOM "'was negligent in failing to discover the co-worker harassment or in responding to a report of such harassment.'"[153] "An employer's action is adequate if it is reasonably calculated to prevent further harassment."[154]

In support of its Rule 50(b) motion on this issue, AHOM asserts that McCoy took appropriate action to address Hibbert's comments in October 2019 and that Hibbert did not repeat these comments or engage in other misconduct until March 2020. As already identified above, there is conflicting testimony as to whether Hibbert in fact repeated the "Oreo baby" comment after October 2019. A reasonable jury could also in fact view McCoy's response as inadequate. First, there is conflicting testimony as to what McCoy actually said in response to Hibbert's comments in October 2019. McCoy asserted that he "told her not to use that terminology. It was derogatory."[155] Holmes claimed that McCoy only stated "Jeez, Bev" although Defendant later impeached this part of her testimony.[156] Further, there was conflicting testimony as to whether these comments continued

---

[152] Doc. 98 (Jury Instructions) at 21 (quoting *Third Circuit Model Civil Jury Instructions*, § 6.1.4 ELEMENTS OF A SECTION 1981 CLAIM – HARASSMENT – HOSTILE WORK ENVIRONMENT – NO TANGIBLE EMPLOYMENT ACTION (June 2024)).

[153] *Stein v. AG United States*, No. 22-2862, 2023 U.S. App. LEXIS 14753, 2023 WL 3993014, at *8 (3d Cir. June 14, 2023) (quoting *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 105 (3d Cir. 2009)).

[154] *Huston*, 568 F.3d at 104.

[155] Doc. 103 (April 8, 2024 Transcript) ¶¶ 111:1-6.

[156] Doc. 104 (April 9, 2024 Transcript) ¶¶ 64:11-15.

in McCoy's presence. Again, it was fundamentally a jury issue to decide whose testimony to credit. Accordingly, I conclude that Plaintiff adequately raised issues concerning the challenged elements of this claim that it was appropriate to submit it to the jury for its consideration. I therefore deny this part of Defendant's Rule 50(b) motion.

### 5. The Verdict Form

Even if I granted Defendant's Rule 50(b) motion on this issue, there would be no need for a new trial. AHOM contends that the verdict slip requires the Court to grant a new trial as the jury did not apportion the damages between Hibbert's and McCoy's conduct. First, this argument disregards the interplay between Hibbert's and McCoy's actions. As I have already explained, the jury considered the totality of the circumstances when evaluating if a hostile work environment existed. Here, the jury was presented with evidence that McCoy regularly heard Hibbert make inappropriate comments about her grandchild's race. The jury could also properly infer that Holmes routinely heard these comments as well. McCoy's purported inaction in response to these comments is naturally part of what the jury was entitled to consider. Accordingly, these comments from Hibbert could have appropriately entered the jury's damages determination even if it did not find a hostile work environment existed based solely on Hibbert's conduct.

As Plaintiff correctly observes, AHOM also did not raise any objection to this aspect of the verdict slip during the trial. In fact, AHOM advocated for this exact distinction between Hibbert and McCoy at the charge conference and submitted a proposed verdict form that is nearly identical to the one used by the Court. Under such circumstances, any possible error would have been invited by Defendant.[157]

## B.      Motion for a New Trial: AHOM's Affirmative Defense

Defendant next contends that the Court must grant a new trial because the jury's failure to find that AHOM "established an affirmative defense to vicarious liability for McCoy's creation of a hostile work environment is against the great weight of the evidence."[158]

"On motion after a jury trial, a court may 'grant a new trial … for any reason for which a new trial has heretofore been granted in an action at law in federal court.'"[159] "But 'it should do so only when the great weight of the evidence cuts against the verdict and … a miscarriage of justice would result if the verdict were to stand.'"[160] Alternatively, a new trial may be ordered "where the verdict, on the

---

[157] *See Kerwin v. McConell*, Civil Action No. 05-93 Erie, 2008 U.S. Dist. LEXIS 76362, at *15-16 (W.D. Pa. Sept. 30, 2008) (collecting cases).

[158] Doc. 126 (Brief in Support of Defendant's Renewed Motion for Judgment as a Matter of Law, Motion for New Trial or Remittiur, and Motion to Amend the Judgment) at 12.

[159] *Repa v. Napierkowski*, No. 22-2537, 2023 U.S. App. LEXIS 9577, 2023 WL 3034603, at *2-3 (3d Cir. Apr. 21, 2023) (quoting FED. R. CIV. P. 59(a)(1)(A)).

[160] *Id.* (quoting *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016)).

record, cries out to be overturned or shocks [the Court's] conscience."[161] "[W]hen a court evaluates a challenge to the weight of the evidence[,] it does not view the evidence in the light most favorable to the verdict winner, but instead exercises its own judgment in assessing the evidence."[162]

### 1. Defendant's Affirmative Defense

This affirmative defense required Defendant to demonstrate by a preponderance of the evidence that it had (1) "exercised reasonable care to prevent racial harassment in the workplace, and also exercised reasonable care to promptly correct the harassing behavior that does occur" and (2) Holmes had "unreasonably failed to take advantage of any preventive or corrective opportunities provided by" AHOM.[163] "The cornerstone of this analysis is reasonableness: the reasonableness of the employer's preventative and corrective measures, and the reasonableness of the employee's efforts (or lack thereof) to report misconduct and avoid further harm. Thus, the existence of a functioning anti-harassment policy *could* prove the employer's exercise of reasonable care so as to satisfy the first element of the affirmative defense."[164]

---

[161] *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 128 (3d Cir. 2003).

[162] *Marra v. Phila. House. Auth.*, 497 F.3d 286, 309 n.18 (3d Cir. 2007).

[163] *Third Circuit Model Civil Jury Instructions*, § 6.1.4 ELEMENTS OF A SECTION 1981 CLAIM – HARASSMENT – HOSTILE WORK ENVIRONMENT – NO TANGIBLE EMPLOYMENT ACTION (June 2024).

[164] *Minarsky v. Susquehanna Cty.*, 895 F.3d 303, 311 (3d Cir. 2018).

## 2.    Prong One of the Affirmative Defense

In spite of the Defendant's contention, the Court concludes that AHOM did not satisfy the first prong of its affirmative defense. I reach this decision due to the content of McCoy's written warning, not based on a belief that McCoy should have received a final written warning.

Lois Dodson's notes from the investigation revealed behavior from McCoy that should have prompted further investigation and a more encompassing corrective action. Holmes described incidents in which McCoy used a racial slur,[165] referenced the Ku Klux Klan,[166] and made other, racial comments.[167] Conversations with Eichelberger and Dunmire substantiated parts of these allegations.[168] And, most importantly, McCoy himself admitted to certain aspects of these claims.[169] Based on Dodson's testimony as to the level of investigations

---

[165] "Tim likes to have sidebar conversations. He spoke about how dark complexions are referred to as 'coonies.'" Ex. P-7 (Dodson Holmes Interview Notes) at 2.

[166] "Another situation, there was a new employee needing to be Fit Tested. Patricia said she could overhear the conversation. Tim said he thought it was extremely funny. A white person was putting a white hood on a black employee … He told Bev to take a picture." *Id.*

[167] "He mentioned bringing in a picture of someone, 'about as dark as you.'"; "He made a comment about Jimmy the Greek, sports commentator getting fired for a comment he made. He stated that blacks were bred to be better athletes." *Id.*

[168] Eichelberger described the Ku Klux Klan reference and indicated that McCoy "shouldn't have the 'odd-ball' conversations he has either." Ex. P-8 (Employee Interview Notes) at 1. Dunmire stated that McCoy "[t]here were so many she wasn't sure where to even start" when asked if McCoy made any comments "that were concerning." *Id.* at 1-2.

[169] "Tim stated that Patricia started the conversation about genealogy and thought it was more about Native Americans. He said that 'coonie' was mentioned and though it was someone part black. He said there were a lot of different conversations that took place. Asked Tim about what was mentioned about Jimmy the Greek. He said that he was fired for making comments about black athletes being bred to be competitive. He said they were bred to dominate some sports." *Id.* at 2-3.

undertaken by the Human Resources Department,[170] I conclude that these additional allegations had been adequately substantiated.

Despite this, it appears McCoy was not disciplined for his ongoing, inappropriate racial behavior. Dodson testified that "[i]f [McCoy] violated our policy for harassment and discrimination, it was addressed in the warning."[171] Mark Cattron further emphasized that the conversation with McCoy would have addressed these issues.[172] I do not find their testimony credible for two reasons. First, Dodson claimed to not know for sure who made the fit test comment.[173] Second, McCoy testified to his own understanding of the Written Warning. Notably, McCoy could not recall if the Written Warning addressed his use of the term "Coonie" and continued to deny the fit test incident.[174] All of this strongly suggests that the impetus behind the Written Warning was McCoy's failure to control Hibbert's unprofessional behavior, not his own, inappropriate conduct. The behavior described in the Written Warning reinforces this conclusion by focusing on McCoy's failures surrounding the events of March 2020.[175] As AHOM failed to pursue substantial allegations against McCoy, I conclude that Defendant had not in fact "exercised reasonable care to prevent racial harassment in the workplace, and

---

[170] Doc. 104 (April 9, 2024 Trial Transcript) ¶¶ 163:18-165:23.
[171] Doc. 103 (April 8, 2024 Trial Transcript) ¶¶ 66:12-13.
[172] Doc. 104 (April 9, 2024 Trial Transcript) ¶¶ 52:21-53:3.
[173] Doc. 103 (April 8, 2024 Trial Transcript) ¶¶ 71:8-11
[174] *Id.* ¶¶ 98:24-99:4, 105:24-106:2.
[175] Ex. P-11 (McCoy Written Warning).

also exercised reasonable care to promptly correct the harassing behavior that does occur."[176]

Further, evidence was also introduced that the harassment continued after AHOM issued the written warning to McCoy. Although Defendant has repeatedly asserted that the racial harassment ceased following its intervention, the Third Circuit has naturally recognized that racial harassment is not always overtly racial in nature.[177] Here, Holmes testified to McCoy's conduct after the events of March 2020. She described what she viewed as verbal and physical aggression. As the Court had explained in its Memorandum Opinion addressing the motions in limine filed by the parties, these additional incidents are informed by the racial animus already displayed by McCoy.[178] In light of this testimony, the great weight of the evidence does not cut against concluding that Defendant failed to fully stop all racial harassment.

Accordingly, the jury's determination that AHOM did satisfy its affirmative defense by a preponderance of the evidence is not against the great weight of the evidence. Given this conclusion, I do not need to reach AHOM's lengthy argument concerning the second prong of this affirmative defense.

---

[176] *Minarsky*, 895 F.3d at 311.

[177] *E.g.*, *Bridges ex rel. D.B. v. Scranton Sch. Dist.*, 644 F. App'x 172, 179 (3d Cir. 2016) ("This Court is well aware that racial discrimination need not be overt to create a hostile environment).

[178] Doc. 68 (Mar. 14, 2024 Memorandum Opinion) at 8-12.

## C.   Motion for New Trial or Remittitur: Compensatory Damages

Next, Defendant suggests that the jury's award of $500,000 in compensatory damages is so "out of proportion to the actual injury" such that a new trial or remittitur of this award is necessary.[179] To do so, I would have to conclude that the award is "excessive."[180] "Remittitur may be proper where the district court concludes that the evidence was too speculative to support the damages awarded by the jury" or "where a damages award 'was contrary to all reason and … shock[s] the conscience of the court.'"[181] "An award 'shocks the conscience of the court' where it bears no rational relationship to the evidence presented at trial."[182] Simply deeming an award "extremely generous" is an insufficient basis to grant remittitur.[183]

### 1.   Defendant's Purported Survey of Cases

Recognizing that courts in the Third Circuit often consider analogous verdicts when determining if a specific award is excessive, AHOM identified a purported range of $50,000 to $350,000 for emotional distress awards in employment discrimination and retaliation cases. On the surface, this suggests that

---

[179] *William A. Graham Co. v. Haughey,* 646 F.3d 138, 142 (3d Cir. 2011).

[180] *Linn v. United Plant Guard Workers*, 383 U.S. 53, 65, 86 S. Ct. 657, 15 L. Ed. 2d 582 (1966).

[181] *Paramount Fin. Commc'ns, Inc. v. Broadridge Inv'r Commc'ns Sols., Inc.*, 684 F. Supp. 3d 316, 346 (E.D. Pa. July 26, 2023) (quoting *Gumbs v. Pueblo Int'l*, 823 F.2d 768, 771-72 (3d Cir. 1987)).

[182] *Id.*

[183] *Johnston v. Sch. Dist. of Phila.*, Civ. Action No. 04-4948, 2006 WL 999966, at *9 (E.D. Pa. Apr. 12, 2006) (citing *Williams v. Martin Marietta Alumina, Inc.*, 817 F.2d 1030, 1038 (3d Cir. 1987)).

the $500,000 awarded by the jury is excessive. But a cursory review of the underlying cases demonstrates that Defendant's proposed range is questionable.

First, AHOM's range is based on only six cases. The Court is skeptical that this qualifies as "[a] survey of past emotional distress awards in the Third Circuit …." At a minimum, it is certainly not a *comprehensive* survey of the twenty-five-year period that Defendant's cited cases span.[184] This conclusion is reinforced by the fact that this survey inexplicably excludes cases relied upon by AHOM elsewhere in its briefs.

Even if this is a sufficient survey, the oldest award is from 1996. Any meaningful comparison to this range requires the Court to consider the effects of inflation and to use a consistent unit of measure. After adjusting these awards to April 2024 dollars,[185] the range becomes $74,657.30 to $433,959.31.[186] The compensatory award at issue is only slightly higher than the upper end of this range. In fact, including other cases relied upon by Defendant in this range raises

---

[184] The Court does not suggest that parties need every relevant case to establish a meaningful range. It is neither necessary nor useful to establish a bright-line rule as to how many cases should be reviewed. Under the circumstances at hand, using six cases from a twenty-five-year period is not sufficient to establish any kind of meaningful range.

[185] The Court uses April 2024 United States Dollars for a consistent unit of measure. To calculate these measurements, the Court used the CPI Inflation Calculator available through the United States Bureau of Labor Statistics. *CPI Inflation Calculator*, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/data/inflation_calculator.htm, (last accessed Aug. 27, 2024). The relevant month and year for each figure was taken from the appropriate opinion. In doing so, I recognize that I have created a range that slightly favors the Defendant.

[186] Acknowledging this issue is not unprecedented in this Circuit. *E.g.*, *Llyod v. Child.'s Hosp. of Phila.*, No. 2:19-cv-02775-JDW, 2023 U.S. Dist. LEXIS 64755 (E.D. Pa. Apr. 13, 2023).

the upper limit to $686,401.05.[187] Despite AHOM's best efforts, a purely numerical comparison to other emotional damages awards does not suggest that the verdict in this case is excessive. Defendant's argument concerning the severity of the behavior at issue is addressed separately below.

### 2. The Sufficiency of Holmes' Testimony

Defendant also argues that Holmes offered "very limited testimony about her emotional suffering" at trial.[188] I disagree with this characterization of Holmes' testimony. She testified to the long-lasting effects this discrimination has on her such as struggling to sleep and suffering from nightmares.[189] She explained how the use of the term "Coonie" was "dehumanizing" to her.[190] When testifying to the events of March 2020, Holmes became visibly upset and began to shake.[191] Further, the March 5, 2020 incident involving the "N-word" was "[o]ne of the most humiliating days of [her] life …" that caused her to change the way she viewed herself and interacted with white people for a while.[192] I would not classify this testimony as limited. It demonstrates that Holmes' time with AHOM has had an enduring impact on her emotional well-being.

---

[187] *Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346 (3d Cir. 2001).

[188] Doc. 126 (Brief in Support of Defendant's Renewed Motion for Judgment as a Matter of Law, Motion for New Trial or Remittiur, and Motion to Amend the Judgment) at 21.

[189] Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 67:17-25.

[190] *Id.* ¶¶ 69:1-6.

[191] *Id.* ¶¶ 75:19-21.

[192] *Id.* ¶¶ 75:24-76:25.

Further, I do not place nearly as much credit in the testimony of Jeff Moore as Defendant encourages me to. He is hardly an objective witness after the contentious end to his relationship with Holmes. I also remember his testimony well, and I did not find his demeanor and presentation to have been credible.

Nor do I find it appropriate to penalize Holmes for not putting forth expert witness testimony or corroborating witnesses. Neither of those were required for her to succeed on her claim. In attempt to persuade the Court otherwise, Defendant discusses several cases at length to demonstrate the level of evidence it claims is required to support the compensatory damages award. One such case is the decision reached by the Third Circuit in *Gagliardo v. Connaught Laboratories, Inc.*;[193] in that case, our Court of Appeals determined that there was a "reasonable probability … that damages due to emotional distress were in fact incurred" due to the unlawful act due to the plaintiff's presentation of testimony from her coworkers and family.[194] But nothing in this opinion indicates that this type of evidence is required to prove a claim of emotional damages.[195] In fact, holding so would impose an additional requirement on Plaintiff to prove her hostile work environment claim. It also does not escape this Court's attention that AHOM

---

[193] *Gagliardo v. Connaught Labs.*, 311 F.3d 565 (3d Cir. 2002).

[194] *Id.* at 573-74.

[195] I also do not find Defendant's reading of *Johnston v. Sch. Dist. of Phila.*, Civ. Action No. 04-4948, 2006 WL 999966 (E.D. Pa. Apr. 12, 2006) to compel me to reach a contrary conclusion. First, this is an unpublished decision from a District Court in this Circuit; it does not bind me. More critically, I note that nothing in this opinion required corroborating testimony, a formal diagnosis, or an economic loss to recover non-economic damages in a hostile work environment case.

conveniently failed to address the fact that the evidence supporting the award of compensatory damages for emotional distress in *Evans v. Port Authority of New York and New Jersey*, another case relied upon rather extensively by Defendant elsewhere in its briefs, was based solely on the Plaintiff's own testimony.[196]

Instead, I conclude that the record supports the jury's award of compensatory damages. As I have already noted, Holmes described the lasting effects this discrimination has had on her life; when doing so, she became visibly upset. As such, I am not persuaded by Defendant's attack on the adequacy of her testimony.

### 3.    Comparison to Other Discrimination Cases

AHOM also analogizes to the underlying facts in several cases to argue that the compensatory damages award is excessive once the severity of the conduct is considered. Upon a review of the parties' filings, I conclude that it is in actuality Defendant's cases that "are a house of cards that collapse under scrutiny."[197]

Defendant heavily relies on *Blakey v. Continental Airlines, Inc.*, a 1998 gender discrimination decision from the District of New Jersey.[198] The behavior at issue in *Blakey* was abhorrent; the plaintiff faced repeated exposure to pornography

---

[196] *Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 352 n.5 (3d Cir. 2001).

[197] Doc. 144 (Reply Brief in Support of Renewed Motion for Judgment as a Matter of Law, Motion for New Trial or Remittitur, and Motion to Amend the Judgment) at 16.

[198] *Blakey v. Continental Airlines*, 992 F. Supp. 731 (D.N.J. 1998).

and ongoing harassment for three years.[199] That conduct is certainly more severe than what Holmes faced, but I do not find AHOM's argument concerning this case persuasive. Blakey was "Continental's first female captain on the A300 Airbus aircraft."[200] This fact alone reveals the dated nature of that case. In the past twenty-five to thirty years, workplace norms and society's tolerance of workplace discrimination has significantly shifted. I am not persuaded that a District of New Jersey case from 1998 with more severe behavior at issue would require me to remit the compensatory damages in this case.

Nor do I find Defendant's use of *Evans v. Port Authority of New York and New Jersey*, a decision from the Third Circuit, compelling. First, the remittitur of the $1.15 million compensatory award to $375,000 by the relevant District Court in 2000 is equivalent to approximately $685,000 today.[201] That is an award that is approximately 37% higher than the compensatory damages at issue in this case. So even if this is "a substantial amount, well above most emotional distress awards,"[202] it is still significantly higher than the award at issue in this case. Further, much of the testimony presented by Evans was similar to that put forth by Holmes. Like Evans,[203] Holmes testified to the effects the discrimination had on

---

[199] *Id.* at 735.
[200] *Id.* at 733.
[201] *Evans*, 273 F.3d at 355. Again, this figure in fact slightly favors Defendant as I calculated it based on when the District Court remitted the award as opposed to the date of the jury's initial verdict.
[202] *Id.*
[203] *Id.* at 352 n.5.

her interpersonal relationships and self-esteem.[204] Holmes similarly discussed more lasting impacts such as her difficulty sleeping.[205] While Holmes' testimony is not as comprehensive as that presented in *Evans*, I do not find it so lacking that the award of damages shocks the conscience or is unmoored from the facts of the case.[206]

Finally, I note that Defendant has consistently minimized the severity of what occurred at its State College Center. From the Court's perspective, ongoing racial harassment was present for Holmes' entire stint of employment. Even worse, the company's designated recipients of discrimination complaints failed to address corroborated incidents of racial harassment involving the Center's supervisor. Evidently, the jury was not persuaded by this argument; neither am I. While the Court may have given Plaintiff a less generous award, the award is not so large that it shocks the conscience or is divorced from its support in the record.

### 4.   Other Causes of Emotional Distress

Finally, Defendant also attacks the size of the award of compensatory damages on the basis that Holmes suffered emotional distress from other events. Defendant is correct that these other incidents overlapped with her claims of suffering and distress in this lawsuit. Be that as it may, I conclude that these other

---

[204] Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 76:6-20.

[205] *Id.* ¶¶ 67:17-20.

[206] In its reply brief, Defendant discussed other, out-of-circuit cases first addressed by Plaintiff in opposition. Since these authorities are only persuasive at best, I simply note that my consideration of those cases does not alter my decision.

reasons do not justify remitting the compensatory damages. First, many of these other incidents are rather distinct. Losing a relative and experiencing financial insecurity are certainly distressing but in a different way. The emotional distress Holmes suffered due to the discrimination was tied to her self-image and confidence, not grief or anxiety. Although Holmes sued Seko Logistics for racial discrimination, the similarity of that suit alone is insufficient to conclude that this award is excessive. The fact that Holmes personally did not face racial harassment in that case reinforces this conclusion.[207] Again, I may have awarded Plaintiff a smaller sum due to these overlapping incidents, but they do not call into question the size of the award to the degree required to order a remittitur.

### D.    Renewed Motion for Judgment as a Matter of Law or Remittitur: Punitive Damages

Defendant has also renewed its motion for judgment as a matter of law on the issue punitive damages. "Punitive damages are available in a [Section] 1981 action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'"[208] But "in the punitive damages context, an employer could not be vicariously liable for the discriminatory … decisions of managerial agents where these decisions are contrary to the employer's 'good-faith efforts to

---

[207]  Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 105:12-19.

[208]  *Goodwin v. Fast Food Enters. #3, LLP*, C.A. No. 10-23 Erie, 2012 U.S. Dist. LEXIS 68503, at *15 (W.D. Pa. May 16, 2012) (quoting *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983)).

comply with [civil rights laws.]'"[209] "This 'good-faith' exception 'shields employers who made a bona fide effort to institute nondiscrimination policies, from the prospect of an award of punitive damages when, despite the good faith efforts of the employer to comply with the law … discrimination has nonetheless occurred.'"[210]

As discussed at length above, there was significant evidence that would allow a reasonable jury to conclude that AHOM did not implement its anti-discrimination and anti-harassment policies in good faith. Failing to act on substantiated allegations of racial harassment, even in the midst of a pandemic, exhibits at least a reckless indifference to Holmes' federally protected rights. Defendant's argument concerning the adequacy of its investigation does not compel the Court to reach a contrary decision. Due to this, it also cannot be said that the failure to find that AHOM acted in good faith was against the great weight of the evidence. I therefore deny Defendant's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial in the Alternative on the issue of punitive damages.

### E.    Constitutionality of the Punitive Damages Award

Defendant also challenges the constitutionality of the award of punitive damages. "Compensatory damages 'are intended to redress the concrete loss that

---

[209] *Id.* at *16 (quoting *Kolstad v. American Dental Ass'n.*, 527 U.S. 526, 545, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999)).

[210] *Id.* (quoting *Copley v. BAX Global, Inc.*, 97 F.Supp.2d 1164, 1168 (S.D. Fla. 2000).

the plaintiff has suffered by reason of the defendant's wrongful conduct."[211] "By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution."[212] But there "are procedural and substantive constitutional limitations" on awards of punitive damages.[213] Here, Defendant correctly argues that the award of punitive damages is unconstitutional.

The Supreme Court of the United States has "instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."[214] When performing this analysis, I remain cognizant of the Supreme Court's observation that its "jurisprudence and the principles it has now established demonstrate … that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."[215] Further, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise

---

[211] *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003).

[212] *Id.*

[213] *Id.*

[214] *Id.* at 418.

[215] *Id.* at 425.

award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff."[216]

### 1.    Degree of Reprehensibility of AHOM's Conduct

Reprehensibility is "[p]erhaps the most important indicum of the reasonableness of a punitive damages award."[217] "Because it is so important to this analysis, the Supreme Court has provided further detail on this guidepost, instructing courts to consider the extent to which the following subfactors are satisfied:

> [1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.[218]

### a.    Physical or Economic Harm

Holmes testified that she has suffered long-lasting emotional distress.[219] As courts in this Circuit have found, "injuries [solely] of embarrassment or

---

[216] *Id.*

[217] *Brand Mktg. Grp. LLC v. Intertek Testing Servs.*, 801 F.3d 347, 363 (3d Cir. 2015).

[218] *Id.*

[219] When asked about how the fit test incident still impacts her, Holmes stated "Four years later, I'm still shaking. I'm still crying. Sleep—I don't like to go to sleep. I don't go to sleep until 3, 4:00 in the morning because I suffer with nightmares. I had a nightmare about this very day, this very day." Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 67:17-20. Further, Holmes indicated that the March 2020 "n-word" incident caused her "to have some self-doubts … in the value of [herself]" and "made [her] have a different approach [to] how [she] interacted with white people." *Id.* ¶¶ 76:9-25. She asserted that the treatment she suffered at AHOM for "four years had me guessing – second guessing myself. Am I less than you? Am I things that these people said that I was? Was I worth having a hood put on my head?" *Id.* ¶¶ 97:18-21.

humiliation" are not physical injuries.[220] Although "[m]ental health problems are real, and they constitute real injuries,"[221] Plaintiff relied solely upon her own testimony to establish her injuries. The Court has not identified an instance where a plaintiff suffered a physical injury through mental illness based solely on his or her own testimony.[222] While Holmes did testify to the isolated physical manifestations of her emotional stress on March 9, 2020,[223] this factor tilts in Defendant's favor.

### b.    Indifference To or Reckless Disregard of the Health or Safety of Others

There are no facts suggesting that AHOM acted indifferently to or recklessly disregarded the health or safety of Plaintiff or any others.

### c.    The Target of the Conduct was Financially Vulnerable

Although AHOM contends that Holmes "did not introduce evidence of financial vulnerability at trial," she did testify that she earned an hourly wage of $13.00.[224] Defendant's counsel then asked if "that amounts to about 27,000 a

---

[220] *Lloyd v. Child.'s Hosp. of Phila.*, No. 2:19-cv-02775-JDW, 2023 WL 2940229, 2023 U.S. Dist. LEXIS 64755, at *30 (E.D. Pa. Apr. 13, 2023) (citing *Jurinko v. Medical Protective Co.*, 305 F. App'x. 13, 26 (3d Cir. 2008); *Dixon-Rollins v. Experian Info. Sols., Inc.*, 753 F. Supp. 2d 452, 464 (E.D. Pa. 2010)).

[221] *Id.*

[222] *E.g.*, *id.* at *30 ("The cases CHOP cites deal with injuries of embarrassment or humiliation, not clinically diagnosed mental health problems."). Plaintiff admitted at trial that she was not treated at all "for the emotional pain and suffering" she experienced. Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 114:15-19.

[223] She testified that before calling human resources on March 9, 2020, she "was sick to [her] stomach; [she] was throwing up, crying and shaking, as usual." *Id.* ¶¶ 85:8-13.

[224] *Id.* ¶¶ 116:23-117-1.

year?" to which Holmes replied, "I believe you are correct."[225] Accordingly, this factor moderately favors Plaintiff.

### d. The Conduct Involved Repeated Actions or an Isolated Incident

While AHOM's argument is well-taken that this subfactor is genearlly geared towards addressing repeated harm impacting non-parties, the circumstances of this case make it difficult to apply this subfactor according to this understanding. As was revealed at trial, Holmes was the only black employee at the State College Center. For this reason, I instead focus on the repeated nature of the harm suffered by Holmes as inherently no other individual at that Center would have faced racial harassment on the account of being black.

Defendant contends that only four incidents occurred: the fit test, the "Coonie" and "Oreo baby" comments, and the use of the N-word. This representation ignores all of McCoy's post-March 2020 conduct and the testimony that Hibbert made the "Oreo baby" comment "all the time."[226] There are therefore a series of incidents spanning from October 2019 through July 2020 that the Court views as racial harassment. Given that the incidents are still relatively infrequent, this factor only slightly favors Holmes.

---

[225] *Id.*
[226] *Id.* ¶¶ 139:1-5.

###### e. The Harm was the Result of Intentional Malice, Trickery, or Deceit, or Mere Accident

Finally, the Court must determine whether the harm was the result of intentional malice, trickery or deceit, or mere accident. As to this factor, Plaintiff expounded, at length, on caselaw that addresses the reprehensibility of intentional racial discrimination. Defendant first argued that Holmes introduced no evidence to demonstrate that McCoy acted with intentional malice. Then, solely in its reply brief, AHOM contended that the Court should focus on the actions of the individuals designated to receive and investigate complaints: Dodson and Cattron.

###### i. McCoy's Conduct

Intentionality is present when considering McCoy's actions. He used a racial slur, initiated a conversation about the N-word, referenced the Ku Klux Klan, and made other racial comments. In fact, McCoy was laughing during the fit test and N-word incidents.[227] At trial, McCoy stated that he knew it was illegal to create a racially hostile work environment.[228] The Third Circuit has indicated that acknowledging one's "actions were illegal could constitute intentional malice …."[229] Consequently, I conclude that McCoy's actions displayed intentional malice.

---

[227] Ex. P-8 (Employee Interview Notes) at 1; Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 141:15-17.

[228] Doc. 103 (Apr. 8, 2024 Trial Transcript) ¶¶ 91:9-15.

[229] *Hyman v. Capital One Auto Fin.*, 826 F. App'x 244, 247 (3d Cir. 2020).

### ii.    Dodson's and Cattron's Conduct

To argue that the Court should only consider Dodson's and Cattron's actions, Defendant relied solely on *Swinton v. Potomac Corp.*,[230] a pre-*State Farm* decision from the United States Court of Appeals for the Ninth Circuit. But even if I only considered Dodson's and Cattron's actions, intentionality still exists. Defendant forcefully emphasized at trial that its investigation was not perfect and that it did not need to be. AHOM further drew repeated attention to the challenges the company faced due to the COVID-19 pandemic. But the investigation is not just imperfect; it raises serious questions. Both Dodson and Cattron knew it was illegal to create a hostile work environment on the basis of race in 2020.[231] Despite this, their investigation failed to pursue substantiated allegations against McCoy and the corrective action they decided upon failed to explicitly call out this behavior. This is surprising as McCoy had actually confirmed his use of a modified version of the slur "coon" and his discussion about Jimmy the Greek.[232] McCoy's understanding of the Written Warning further exacerbates this issue. I find that his testimony significantly undermines Dodson's and Cattron's attempts to suggest that these other racial issues were addressed. This record raises a strong inference of intentionality.

---

[230]  *Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir. 2001).

[231]  Doc. 103 (Apr. 8, 2024 Trial Transcript) ¶¶ 33:23-34:1; Doc. 104 (Apr. 9, 2024 Trial Transcript) ¶¶ 32:7-10.

[232]  Ex. P-8 (Employee Interview Notes) at 2-3.

### 2. Disparity Between the Harm Suffered and the Punitive Damages Award

The second guidepost that the Supreme Court directs the Court to consider is the ratio between the compensatory and punitive damages. Notwithstanding Plaintiff's arguments to the contrary, the current ratio is "the type of gross disparity between compensatory and punitive damages that renders a punitive award suspect by itself."[233] At the oral argument on this issue, Plaintiff encouraged the Court to consider *Bert Co. v. Turk*, a 2023 decision from the Supreme Court of Pennsylvania.[234] While that decision is academically interesting, I remain unpersuaded by its reasoning in the face of clear guidance from the Supreme Court of the United States that the current award of punitive damages is unconstitutional.

### a. Attorney's Fees

In an attempt to defend the size of the award, Holmes asserts that her attorney's fees should be considered compensatory damages. Of the cases she cited for this proposition, most dealt with state laws that authorized the courts to consider attorney's fees when calculating compensatory damages. No such federal law exists. Only the Appellate Court of Illinois' decision in *Blount v. Stroud*[235] addresses the relevance of attorney's fees in a Section 1981 case. In that case, the Appellate Court of Illinois relied, in part, on the Third Circuit's decision in *Willow*

---

[233] *Brand Mktg. Grp. LLC*, 801 F.3d at 366.
[234] *Bert Co. v. Turk*, 298 A.3d 44 (Pa. 2023).
[235] *Blount v. Stroud*, 395 Ill. App. 3d 8, 333 Ill. Dec. 854, 915 N.E. 2d 925 (2009).

*Inn Inc. v. Public Service Mut. Ins. Co.*[236] to conclude that attorney's fees awarded under Section 1988 should be considered part of the award of compensatory damages.

Despite *Blount's* reliance on *Willow Inn*, attorney's fees will not be counted as compensatory damages in the matter at hand. First, *Blount* also relied on Illinois caselaw that "has recognized that the amount of attorney fees expended in a case may be taken into account when assessing the propriety of a punitive damage award."[237] *Willow Inn* itself also relied extensively on inapposite Pennsylvania caselaw to reach its own outcome.[238] More critically, the Court has not located another case that reaches a similar conclusion to *Blount*. As recognized by the District of Delaware, *Willow Inn* does "not address damages in cases of intentional discrimination in employment."[239] Given the isolation of this decision, it is not persuasive enough to overcome the general assertion that attorney's fees do not "redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct."[240]

---

[236] *Willow Inn, Inc. v. Public Serv. Mut. Ins. Co.*, 399 F.3d 224, 231 (3d Cir. 2005).
[237] *Id.* at 943.
[238] *Willow Inn, Inc.*, 399 F.3d at 235.
[239] *Laymon v. Lobby House, Inc.*, 613 F. Supp. 2d 504, 515 (D. Del. 2009) (considering punitive damages under Title VII).
[240] *Brand Mktg. Grp. LLC*, 801 F.3d at 357 (internal citations omitted).

### b.    Size of the Compensatory Award

Defendant contends that the award of $500,000 in compensatory damages is substantial; I agree. Further, this award is at the upper end of the emotional damages awards discussed by the parties in this Circuit. In such instances, the Supreme Court has indicated that "a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."[241]

### c.    Emotional Distress Awards Contain a Punitive Element

Next, Defendant asserts that since the compensatory damages are based on Holmes' claim of emotional distress, the compensatory award already encompasses a degree of punishment. To make this argument, AHOM relies on dicta in *State Farm Mut. Auto. Ins. Co. v. Campbell* where the Supreme Court observed that "[t]he compensatory damages for the injury suffered … likely were based on a component which was duplicated in the punitive award."[242] "Much of the distress was caused by the outrage and humiliation the Campbells suffered at the actions of their insurer; and it is a major role of punitive damages to condemn such conduct."[243] "Compensatory damages, however, already contain this punitive

---

[241] *State Farm*, 538 U.S. at 425.
[242] *Id.* at 426.
[243] *Id.*

element."[244] To support that proposition, the Supreme Court relied on Section 908 of the Restatement (Second) of Torts, Comment C which states: "In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both."[245] This Court is not aware of any case in the Third Circuit that relies on this proposition to reduce an award of punitive damages.

Further, the jury is presumed to follow the instructions distinguishing between compensatory and punitive damages.[246] Compensatory damages were described to the jury as an award of damages that "is meant to put Patricia Holmes in the position she would have occupied if the discrimination had not occurred."[247] The jury was specifically admonished that an award of compensatory damages may not be "based on sympathy, speculation, or guesswork."[248] As to punitive damages, the jury was instructed that they "may award punitive damages to punish a defendant, or to deter the defendant and others like the defendant from committing such conduct in the future."[249] The jury was further instructed "to

---

[244] *Id.*

[245] *Id.*

[246] *E.g.*, *Weeks v. Angelone*, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000) ("A jury is presumed to follow its instructions.").

[247] Doc. 98 (Jury Instructions) at 25.

[248] *Id.* at 26.

[249] *Id.* at 28.

consider whether actual damages standing alone are sufficient to deter or prevent [AHOM] from again performing any wrongful acts that may have been performed."[250] Without any indication to the contrary, I conclude that the jury properly followed this Court's instructions.

### 3. Difference Between Punitive Damages and Comparable Civil Penalties

"This guidepost reflects a deference to legislative judgments concerning the appropriate sanctions for the conduct at issue … and provides notice of possible sanctions to potential violators."[251] Some courts in this Circuit have compared the amount of punitive damages in a Section 1981 to the corresponding statutory cap if the case had been brought under Title VII.[252] But a Title VII case under the relevant facts would cap punitive damages at $300,000. As AHOM correctly points out, the $20,000,000 awarded far exceeds the comparable punitive damages that would be imposed under Title VII. But, as other, out-of-Circuit courts have acknowledged, "Congress has not seen fit to impose any recover caps in cases under" Section 1981.[253] Consequently, I do not believe that this final guidepost strongly supports a reduction in the size of the award.

---

[250] *Id.* at 29.

[251] *Willow Inn,* 399 F.3d at 237.

[252] *E.g.*, *Williams v. Advanced Urgent Care*, Civil Action No. 14-6347, 2016 U.S. Dist. LEXIS 113730 (E.D. Pa. Aug. 25, 2016).

[253] *Swinton*, 270 F.3d at 820.

### 4.     The Punitive Damages Award Will Be Reduced to a Ratio of Two-to-One

Upon a review of the three factors, I conclude that the current award of punitive damages is unconstitutional. As only some of the subfactors concerning reprehensibility tilt in Plaintiff's favor and the award of compensatory damages in this case has been substantial, I conclude that a two-to-one ratio reaches the outer constitutional limits. Accordingly, I will reduce Plaintiff's award of punitive damages from $20 million to $1,000,000.

### F.     Motion for New Trial Due to Prejudice or Passion

AHOM also suggests that a new trial is necessary because the jury's $20.5 million verdict was the result of passion or prejudice. But the Third Circuit has rejected the suggestion that "the size of the award alone was enough to prove passion or prejudice."[254] Defendant's other arguments concerning this point are unconvincing.

First, AHOM claims that Holmes' use of images of the Ku Klux Klan and a Swastika improperly inflamed the passions of the jury. That is not so. Plaintiff had the right to make this exact argument in her closing as it goes directly to the issues in this case.

---

[254] *Dunn v. HOVIC*, 1 F.3d 1371, 1383 (3d Cir. 1993).

Next, Defendant claims that Holmes improperly accused the jury of being racist if they did not find for her.[255] I do not believe that Plaintiff's closing argument had that effect; even if it did, the jury was appropriately instructed to ensure that passion and bias did not color its verdict.[256]

Third, Defendant contends that Holmes improperly instructed the jury that a single instance of racial discrimination is sufficient to create a hostile work environment. Again, this ignores the fact that this Court properly instructed the jury on the relevant law. Further, that is a mischaracterization of what Plaintiff's attorney said; the full quotation reveals that he in fact claimed that "Courts have held – as a matter of fact, Justice Kavanaugh, who is on the Supreme Court, held in a case in 2013 that the single use of a racial slur in the office creates a hostile work environment."[257] This is not a directive that a single racial slur in this case is sufficient to find for Holmes. Selectively quoting Plaintiff's closing argument will not lead this Court to conclude the jury was improperly impassioned.

Finally, Defendant's takes issue with Holmes' comments on McCoy's and Moore's testimony. While it is true that AHOM's reaction to McCoy's testimony was irrelevant, Holmes' argument that McCoy lied on the stand is consistent with her presentation of evidence.[258] She was again entitled to argue to that effect. Nor

---

[255] Doc. 105 (Apr. 10, 2024 Trial Transcript) ¶¶ 44:20-23.
[256] Doc. 98 (Jury Instructions) at 35.
[257] Doc. 105 (Apr. 10, 2024 Trial Transcript) ¶¶ 47:20-23.
[258] *Id.* ¶¶ 50:1-12.

do I find the phrasing of her argument on this point sufficiently inflammatory to justify setting aside this verdict. Similarly, Holmes' comments about Moore would not inflame the jury to the point that a new trial is necessary.[259]

### G. Motion to Defer Consideration of Plaintiff's Request for Attorney's Fees

Finally, I must address Defendant's Motion to Defer Consideration of Plaintiff's Petition for Attorney's Fees and Costs. I first note that Plaintiff's contingency fee arrangement with her counsel has no impact on her ability to recover attorney's fees under 42 U.S.C. § 1988(b). The Supreme Court has stated that "Section 1988 itself does not interfere with the enforceability of a contingent-fee contract."[260] Instead, "statutory awards of fees can coexist with private fee arrangements."[261] That is because "it is the party, rather than the lawyer, who is so eligible" to seek attorney's fees under Section 1988.[262]

As Defendant repeatedly emphasized, judicial economy is an important consideration when ruling on this motion. However, I have determined that it is more expeditious to decide this issue before any appeals are taken. The contentious nature of the attorney's fees in this case makes it likely they will be appealed. Therefore, judicial economy is best served by allowing the Third Circuit to decide all the issues in one sitting. The Order accompanying this Memorandum Opinion

---

[259] *Id.* ¶¶ 50:13-21.
[260] *Venegas v. Mitchell*, 495 U.S. 82, 90, 110 S. Ct. 1679, 109 L. Ed. 2d 74 (1990).
[261] *Id.* at 88.
[262] *Id.* at 87.

will direct Plaintiff to supplement her filings in support of her Motion for Attorney's Fees. This supplement should adequately outline the additional hours her counsel spent litigating these post-trial motions. Upon receipt of the supplement and any objections from AHOM, the Court will then rule on the entirety of Plaintiff's Motion for Attorney's Fees.

**H.     Motion to Amend Judgment**

In accordance with this Court's Order approving the Stipulation to Correct Party Name, the Clerk of Court will be directed to change Defendant's name on the judgment to "American HomePatient, Inc."

## IV.    CONCLUSION

The Court has now resolved all pending motions, excluding Plaintiff's Motion for Attorney's Fees. Despite Defendant's best efforts, the jury's verdict in this case remains largely undisturbed. Only the constitutional constraints upon punitive damages compel me to alter the determinations reached by the jury.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge
